KEKER & VAN NEST LLP
JOHN W. KEKER, SBN 49092
Email: JKeker@kvn.com
ELLIOT R. PETERS, SBN 158708
Email: EPeters@kvn.com
MICHAEL D. CELIO, SBN 197998
Email: MCelio@kvn.com
710 Sansome Street
San Francisco, CA 94111-1704
Telephone: (415) 391-5400
Facsimile: (415) 397-7188

CALDWELL LESLIE & PROCTOR, PC
ANDREW ESBENSHADE, SBN 202301
Email: esbenshade@caldwell-leslie.com
BENJAMIN B. AU, SBN 237854
Email: au@caldwell-leslie.com
1000 Wilshire Boulevard, Suite 600
Los Angeles, CA 90017-2463
Telephone: (213) 629-9040
Facsimile: (213) 629-9022

O'MELVENY & MYERS LLP
SRI SRINIVASAN, SBN 205145
Email: ssrinivasan@omm.com
JONATHAN HACKER
(*pro hac vice*)
Email: jhacker@omm.com
1625 Eye Street, NW
Washington, DC 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

Attorneys for Defendant BRUCE KARATZ

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>BRUCE KARATZ,<br><br>Defendant. | Case No. CR No. 09-0203-ODW<br><br>**DEFENDANT BRUCE KARATZ'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF HIS MOTION FOR A NEW TRIAL PURSUANT TO FED. R. CRIM. P. 33**<br><br>Date: October 4, 2010<br>Time: 2:30 p.m.<br>Dept: 11<br>Judge: Hon. Otis D. Wright II<br><br>Trial Date: March 9, 2010 |

510370.01

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................... 1

II.   ARGUMENT ...................................................................... 2

    A.   Both the Hirst Report and Burr's Testimony About the Report Were Inadmissible Hearsay ...................................... 2

        1.   The government implicitly concedes that the theory of admissibility it urged on the Court was mistaken, and its new theories fare no better ........................... 2

        2.   The government's alternative, newly-minted theories for the Hirst Report's admission are meritless ...................................................................... 5

        3.   Burr's testimony was also inadmissible ...................... 6

    B.   Limits Placed On The Cross-Examination Of Daniel Lefler Deprived Karatz Of A Fair Trial ................................ 7

        1.   The proffered statements were not hearsay because they were not offered for their truth ........................... 7

        2.   The distortion of the record was not harmless ........... 8

    C.   Karatz Was Entitled To An Advice Of Counsel Instruction And To Call Bruce Mann As An Expert Witness ...................................................................... 11

        1.   Karatz was entitled to an advice of counsel instruction ...................................................... 11

        2.   Karatz was entitled to call Bruce Mann as an expert witness ...................................................... 13

    D.   The Introduction of Documents Outside the Presence of the Jury Was Error ................................................... 15

        1.   The introduction of exhibits 340 and 343 (among others) was erroneous and prejudicial ...................... 15

        2.   Permitting the government to introduce evidence without a witness on the stand violated Karatz's due process rights ...................................................... 18

        3.   If the government's exhibits were properly admitted, it was error to preclude Karatz's exhibit 2168 ...................................................... 20

    E.   The Jury Was Misinstructed on the Standard of Materiality as to Count 20 ............................................... 21

i

510370.01

# TABLE OF CONTENTS
### (cont'd)

**Page**

III.    CONCLUSION ................................................................................ 22

BRUCE KARATZ'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF HIS
MOTION FOR A NEW TRIAL PURSUANT TO FED. R. CRIM. P. 33
CASE NO. CR 09-203-ODW

510370.01

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Bisno v. United States*
299 F.2d 711 (9th Cir. 1961) ................................................................. 13

*Chapman v. California*
386 U.S. 18 (1967) ............................................................................... 20

*Kotteakos v. U.S.*
328 U.S. 750 (1946) ............................................................................. 19

*Reid Bros. Logging Co. v. Ketchikan Pulp Co.*
699 F.2d 1292 (9th Cir. 1983) ................................................................. 6

*Standard Oil Co. v. Moore*
251 F.2d 188 (9th Cir. 1957) ............................................................... 17

*United States v. Berger*
473 F.3d 1080 (9th Cir. 2007) ............................................................. 21

*United States v. Boulware*
558 F.3d 971 (9th Cir. 2009) ............................................................... 12

*United States v. Brodie*
858 F.2d 492 (9th Cir. 1988) ............................................................... 14

*United States v. Carrillo*
16 F.3d 1046 (9th Cir. 1994) ............................................................. 3, 4

*United States v. Duncan*
42 F.3d 97 (2d Cir. 1994) .................................................................... 14

*United States v. Gajo*
290 F.3d 922 (7th Cir. 2002) ................................................................. 8

*United States v. Ibarra-Alcarez*
830 F.2d 968 (9th Cir. 1987) ............................................................... 12

*United States v. Marino*
658 F.2d 1120 (6th Cir. 1981) ............................................................... 3

*United States v. Mitchell*
502 F.3d 931 (9th Cir. 2007) ................................................................. 8

*United States v. Nakai*
413 F.3d 1019 (9th Cir. 2005) ............................................................... 8

*United States v. Ordonez*
737 F.2d 793 (9th Cir. 1983) ................................................................. 4

*United States v. Ortega*
203 F.3d 675 (9th Cir. 2000) ................................................................. 8

*United States v. Ospina*
739 F.2d 448 (9th Cir. 1984) ....................................................... 3, 4, 5, 6

*United States v. Reyes*
577 F.3d 1069 (9th Cir. 2009) ............................................................. 11

iii

510370.01

1

**TABLE OF AUTHORITIES**
**(cont'd)**

2

**Page(s)**

3

*United States v. Scholl*
　166 F.3d 964 (9th Cir. 1999)................................................................14

4

*United States v. Thongsy*
　577 F.3d 1036 (9th Cir. 2009)..............................................................4

5

*Wigglesworth v. Oregon*
　49 F.3d 578 (9th Cir. 1995)................................................................19

6

*Williamson v. United States*
　512 U.S. 594 (1994)............................................................................8

7

8

**Federal Rules**

9

Fed. R. Evid. 702 ................................................................................14

Fed. R. Evid. 801 ..................................................................................3

10

Fed. R. Evid. 801(d)(2)(B) ...............................................................2, 4

11

Fed. R. Evid. 801(d)(2)(C) ...............................................................5, 6

12

Fed. R. Evid. 803(6) ...............................................................16, 17, 18

Fed. R. Evid. 806 ..................................................................................6

13

Fed. R. Evid. 902(11) .......................................................15, 16, 17, 18

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

iv

510370.01

# I.    INTRODUCTION

The government's strategy at trial was to urge the Court to permit it to present its side of the story to the jury but to prevent Bruce Karatz from doing the same.  For example, the government sought to introduce out-of-court statements made by KB Home General Counsel Ben Hirst in a written report, but chose not to call Hirst as a witness so he would not be subject to cross examination and be required to explain what had actually happened.  The government sought to introduce statements made by Mr. Karatz to Irell & Manella attorney Daniel Lefler, but sought successfully to prevent Mr. Karatz's counsel from eliciting from Lefler what Mr. Karatz actually said.  The government sought to introduce emails from KB Chief Financial Officer Domenico Cecere purporting to show Cecere was "alarmed" about the consequences of not disclosing KB's internal investigation, but chose not to call Mr. Cecere.  On each of these issues, the government pushed the Court to make rulings to facilitate its strategy of presenting only half of the story.  It is now clear that this strategy, and the rulings which permitted it to succeed, were erroneous.  A new trial is the appropriate remedy.

The most obvious example is the admission of the Hirst Report – easily the most significant document in this case on the four counts of conviction.  The admissibility of that report, in the absence of Mr. Hirst as a witness, was a hard fought issue from the beginning of the trial until the end.  The government prevailed in its argument to the Court that Mr. Karatz "adopted" the Report through his silence, and hence the Report came in as an adoptive admission.  The Court likewise admitted, on the same grounds, testimony of Ernst & Young partner Glenn Burr recounting Hirst's hearsay statements about his investigation of KB Home's option granting practices.  Those rulings were wrong and the government does not defend them.  Silence can only be construed as an adoptive admission in the face of an accusation of wrongdoing.  Rather than directly conceding that it led this Court to error with its "adoptive admission by silence" theory, the government

1

1   has now furiously backpedaled and come up with a new explanation for the

2   admissibility of the Hirst Report.  But its newly-minted rationale for admission of

3   this critical piece of evidence holds no water, as discussed more fully below.

4         While the government's abrupt change of course with respect to the Hirst

5   Report is truly a bombshell, its defense of the half-truths it urged the Court to

6   permit Daniel Lefler to testify to and the admission of the Cecere emails without

7   Cecere on the stand fare no better.  In the cold light of morning, the government's

8   one-sided document dump strategy and the restrictive questioning of Lefler each

9   deprived Karatz of a fair trial.  Moreover, the Court's *sua sponte* exclusion of

10  expert witness Bruce Mann and refusal to give an advice of counsel instruction

11  related to Mann's proffered testimony cannot be defended on this record.   These

12  errors were substantial factors leading to Karatz's conviction on four counts, and

13  he is entitled to a new trial.

## II.   ARGUMENT

**A.    Both the Hirst Report and Burr's Testimony About the Report Were Inadmissible Hearsay**

**1.    The government implicitly concedes that the theory of admissibility it urged on the Court was mistaken, and its new theories fare no better**

19        The government's decision not to call former General Counsel Ben Hirst as

20  a witness but to offer his report into evidence was a centerpiece of its trial strategy.

21  Now, for the first time, buried within the government's 45-page opposition brief is

22  an unspoken but remarkable concession:  the legal theory on which the Hirst

23  Report came into evidence—that Karatz adopted its contents by his silence—was

24  error.

25        The Hirst Report was admitted at trial on the express ground that it was an

26  adoptive admission under Fed. R. Evid. 801(d)(2)(B)[1]—the government claimed

27

28  ---

[1] The government's statement that Karatz "did not object at trial" to the Hirst Report's admission (Opp. 13:22) is an outright falsehood.  Karatz *repeatedly*

Karatz adopted the Report by silence, because he did not correct it after reviewing it. *See, e.g.*, Tr. 102:25-103:2 ("[H]e had about seven or eight times to review that report and actually correct it, and he didn't.  Adoptive admission.").  But Karatz showed in his opening brief that under Ninth Circuit law, a statement can be adopted by silence *only* if the statement is an accusation of wrongdoing, which the Hirst Report undisputedly was not.[2]  Mot. 11:2-13:26.  The government—recognizing that Karatz is correct—has now abandoned the adoption-by-silence theory, the theory it urged on this Court.[3]  This implicit concession could hardly be more material to the counts of conviction:  without the Hirst Report, the convictions cannot be sustained.

Having led the Court into error on the issue, the government now tries to salvage its case by claiming that the Hirst Report could still be admissible based on two Ninth Circuit drug cases holding that "when a person acts on written instructions, and the instructions are found in his possession, the instructions are admissible as adopted admissions under Rule 801."  *See United States v. Ospina*, 739 F.2d 448, 451 (9th Cir. 1984); *see also United States v. Carrillo*, 16 F.3d 1046, 1049 (9th Cir. 1994) (citation omitted) (defendant "acted on the information written on the cards when he travelled to the address written there to pick up the cocaine.").  These two cases (and the virtually identical out-of-circuit cases the

---

objected that the Hirst Report was hearsay absent Hirst's testimony.  *See, e.g.*, Tr. 99:8-101:2; 104:4-106:2; 340:9-343:17; 351:14-19; *see also* 1853:23-24 (renewing objection at time of introduction of evidence).

[2] The government somehow reads Karatz's argument to be that "adoptive admissions are limited solely to accusatory statements," thus ignoring "well-settled lines of precedent."  Opp. 14:20-22.  But as the government well knows, Karatz argued that the "*adoption-by-silence* rule is limited to accusatory statements," Mot. 12:4 (emphasis added), because adoption-by-silence was the theory upon which the government relied at trial.  Karatz can hardly be faulted for failing to anticipate that the government would abandon its own argument.

[3] Indeed, one of the cases the government itself cites states that "silence in the face of an *accusation* may constitute an admission to its truth."  Opp. 14:18-15:1 (quoting *United States v. Marino*, 658 F.2d 1120, 1125 (6th Cir. 1981)) (emphasis added).

3

1    government also cites) have no application here.[4]

2    Karatz did not even "possess" the Hirst Report in the way addressed by the

3    Ninth Circuit precedent on which the government relies.[5]   But more

4    fundamentally, possession by itself does not constitute adoption for purposes of

5    Rule 802(d)(2)(B) under those decisions.  *See United States v. Ordonez*, 737 F.2d

6    793, 800-01 (9th Cir. 1983).  Rather, for the Report to constitute an admission

7    under the government's cases, a defendant must "act[] on written instructions."

8    *Ospina*, 739 F.2d at 451; *Carrillo*, 16 F.3d at 1049.  A defendant must, for

9    example, follow written instructions to an address where drugs are located.

10   *Ospina*, 739 F.2d at 451. The government does not cite, and cannot cite, a single

11   case to the contrary.  But the Hirst Report was not akin to a set of instructions that

12   Karatz could have followed, and thereby adopt by his actions.

13   The government argues only that:  (i) Karatz "played a significant role in

14   creating the Hirst Report," and (ii) he "consistently manifested to KB's Board

15   members and other executives a belief in the report's truth."  Gov't Opp. (Opp.)

16   15:5-8.  Neither of these arguments remotely supports an adoptive-admission

17   theory.  First, to whatever extent Karatz allegedly played a role in creating the

18   Hirst Report, that role was necessarily played *before* the Hirst Report was created.

19   As a matter of both law and logic, Karatz could not adopt a statement that *had not*

20   *yet been made*.  And the government does not explain what it means when it says

21

22   ──────────────

[4] It is worth noting that in both *Ospina* and *Carillo* the author of the notes could
not be identified or called to sponsor the document.  Here, the government could
23   have called Hirst and his report would likely have come into evidence without
controversy.  In other words, the admissibility of the Hirst Report is only an issue
24   because the government's strategy made it an issue.

25   [5] The cases on which the government relies apply by their own terms where "the
instructions are found in [the defendant's] possession."  *Ospina*, 739 F.2d at 451.
26   There is no suggestion that the Hirst Report was "found in [Karatz's] possession."
To get around this problem, the government cites *United States v. Thongsy*, 577
27   F.3d 1036, 1040-41 (9th Cir. 2009), for the proposition that possession may be
actual or constructive.  Opp. 15:20-25.  *Thongsy* is a case about possession of a
*tangible thing* (a firearm).  The government cites nothing to support the proposition
28   that a defendant can adopt *a statement* merely by constructively "possessing" it.

──────────────
4

BRUCE KARATZ'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF HIS
MOTION FOR A NEW TRIAL PURSUANT TO FED. R. CRIM. P. 33
CASE NO. CR 09-203-ODW

1  that Karatz manifested to others a belief in the Report's truth, but the only thing it

2  *could* mean is that he was silent in the face of the Report's inaccuracies.  As Karatz

3  explained in his opening brief—and as the government does not contest—only an

4  accusatory statement can be adopted by silence.  The Hirst Report does not accuse

5  Karatz of anything.

6      In short, *Ospina* and *Carillo* have no bearing here.  The Hirst report never

7  should have come into evidence without Hirst on the stand, and the government

8  should have been forced to live with the consequences of its trial strategy.

9  **2.    The government's alternative, newly-minted theories for the Hirst**

10  **Report's admission are meritless**

11      The government argues that even if *Ospina* and *Carillo* do not save the day,

12  the Hirst Report could have been admitted in two other ways, neither of which

13  were argued at trial.  Both new arguments are wrong.

14      First, the government half-heartedly argues that at least "those portions that

15  were not offered for their truth," but "for the proper purpose of showing that [the

16  Report's false statements] provid[ed] notice to the defendant and evidenc[ed] his

17  fraudulent state of mind" could have been admitted as non-hearsay.  Opp. 16:17-

18  17:10.  But the *entire* Report was introduced for its truth.  Indeed, the government

19  *expressly* asked the jury to consider the Report for its truth: "Mr. Ray and Mr.

20  Karatz told Mr. Hirst absolutely, emphatically there was no backdating.  They lied

21  to Mr. Hirst."  Tr. 4485:14-16 (government summation).

22      Second, the government now argues that the Report could have been

23  admitted as an authorized statement under Rule 801(d)(2)(C).[6]  But the evidence

24  supports the conclusion that *KB Home*—not Karatz—authorized Hirst to create and

---

[6] The government states in a footnote that it pressed this theory when it argued that "the defendant actually gave the information for the report," "even though it did not invoke FRE 801(d)(2)(C) by name."  Opp. 18:20-21, 18:24-25.  Not so.  The government did not argue that Karatz authorized its use, as required for admission under an authorized-statement theory.  Nor does (or could) the government argue that the Hirst Report was actually admitted under this theory.

5

BRUCE KARATZ'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF HIS
MOTION FOR A NEW TRIAL PURSUANT TO FED. R. CRIM. P. 33
CASE NO. CR 09-203-ODW

present his Report.  Indeed, the very authority the government cites, *Reid Bros.*
*Logging Co. v. Ketchikan Pulp Co.*, 699 F.2d 1292 (9th Cir. 1983), makes clear
that a statement prepared at the behest of the corporation's chairman and presented
to the Board was an authorized statement of *the corporation*.  *Id.* at 1306-07.  What
is more, if the Report had been admitted under Rule 801(d)(2)(C), Karatz would
have been expressly entitled by Rule 806 to introduce evidence to impeach Hirst,
and would have had the right to call Hirst as a witness for cross-examination—
precisely what the government sought to prevent all along.

### 3.    Burr's testimony was also inadmissible

Even if the Hirst Report were admissible, Glenn Burr's testimony recounting
Hirst's presentation of his findings to KB Home's Audit Committee plainly was
not.   Burr's testimony—he testified about what Hirst said that Karatz had said—
was also crucial to the government's case.  Indeed, the government relied upon
Burr's testimony in its summation (Tr. 4514:3-9).  Again changing its theory of
admissibility,[7] the government now argues that the Burr testimony "was admissible
as an adoptive admission . . . for the same reasons set forth above."  But the *Ospina*
and *Carillo* cases provide no support for the admission of Burr's testimony.  An
oral statement cannot be "possessed"—the concept makes no sense.   And in any
event, the statements at the meeting were not instructions but conclusions.  The
government is left to argue that Karatz's supposed silence at that meeting is
meaningful.  Opp. 19:8-15.  But as explained in Karatz's opening brief—and as
the government now concedes—adoption-by-silence is not a proper basis for the
admission of these statements.

Even if the Hirst Report were admissible—which it was not—a new trial is

---

[7] As with the Hirst Report, the government replied on an adoption-by-silence
rationale in arguing for the Burr testimony's admission.  Tr. 3120:23-3121:9 ("the
chief legal officer got up, said he talked to Mr. Karatz … and he said there was no
backdating … And Mr. Karatz doesn't contradict any of that…. It's an admission.
THE COURT:  Okay.  It is.  It's an adoptive admission.")

6

BRUCE KARATZ'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF HIS
MOTION FOR A NEW TRIAL PURSUANT TO FED. R. CRIM. P. 33
CASE NO. CR 09-203-ODW

510370.01

1   required, as Burr's testimony was every bit as prejudicial as the Hirst Report.

2   Unlike the Hirst Report—which does not link any particular member of

3   management to any particular statement—Burr testified that Hirst told the Audit

4   Committee specifically that *Karatz* had told him that he understood there would be

5   accounting consequences if hindsight pricing or backdating had occurred, but that

6   there was no backdating or hindsight pricing at KB Home.  Tr. 3157:14-22.  The

7   fact that the government pointed this out in its summation demonstrates the severe

8   prejudice Karatz suffered through admission of this hearsay.[8]

9   **B.  Limits Placed On The Cross-Examination Of Daniel Lefler Deprived**
    **Karatz Of A Fair Trial**

10

11  As explained in Karatz's opening brief, the government elicited through

12  Daniel Lefler numerous incomplete or inaccurate statements that Karatz

13  purportedly made during an October 2006 interview.  Karatz attempted on cross-

14  examination to elicit related portions of Karatz's statements to Lefler, for the

15  purpose of contextualizing his testimony on direct, and to show the jury what

16  Karatz actually said.  The Court precluded that line of cross-examination, on the

17  ground that any statements not introduced by the government as admissions of a

18  party-opponent are inadmissible hearsay.

19  The Court's rulings were both erroneous and prejudicial.  They were

20  erroneous because Karatz's statements were not proffered for their truth; and they

21  were prejudicial because the jury was left with a grossly incomplete view of what

22  Karatz told Lefler.  Mot. 2-9.  The government's contrary arguments are meritless.

23  **1.  The proffered statements were not hearsay because they were not**
    **offered for their truth**

24

25  The government begins by arguing that *any* purportedly "self-exculpatory"

26  _____

27  [8] The government's use of Burr's testimony in its summation also demonstrates
    that the government asked the jury to take Hirst's out-of-court statements
    recounted through Burr—what Karatz had told Hirst—for the truth of the matter
28  asserted, and not (as the government argues in a footnote) "to establish notice to
    and knowledge of a defendant." (Opp. 19:27-28).

statement made by Karatz is inadmissible hearsay.  Gov't Opp. (Opp.) 5-6.  The government is wrong.  An out-of-court statement is inadmissible hearsay only when *offered for the truth*.  The statements Karatz sought to admit were *not* being admitted for their truth, but rather to clarify and contextualize *other* statements elicited by the government.  "It is well settled that … statements are not hearsay to the extent they are offered for context and not for the truth of the matter asserted." *United States v. Gajo*, 290 F.3d 922, 930 (7th Cir. 2002); *see United States v. Mitchell*, 502 F.3d 931, 965 (9th Cir. 2007) (defendant may elicit statements through cross-examination when the "inculpatory statements elicited on direct examination … [are] taken out of context or otherwise distorted"); *United States v. Nakai*, 413 F.3d 1019, 1022-23 (9th Cir. 2005) (citation omitted) (defendant's statements are admissible when "necessary to place the admitted statement in context").

Accordingly, the government's reliance on *Williamson v. United States*, 512 U.S. 594 (1994), and *United States v. Ortega*, 203 F.3d 675 (9th Cir. 2000), is entirely misplaced.  Those cases concerned whether statements *offered for their truth* were nonetheless admissible.  *See Williamson,* 512 U.S. at 598-602; *Ortega* 203 F.3d at 682.  Indeed, Ninth Circuit precedent is clear that a defendant may elicit statements through cross-examination when the "inculpatory statements elicited on direct examination … [are] taken out of context or otherwise distorted." *Mitchell*, 502 F.3d at 965; *see also Nakai*, 413 F.3d at 1022-23 (defendant's statements are admissible when "necessary to place the admitted statement in context").

### 2.    The distortion of the record was not harmless

The government also argues that even if Karatz's <u>excluded</u> statements were not hearsay, their exclusion was of no legal significance because the jury was not misled.  Opp. 6-11.  But the government's claim cannot bear scrutiny.  Three examples should suffice to make this clear.

1    *First*, Lefler testified that, contrary to the Hirst Report, Karatz told him he

2    "did not think there was" a "link between the allocation process [for options] and

3    the manner in which the grant date for the stock options were selected."  Tr.

4    3295:18-22.  But Lefler's memorandum of the interview reported that "Mr. Karatz

5    acknowledged that *today* he would agree that the statement [i.e., that there was a

6    link between the allocation process and selection of the grant date] was inaccurate,

7    but *when he read it originally it did not raise any flags*, especially since he did not

8    then know what Mr. Ray was or was not doing before the call to Mr. Karatz."

9    Celio Decl., Exh. B at 42 (emphasis added).

10    In other words, what Karatz actually said was that *at the relevant time*,

11    Karatz *did not realize* the Hirst Report was inaccurate.  The statement the jury

12    heard from the government's direct examination of Lefler was that Karatz had

13    admitted knowing *all along* that the Hirst Report was inaccurate.  Karatz should

14    have been permitted to clarify this important point.

15    *Second*, Lefler testified on direct that Karatz did not correct the Hirst Report

16    because "he didn't read the report that carefully after the Conclusion section, and

17    didn't really notice the inconsistency and, therefore, correct it", Tr. 3301:12-23, a

18    statement which the government characterizes as not a "credible reason."  Opp.

19    12:12.  But Karatz simply *did not say* that he "didn't read the report carefully" and

20    "didn't really notice the inconsistency."  Rather, Lefler's memo stated that "At the

21    time [he read the Hirst Report], Mr. Karatz had very little concern about the

22    Company's stock option practices, and he was confident that Mr. Hirst was

23    managing whatever technical problems existed, so Mr. Karatz did not focus on the

24    sentence."  Celio Decl., Exh. B (Irell Memo) at 42.  Thus, Lefler's testimony about

25    Karatz's statement was inconsistent with his own memo summarizing the

26    interview – but the defense was not permitted to demonstrate that.

27    The government claims that this makes no difference because what Karatz

28    was discussing was "why he had not disclosed his practice for pricing of options in

9

the *post-SOX* period, not the *pre-SOX* period, for which his defense was that he had 'no memory' of the pricing practice." Opp. 9. Even if that pettifogging distinction had merit—and it does not—it misses the point. Lefler testified that Karatz said something he did not say. Karatz simply tried to correct a misstated (and particularly important) fact for the jury, and was not allowed to do so.

*Third*, the jury was also misled when Lefler testified on direct that Karatz "acknowledged that [the Audit Committee] would have wanted to know" that he did not have a clear memory of the grant process. Tr. 3302:6. The implication of Lefler's testimony was that Karatz had admitted that he should have told the Audit Committee more than he did. But Lefler's memo reflects something very different. *At the time of the October interview* (and after months of investigation and corporate distraction), Karatz indeed recognized that the Board and Audit Committee would have wanted to know he did not remember exactly how options were granted. (Irell Memo at 42.) But Lefler's memo also states that when Karatz read the Hirst Report *months earlier* "it simply did not register that backdating or hindsight was involved." *Id.* Thus, the jury was left with the false impression that Karatz had admitted to conscious wrongdoing in June—essentially, the charged offense—when in fact Karatz said the opposite.

The government responds by arguing that Karatz was able to get this point across to the jury by eliciting from Lefler Karatz's statement that "he interpreted Mr. Hirst's report as essentially telling him that hindsight or backdating was not possible in the post-SOX period." Opp. 11 (quoting Tr. 3327:16-18). But that point is wholly separate from Karatz's purported "acknowledg[ment]" that the Audit Committee would have wanted to know that Karatz did not remember the grant process, when in fact Karatz explained why *at the relevant time* he did not believe there was anything to tell them.

Further, even if Karatz's inability to cross-examine Lefler on this point did not prejudice him, the government's misrepresentation of the record in summation

certainly did.  The government used this statement in summation to argue that Karatz "provide[d] no explanation for why he didn't tell the chair of the Audit Committee when he was reviewing the Hirst report that he didn't remember."  Tr. 4517:15-19.  Karatz's complete statement (as recorded in Lefler's memo) was virtually the *exact opposite* of the government's representation during summation. Rather than failing to explain to Lefler why he did not tell the Audit Committee that he did not remember the grant process, Karatz actually gave Lefler a very specific explanation: at the time, Karatz simply did not recognize there was any inaccuracy to correct.  The government thus "asserted as fact a proposition [it] knew was contradicted by evidence not presented to the jury."  *United States v. Reyes*, 577 F.3d 1069, 1076 (9th Cir. 2009).

In sum, Karatz was precluded from correcting direct testimony that misrepresented and misconstrued his actual statements, and the government compounded the prejudice by arguing in summation what it knew to be false.

**C.    Karatz Was Entitled To An Advice Of Counsel Instruction And To Call Bruce Mann As An Expert Witness**

As set forth in Karatz's opening brief, the government also led the Court into error when it opposed Karatz's efforts to mount an advice of counsel defense.   At the government's urging the court declined to instruct the jury on that theory and, on its own motion, fully excluded expert Bruce Mann, who would have helped the jury understand how an executive reconciles conflicting advice from his lawyers. Nothing in the government's opposition can support either ruling.

**1.    Karatz was entitled to an advice of counsel instruction**

The government does not dispute that Hirst gave Karatz the following legal advice during the critical period in mid-2006:

- that "backdating" could not occur in the post-Sarbanes-Oxley (SOX) period; (Celio Decl., Exh. C (Trial Exh. 273) at 3);

- that KB Home should file its 10-Q without any disclosure of an

11

BRUCE KARATZ'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF HIS MOTION FOR A NEW TRIAL PURSUANT TO FED. R. CRIM. P. 33 CASE NO. CR 09-203-ODW

1             internal investigation contrary to the advice of government witness

2             Charlie Carroll; (Celio Decl., Exh. D (Trial Exh. 350))

3      •    that—even if critics of his internal report were correct and KB

4             Home's history of backdating was more extensive than the Hirst

5             Report indicated—this was "a technical problem (albeit a complex

6             one), not a misconduct or manipulation problem."  Celio Decl., Exh. E

7             (Trial Exh. 328).

8      •    Exhibit 2168 (discussed more fully in Section C, below) a document

9             signed by KB's chief financial officer, states that Hirst told Karatz

10            (among others) there was "absolutely no issue with Q filing" despite

11            Carroll's concerns.  Celio Decl., Exh. J (Trial Exh. 2168).

12 Rather than contesting that Hirst gave Karatz this advice—which it cannot in good

13 faith do—the government argues that no advice of counsel instruction was required

14 because the evidence could be read differently.  The government claims that based

15 on *its* view of the evidence, Karatz informed Hirst falsely that options were not

16 granted with hindsight, and that pre-SOX grant dates were linked to the allocation

17 process.  Opp. 23:2-5.

18       The parties have dramatically different views of the evidence on this point,

19 but that disagreement *is utterly irrelevant to jury instruction issues*.  To be entitled

20 to an advice of counsel instruction, the "defendant needs to show only that there is

21 evidence upon which the jury could rationally sustain the defense," *United States*

22 *v. Boulware*, 558 F.3d 971, 974 (9th Cir. 2009) (internal quotation and citation

23 omitted), and the Court *must* give the instruction "even if the evidence presented

24 by the defense was 'fragile, weak[,] insufficient, inconsistent or of doubtful

25 credibility,'" *United States v. Ibarra-Alcarez*, 830 F.2d 968, 975 (9th Cir. 1987).

26 Karatz was plainly entitled to an advice of counsel instruction under that lenient

27 standard.

28       As a fallback, the government argues that even if an advice of counsel

1   instruction was required, the failure to give one was harmless because the jury was

2   given a good faith instruction, and advice of counsel is "merely 'a circumstance

3   indicating good faith.'"  Opp. 26:13-14 (quoting *Bisno v. United States*, 299 F.2d

4   711, 719 (9th Cir. 1961)).  The government's argument makes no sense.  If a

5   generic good faith instruction sufficed, an advice of counsel instruction would

6   never be required.  Ninth Circuit law clearly holds that a defendant is entitled as a

7   matter of law to an *advice of counsel instruction* when its predicates are met, not

8   "merely" a good faith instruction.  Mot. 14-15.  That is because an advice of

9   counsel instruction is *different from* a good faith instruction, and in fact explains a

10  specific point about good faith that is likely to be outside a lay juror's lay

11  knowledge, *viz.*, reliance on an attorney's advice is especially compelling evidence

12  that the defendant acted in good faith.  That is particularly true here, given the

13  complex relationship between a company's CEO and its legal staff.  That renders

14  non-harmless the failure to give an advice of counsel instruction.  It also

15  demonstrates why defendant was entitled to call Bruce Mann as an expert, as

16  explained directly below.[9]

17  ## 2.   Karatz was entitled to call Bruce Mann as an expert witness

18  Karatz sought to call Mann as an expert witness in part to explain to the jury

19  that it was normal practice for a corporate CEO to rely on the advice of his general

20  counsel over that of a more junior lawyer, a corporate governance issue that the

---

[9] The government also states that Karatz "mis-characterizes the record" in arguing that "the Court did not give an advice of counsel instruction because Karatz 'elected not to testify.'"  Opp. 25:13-15 (quoting Mot. 16).  The Court stated that the "criteria" for an advice of counsel instruction cannot "be met as long as the defendant is exercising his Fifth Amendment privileges, his rights" (Tr. 3678:19-20), and that "we need someone to stand there and go, 'Yeah, I asked her, we had a discussion, I made sure that she was fully abreast of all the facts.  We talked about it, she gave me advice'" (Tr. 4138:10-12).  The Court further explained that it "it is not for a lowly trial court to decide … whether or not it's even fair that someone should be forced to give up a constitutional right in order to assert something that I believe would be a complete defense, that is, justifiable reliance on the advice of counsel," and that the Court "just want to make sure that you guys have a record to take to Pasadena."  Tr. 4138:4-9, 4138:14-15.  Karatz's characterization of the record is accurate.

510370.01

1   Court itself acknowledged was "beyond the understanding of the lay juror."  Tr.

2   3887:13-14.  Thus, Mann's testimony would have "assist[ed] the trier of fact to

3   understand the evidence or to determine a fact in issue," Fed. R. Evid. 702, and it

4   would have "shed light on activities not within the common knowledge of the

5   average juror," *United States v. Duncan*, 42 F.3d 97, 102 n.3 (2d Cir. 1994).  Mann

6   should have been allowed to testify.

7        The government objects on the ground that there was no evidence that

8   Karatz's own conduct comported with the general custom of a corporate CEO, and

9   that Mann's testimony thus would not have been relevant to Karatz's state of mind.

10  Opp. 27-30.  The objection is meritless.  There was uncontroverted record evidence

11  that Karatz followed the path urged by Hirst (and not the path urged by Carroll).  It

12  was the government that made an issue of Karatz's decision not to follow Carroll's

13  advice, in part by choosing to call Carroll and not Hirst, and Mann would simply

14  have made clear to the jury that there was nothing unusual about a CEO following

15  the advice of his general counsel rather than that of a more junior lawyer.  The

16  government thus errs in asserting that Mann's testimony would have been "based

17  on conjecture inconsistent with actual evidence presented to the jury," and thus

18  "would not be helpful to the trier of fact."  Opp. 29:3-6.[10]  Without Mann, lay

19  jurors would not necessarily know how corporate management and internal legal

20  counsel work, and thus could have been more willing than they should have been

21  _____

22  [10] The government is, for the same reason, wrong to rely on *United States v. Brodie*, 858 F.2d 492 (9th Cir. 1988) *overruled by United States v. Morales,* 108

23  F.3d 1031 (9th Cir. 1997), and *United States v. Scholl*, 166 F.3d 964 (9th Cir. 1999).  In *Brodie*, the expert's opinion that defendants "did not have taxable

24  income" "was not relevant to the central issue in this case, [defendants'] failure to file returns."  858 F.2d at 496.  Here, the relationship between a general counsel

25  and his subordinate—and the relative weight CEOs normally give their respective opinions—was directly relevant to whether Karatz acted in bad faith by failing to

26  follow Carroll's advice, and following Hirst's instead.  In *Scholl*, the expert's proffered testimony concerned "the reasonableness of [defendant's] belief that he

27  could net out wins and losses," which "calls for a legal conclusion" and thus "is inappropriate matter for expert testimony."  166 F.3d at 973.  Mann's proffered

28  testimony did not call for a legal conclusion, but rather a factual explanation of complex corporate governance issues outside the knowledge of a lay jury.

to draw adverse inferences from Karatz's decision to follow Hirst's advice rather than Carroll's, just as the government urged jurors to do.  Mann's testimony would have allowed the jury to consider the facts in a more realistic light, and it was error to exclude it.

The government also argues that excluding Mann's testimony was in any event harmless because the points about which Mann would have testified were brought out through other witnesses.  But there was *no* testimony from anyone else concerning the relationship between a CEO, a general counsel, and more junior lawyers in a corporation—the most important testimony Mann would have offered.  Exclusion of Mann's testimony was therefore not harmless.

**D.    The Introduction of Documents Outside the Presence of the Jury Was Error**

As Karatz's opening brief explained, the government also led the court into error when it introduced scores of documents at the close of its case without a witness on the stand and outside the presence of the jury.  As the Court will recall, the government asked KB Home to certify hundreds of documents as "business records" pursuant to Rule 902(11) and delivered to the Court numerous boxes of documents that it sought to introduce without a witness on the stand.   Karatz objected, but the government persuaded the Court to permit it to introduce dozens of highly prejudicial documents in this manner—documents featured prominently in the government's closing argument—while simultaneously excluding a key defense exhibit.   This procedure was error under Ninth Circuit law and deprived Karatz of a fair trial.

**1.    The introduction of exhibits 340 and 343 (among others) was erroneous and prejudicial**

Karatz's fears that the government's "document dump" would lead to mischief proved well founded when the government made two of those documents key elements in its closing argument: emails forwarded from Chief Financial

Officer Dom Cecere to Karatz with the words "FYI."  Each email had been received from Chief Accounting Officer Bill Hollinger, who in turn was forwarding message Hollinger had received from attorney Charlie Carroll.[11]  *See* Celio Decl., Exhs. F and G (Trial Exhs. 340 and 343 respectively).  Those emails were not self-authenticating business records, and they should not have been admitted – nor should the government have been allowed to use them to claim they demonstrated what Karatz's state of mind was.

The government's opposition highlights precisely why these documents never should have been received.  These emails could only have been admitted if they qualified as business records under Rule 803(6), *see* Fed. R. Evid. 902(11).  They do not come close.  As Karatz's opening brief demonstrated, the exhibits do not fall into any of the categories of documents that David Simons' Rule 902(11) declaration certified were required to be kept by KB Home.  In response, the government argues that KB Home was required to keep accurate books and records to comply with federal securities laws, and Carroll's emails were intended to ensure that the company was complying with those laws.  Opp. 35:23-28.  That may be, but the government nowhere explains why KB Home was required to maintain accurate records of other emails forwarding Carroll's emails with simple "FYI" notations.  Such forwards of emails plainly are not covered by Simons' declaration, Mot. 25:2-15, and the government makes no attempt to show otherwise.[12]

---

[11] The email from Carroll himself was properly admitted through Carroll on the stand, but Carroll never sent the email to Karatz.  It is the subsequent forwarding of the email to Karatz—the only link between Karatz and the particular advice from Carroll reflected in the email—that is the issue here.

[12] Exhibit 405, too, was improperly designated a business record, and thus was improperly authenticated and inadmissible.  It is a letter from Ben Hirst to Ernst & Young stating that the Hirst Report were created in anticipation of litigation and are therefore privileged.  Celio Decl., Exh. I. (Trial Exh. 405) at 2.  The government argues that this statement does not apply to Exhibit 405 itself because that document was not provided "in connection with KB Home's review of stock option grants."  *Id.*  But the government does not explain why that is so.  Indeed, the letter itself is marked "Confidential" in the bottom margins, consistent with its

16

BRUCE KARATZ'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF HIS
MOTION FOR A NEW TRIAL PURSUANT TO FED. R. CRIM. P. 33
CASE NO. CR 09-203-ODW

510370.01

1    Recognizing that the Rule 902(11) declaration provides slim support for the

2    admission of these documents, the government buttresses its argument by asserting

3    "Hollinger and Cecere forwarded the emails to defendant because of the serious

4    advice that Carroll was conveying," and "Cecere recognized the importance of the

5    emails and he forwarded them to defendant because he recognized the need to

6    apprise defendant of the deputy general counsel's concerns."  Opp. 35:13-19.  In

7    support of that argument the government cites…nothing.   Nor could it possibly

8    cite any evidence in support of that argument because neither Cecere nor Hollinger

9    testified.  The government is engaged in speculation.  While it is *possible* that

10   Cecere and Hollinger forwarded them because Carroll's advice was "serious," it is

11   at least equally possible they forwarded them to further demonstrate that Carroll is

12   an overly zealous troublemaker, as Hollinger famously and not-so-politely advised

13   in a contemporaneous meeting.[13]  We simply do not know why the email was

14   forwarded – and the record does not say.[14]

15        Remarkably, the government also argues that Karatz has waived any

16   objection to the authentication of government exhibits pursuant to Rule 902(11)

17   because Karatz himself used that process.  Opp. 31:11-15, 31:26-28.  That

18   argument is inexplicable.  The government well knows that Karatz employed the

_____

treatment as a privileged document.  *Id.*

[13] Indeed, even if the government's speculation had some evidentiary basis, it would simply demonstrate that the emails are *not* business records, which is the basis on which they were admitted.  Urgent messages about a special problem are not a "regularly conducted activity" such as maintenance of monthly invoices or daily employee hours reports.

[14] The government contends that these documents were business records because *Carroll's original emails* were drafted in the ordinary course of business.  Opp. 33-35.  The government misunderstands Karatz's argument.  Karatz is not challenging the admission of the emails that Carroll himself wrote—which were admitted separately through Carroll.  Rather, as Karatz explained in his opening brief (at 24-25), Exhibits 340 and 343 fail to qualify as business records because of Hollinger's and Cecere's "FYI" notes—such "FYI" forwards cannot be said to have been "kept in the course of a regularly conducted business activity."  Fed. R. Evid. 803(6).  Instead, they are communications "casual and informal in nature" and are "apparently written as a result of the exercise of individual judgment and discretion."  *Standard Oil Co. v. Moore*, 251 F.2d 188, 215 (9th Cir. 1957).

17

process *only* because the government had been allowed to do so, and even reiterated his objection while doing so:

> Your Honor, we objected to the entire procedure of the 902[(]11[)] issue and raised these kinds of arguments. And in the face of those arguments, the Government has been able to put in an enormous amount of hearsay … that's never been explained to the jury, … So learning the rules in this court and accepting Your Honor's ruling, we went out and did the same thing so that—so that documents that we think are useful can come in in the same way.

Tr. 3866:24-3867:10 (statement of Karatz's counsel). The government's claim that this constitutes a waiver cannot be taken seriously.[15]

Finally, the government claims that in any event the admission of Exhibits 340 and 343 was harmless error—but the government's own conduct belies that claim. The government explicitly referenced Exhibit 340 and 343 in its summation as bolstering Carroll's testimony. Tr. 4507:24-4508:20. The government used these documents to argue that Karatz ignored Carroll's advice about the filing of KB's form 10-Q—one of the counts of conviction—and these two documents were the only documents that supported that argument. Their admission was anything but harmless.

## 2. Permitting the government to introduce evidence without a witness on the stand violated Karatz's due process rights

More fundamentally, the process of admitting into evidence documents without any supporting witness violated Karatz's due process rights. He was denied any opportunity to challenge the documents or to cross examine their authors. In order to challenge these documents, he would have been required to

---

[15] The government also argues that Karatz has waived any challenge to the authentication of the documents whose admission he challenges, because he only challenged whether they were business records, and not whether they are authentic. Opp. 31:15-32:5. But an argument that a document purportedly authenticated under Rule 902(11) is not a business record *necessarily is* an argument that the document was not properly authenticated, because documents are self-authenticating under Rule 902(11) *only* when they "would be admissible [as business records] under Rule 803(6)." Fed. R. Evid. 902(11). In other words, if the documents were not business records, then they were not properly authenticated.

call Cecere to the stand himself to determine why he forwarded Carroll's messages.   But the Ninth Circuit has made clear that Karatz may not be put to that choice, as it unconstitutionally shifts to the defendant the burden of putting on a defense.  *See Wigglesworth v. Oregon*, 49 F.3d 578 (9th Cir. 1995).  Such a procedure "places the defendant in a 'Catch-22' situation—call the [witness] who prepared the [relevant document] during the defendant's own case, and possibly bolster the prosecution's case, or forego examination of the [witness] and perhaps lose an opportunity to expose a defect in the [document's] authenticity."  *Id.* at 581.   The government needed to put a competent witness on the stand to have these documents admitted.

The government attempts to distinguish *Wigglesworth* on three grounds, none of which is persuasive.  First, the government argues that *Wigglesworth* involved "testimonial" evidence that was introduced to prove an essential element of the crime and that "had to be accepted" in the prosecution's case in chief, thus depriving the defendant of the ability to cross-examine it.  But *Wigglesworth* itself made clear that its analysis did not turn on whether the relevant evidence was testimonial or whether it fell under an established hearsay exception.  *See* 49 F.2d at 581.

Second, the government argues that the lab report in *Wigglesworth* was prepared for purposes of that litigation, while the documents introduced in Karatz's case predated the prosecution.  Opp. 40:14-19.  That may be a distinction, but the government does not even attempt to explain what difference it might make.  Nothing in *Wigglesworth* suggests the relevance of any such distinction.

Third, the government argues that, unlike in *Wigglesworth*, the documents introduced in Karatz's trial did not serve as the only evidence to prove an element of the charged offense, and that the evidence was sufficient without those documents to convict Karatz.  Opp. 40:20-41:6.  But sufficiency of the evidence is *not* the pertinent standard.  *See Kotteakos v. U.S.*, 328 U.S. 750, 767 (1946)

19

510370.01

BRUCE KARATZ'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF HIS
MOTION FOR A NEW TRIAL PURSUANT TO FED. R. CRIM. P. 33
CASE NO. CR 09-203-ODW

1    (government cannot prove error harmless merely by showing that evidence "would

2    be sufficient to sustain his conviction" absent the error).  Rather, the government

3    must show beyond a reasonable doubt that a rational jury could not have acquitted

4    Karatz even absent the documents introduced at the close of the government's

5    case.  *See Chapman v. California*, 386 U.S. 18, 24 (1967) ("the burden [is] on the

6    beneficiary of the error either to prove that there was no injury or to suffer a

7    reversal of his erroneously obtained judgment…[B]efore a federal constitutional

8    error can be held harmless, the court must be able to declare a belief that it was

9    harmless beyond a reasonable doubt.").  The government has not even attempted to

10   make that showing.

### 3.    If the government's exhibits were properly admitted, it was error to preclude Karatz's exhibit 2168

To the extent the Court's process of introducing evidence in the above-described manner was proper, the Court should have admitted Defense Exhibit 2168.  As Karatz explained in his opening brief, Exhibit 2168 was a printout of the exact same email from Charlie Carroll the government introduced as Exhibit 343, with notes that Dom Cecere had taken concerning a June 30 meeting of several KB Home senior executives, including Karatz.  Cecere's notes state that Hollinger had asked Hirst whether it was permissible to file the 10-Q despite Carroll's concerns, to which Hirst replied, in front of Karatz, that there was "absolutely no issue with Q filing."  Celio Decl., Exh. J (Trial Exh. 2168).

The government responds that the Court "identified a number of valid concerns regarding the admissibility of the document."  Opp. 43:1-2.  The government does not say which of the Court's concerns it means to reference, but as Karatz has explained, the Court's concerns were misplaced.  Mot. 27:22-28:8.  The government's vague wave of the hand towards some unspecified "concern" isn't even an argument; it is certainly not a basis on which to exclude a crucial defense exhibit.

20

510370.01

1   The government spends more energy arguing that Karatz was not prejudiced

2   by the exclusion of Exhibit 2168 because another email—sent a week later—was

3   introduced in which Hirst recommended filing the 10-Q without disclosing the

4   internal investigation.  But it is the fact that Karatz had been given this same

5   advice days earlier that, in the Court's own words, goes "to a core issue of the

6   case."  Tr. 3864:2.  It demonstrates that Karatz's rejection of Carroll's advice was

7   made on the advice of his general counsel.

8   If the Court's rule was good enough for the government's goose, it was good

9   enough for Karatz's gander. Exhibit 2168 should have been admitted.  Indeed, the

10   irreconcilable inconsistency between the Court's ruling on government Exhibits

11   340 and 343 on the one hand, and its ruling on Defense Exhibit 2168 on the other,

12   demonstrates exactly why this entire procedure was such a critical error.  The

13   Court was placed in the position of evaluating evidence divorced from all context;

14   the government forced the Court to rule on the admissibility of these documents

15   without any understanding of their role in the case.  The inconsistent rulings that

16   resulted prejudiced Karatz and rendered his trial unfair.  A new trial is required.

17   **E.   The Jury Was Misinstructed on the Standard of Materiality as to Count**

18   **20**

19   The jury should have been instructed that materiality as to Count 20 (false

20   statements to auditors) must be considered from the point of view of the reasonable

21   *investor*, and not that of a reasonable auditor, under controlling Ninth Circuit

22   precedent.  *See United States v. Berger*, 473 F.3d 1080, 1098 (9th Cir. 2007); Mot.

23   28:15-29:17.  The government's first argument is that the materiality standard that

24   an accountant uses is the same as the standard that Karatz urges, because the

25   accountant should consider questions of materiality from the point of view of

26   investors.  Opp. 44:1-10.  That argument is obviously wrong, because even if an

27   investor might find a fact immaterial, an accountant must consider and analyze that

28   fact to determine whether it would be material from an investor's viewpoint.

21

1   The government also argues in effect that any error would be harmless,

2   because the jury convicted Karatz on Count 19 (false statements to the SEC),

3   where the jury was properly instructed on materiality.  Opp. 44:11-45:1.  But as

4   explained in Karatz's motion for a judgment of acquittal, the government presented

5   insufficient evidence to sustain the materiality element on Count 19, Mot. for

6   Judgment of Acquittal 15:10-17:2; Reply Br. In Support of Mot. for Judgment of

7   Acquittal 16-17, and the same would be true for Count 20 had a proper instruction

8   been given.

### III.   CONCLUSION

10   For the foregoing reasons, and those stated in Karatz's motion for a new trial

11   and his separate motion for a judgment of acquittal, this Court should GRANT

12   Karatz's motion pursuant to Rule 33 of the Rules of Criminal Procedure.

14   Dated:  August 30, 2010                     KEKER & VAN NEST LLP
15                                               CALDWELL LESLIE & PROCTOR, PC
                                                 O'MELVENY & MYERS LLP

18                                       By: */s/ John W. Keker*
19                                           JOHN W. KEKER
                                             Attorneys for Defendant
20                                           BRUCE KARATZ