ANDRE BIROTTÉ JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
PAUL G. STERN (State Bar No. 162734)
HARVINDER S. ANAND (State Bar No. 243913)
Assistant United States Attorneys
Major Frauds Section
        1100 United States Courthouse
        312 North Spring Street
        Los Angeles, California  90012
        Telephone:  (213) 894-0715/2624
        Email: paul.stern@usdoj.gov
               harvinder.anand@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NO. CR 09-203-ODW |
| | ) | |
| Plaintiff, | ) | **GOVERNMENT'S RESPONSE AND** |
| | ) | **OBJECTIONS TO THE PRESENTENCE** |
| v. | ) | **REPORT** |
| | ) | |
| BRUCE E. KARATZ, | ) | [DECLARATIONS OF PAUL G. STERN |
| | ) | AND HARVINDER S. ANAND FILED |
| | ) | CONCURRENTLY HEREWITH] |
| Defendant. | ) | |
| | ) | Sentencing Date: November 10, |
| | ) | 2010 at 3:00 p.m. |

        Plaintiff United States of America, by and through its counsel

of record, the United States Attorney for the Central District of

California, hereby files its Response and Objections to the

Presentence Report prepared by the United States Probation Office.

/ /

/ /

1    This filing is based on the attached Response and Objections
2  to the Presentence Report, the files and records of this case, the
3  declarations of Paul G. Stern and Harvinder S. Anand and the
4  exhibits attached thereto, and such additional evidence and
5  argument as the Court may consider at defendant's sentencing
6  hearing.

7  DATED: October 14, 2010          Respectfully submitted,

8                                   ANDRÉ BIROTTE JR.
                                    United States Attorney
9
                                    ROBERT E. DUGDALE
10                                  Assistant U.S. Attorney
                                    Chief, Criminal Division
11

12                                  _____/s/_____
                                    PAUL G. STERN
13                                  HARVINDER S. ANAND
                                    Assistant U.S. Attorneys
14                                  Major Frauds Section

15                                  Attorneys for Plaintiff
                                    United States of America
16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

PAGE(S)

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . iii

I.     INTRODUCTION AND SUMMARY OF OBJECTIONS . . . . . . . . .   1

II.    OBJECTIONS, CORRECTIONS AND ADDITIONS TO THE PSR . . . . .   6

III.   DISPUTED ISSUES REGARDING THE PSR'S GUIDELINES ANALYSIS    16

       A.   The Scope of Defendant's Relevant Conduct . . . . .  16

       B.   Given The Extensive Scope of Defendant's Relevant
            Conduct, Defendant Should Be Held Accountable For $10.9
            Million in Losses to KB Home . . . . . . . . .      23

            1.   The Jury Convicted Defendant of Committing
                 Mail Fraud to Obtain Money and Property in the
                 Form of Unauthorized Stock-Based Compensation
                 from KB Home . . . . . . . . . . . . . .       23

            2.   Under Relevant Conduct Analysis, Defendant Is
                 Responsible at a Minimum for Intended Losses
                 of $10.9 Million . . . . . . . . . . . .       25

                 a.   KB Actually Lost at Least $6.6 Million . .  25

                 b.   Defendant Intended to Cause $10.9 Million in
                      Losses . . . . . . . . . . . . . . .       25

       C.   Even if Defendant Legally Obtained His Discounted
            Backdated Stock Options Prior to 2006, His Conduct in
            2006 Establishes that He Illegally Retained Compensation
            and Assets to Which He Was Not Entitled . . . . . .  28

            1.   Defendant Was Notified that Backdating Stock
                 Options to Receive a Discount Violated KB's Stock
                 Plans and that He Faced Prosecution for Such
                 Conduct and for Falsely Certifying KB's Financial
                 Statements . . . . . . . . . . . . . . .        28

            2.   Defendant Repeatedly Lied in 2006 to Conceal His
                 Backdating Activities and to Avoid Returning
                 Unauthorized Compensation and His Unexercised
                 Discount Options . . . . . . . . . . . .        32

       D.   A Two-Level Organizer or Leader Adjustment Applies
            for Defendant's Role in the Offense . . . . . . .    34

       E.   Defendant Should Receive A Two-Level Enhancement
            For Obstruction of Justice Under USSG § 3C1.1 . .    42

i

TABLE OF CONTENTS (CONTINUED)

PAGE(S)

F.    A Substantial Term of Imprisonment Is Required To
      Address The Seriousness of the Offense And Provide
      General Deterrence  . . . . . . . . . . . . . . . .   46

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . .   49

TABLE OF AUTHORITIES

**FEDERAL CASES:**                                                    PAGE(S)

Carpenter v. United States,
   484 U.S. 19 (1987) . . . . . . . . . . . . . . . . . 32

Morissette v. United States,
   342 U.S. 246 (1952) . . . . . . . . . . . . . . . . . 32

United States v. Andersen,
   45 F.3d 217 (7th Cir. 1995) . . . . . . . . . . . . . 26

United States v. Andreen,
   628 F.2d 1236 (9th Cir. 1980) . . . . . . . . . . . . 32

United States v. Berger,
   587 F.3d 1038 (9th Cir. 2009) . . . . . . . . . . 23, 26

United States v. Breon,
   357 Fed. Appx. 615 (5th Cir. 2009) (unreported) . . . 26

United States v. Choi,
   101 F.3d 92 (9th Cir. 1996) (per curiam) . . . . . . . 27

United States v. Cunningham,
   593 F.3d 726 (8th Cir. 2010) . . . . . . . . . . 41, 42

United States v. Garro,
   517 F.3d 1163 (9th Cir. 2008) . . . . . . . . . . . . 41

United States v. Gordon,
   393 F.3d 1044 (9th Cir. 2004) . . . . . . . . . . . . 12

United States v. Hahn,
   960 F.2d 903 (9th Cir. 1992) . . . . . . . . . . . . . 19

United States v. Harper,
   33 F.3d 1143 (9th Cir. 1994) . . . . . . . . . . . . . 35

United States v. Hopper,
   177 F.3d 824 (9th Cir. 1999) . . . . . . . . . . . . . 22

United States v. Jennings,
   599 F.3d 1241 (11th Cir. 2010) . . . . . . . . . . . . 41

United States v. Jones,
   472 F.3d 1136 (9th Cir. 2007) . . . . . . . . . . . . 32

United States v. Lauer,
   148 F.3d 766 (7th Cir. 1998) . . . . . . . . . . . . . 27

United States v. Lin,
   410 F.3d 1187 (10th Cir. 2005) . . . . . . . . . . . . 27

1                   TABLE OF AUTHORITIES (CONTINUED)

2   **FEDERAL CASES:**                                    **PAGE(S)**

3   United States v. Luca,
    183 F.3d 1018 (9th Cir. 1999). . . . . . . . . . . . 45

4

  United States v. Maldonado,
5     215 F.3d 1046 (9th Cir. 2000). . . . . . . . . . 35, 39

6   United States v. McCormac,
    309 F.3d 623 (9th Cir. 2002). . . . . . . . . . . . 34

7   United States v. Mercado,
    474 F.3d 654 (9th Cir. 2007). . . . . . . . . . . . 22

8

  United States v. Morgan,
9     238 F.3d 1180 (9th Cir. 2001). . . . . . . . . . . . 35

10   United States v. Munoz,
    233 F.3d 1117 (9th Cir. 2000). . . . . . . . . . . . 18

11

  United States v. Narte,
12     197 F.3d 959 (9th Cir. 1999). . . . . . . . . . . . 35

13   United States v. Newbert,
    952 F.2d 281 (9th Cir. 1991). . . . . . . . . . . . 18

14

  United States v. Peyton,
15     353 F.3d 1080 (9th Cir. 2003). . . . . . . . . . . . 18

16   United States v. Pham,
    545 F.3d 712 (9th Cir. 2008). . . . . . . . . . . . 12

17

  United States v. Piggie,
18     303 F.3d 923 (8th Cir. 2002). . . . . . . . . . 26, 27

  United States v. Putra,
19     78 F.3d 1386 (9th Cir. 1996). . . . . . . . . . . . 22

20   United States v. Radtke,
    415 F.3d 826 (8th Cir. 2005). . . . . . . . . . . . 42

21

  United States v. Scarano,
22     975 F.2d 580 (9th Cir. 1992). . . . . . . . . . . . 18

23   United States v. Sullivan,
    522 F.3d 967 (9th Cir. 2008). . . . . . . . . . 32, 34

24

  United States v. Varela,
25     993 F.2d 686 (9th Cir. 1993). . . . . . . . . . . . 35

26   United States v. Watts,
    519 U.S. 148 (1997). . . . . . . . . . . . . . . . 22

27

28

TABLE OF AUTHORITIES (CONTINUED)

**FEDERAL CASES:**                                                              PAGE(S)

United States v. Zamora,
  37 F.3d 531 (9th Cir. 1994) . . . . . . . . . . . . . . . . 26

**STATUTES:**

18 U.S.C. § 1350 . . . . . . . . . . . . . . . . . . . . 46, 47

18 U.S.C. § 1519 . . . . . . . . . . . . . . . . . . . . 15, 16

18 U.S.C. § 3553 . . . . . . . . . . . . . . . . . . . . passim

**SENTENCING GUIDELINES:**

USSG § 1B1.2 . . . . . . . . . . . . . . . . . . . . . . . 11

USSG § 1B1.3 . . . . . . . . . . . . . . . . . . . . . passim

USSG § 2B1.1 . . . . . . . . . . . . . . . . . . . . . passim

USSG § 2J1.2 . . . . . . . . . . . . . . . . . . . . . . . 43

USSG § 3B1.1 . . . . . . . . . . . . . . . . . . . . . . 4, 42

USSG § 3C1.1 . . . . . . . . . . . . . . . . . . . . . passim

1     **GOVERNMENT'S RESPONSE AND OBJECTIONS TO THE PSR**

2                                    I

3                  **INTRODUCTION AND SUMMARY OF OBJECTIONS**

4          In its Presentence Investigation Report ("PSR"), the United

5     States Probation Office ("USPO") remarkably concludes that,

6     notwithstanding having sustained four felony convictions for

7     participating in a stock option backdating scheme and then lying to

8     KB Home, KB Home's auditors, and the investing public about it,

9     defendant Bruce E. Karatz ("defendant"), the former Chief Executive

10    Officer ("CEO") of KB Home, should receive a sentence of five years

11    probation, eight months of which is to be served as "home

12    detention" in defendant's 24-room Bel-Air mansion situated on a one

13    acre estate.  The central premise of the USPO's lenient

14    recommendation is that defendant's criminal misconduct did not

15    cause any losses to the victim of his crimes, KB Home, even though,

16    after defendant's backdating conduct was fully uncovered, defendant

17    agreed to disgorge to KB Home over $6 million of illicit gains he

18    received through KB Home's stock option award program.  See PSR

19    ¶ 122.[1]

20         The USPO's loss analysis defies common sense and is

21    essentially incoherent, given that, as the jury expressly found,

22    defendant's purpose in lying about his prior backdating misconduct

23

24         [1] In connection with settling the case brought against him by
      the Securities and Exchange Commission ("SEC") in 2008, defendant
25    agreed to make direct payment to KB Home of $6.7 million, $6.18
      million of which, pursuant to the terms of the settlement,
26    represented profits gained by defendant as a result of the
      backdating conduct alleged in the SEC's Complaint.  True and
27    correct copies of the Complaint, Consent to Entry of Judgment and
      the Final Judgment in Securities and Exchange Commission v. Bruce
28    E. Karatz, CV 08-6012-AHM, are attached as Exhibit ("Exh") AA to
      the Declaration of Paul G. Stern ("Stern Dec.").

                                        1

1  in 2006 was precisely to maintain the status quo <u>ante</u> and to retain

2  the illicit, unauthorized compensation, <u>i.e.</u>, money or property, he

3  received from KB Home through his undisclosed backdating from 1999-

4  2005.[2]

5       Apart from its defective Guideline analysis, the USPO's

6  sentencing recommendation also undermines criminal enforcement of

7  the federal securities laws because it essentially tells the

8  investing public that a CEO's breach of his statutory and fiduciary

9  duties to fully and fairly disclose a public company's financial

10  results, particularly results pertaining to the value of the CEO's

11  <u>own</u> compensation, is not a truly serious crime and is at most

12  deserving of a "slap on the wrist."

13       The USPO's recommendation ignores two essential facts:

14  (1) defendant's offenses of conviction, which encompass lying to KB

15  Home's Audit Committee, outside auditors and the investing public

16  over a period of nearly five months (between June and October 2006)

17  about how he priced his own stock options (as well as those granted

18  to other KB Home employees), must be taken seriously by the

19  criminal justice system; and (2) given defendant's sophistication

20  as a longstanding CEO of a publicly-traded company and former

21  securities lawyer, defendant bears an <u>enhanced</u> level of culpability

22  for his pattern of lies and deception about matters relating to his

23  own compensation.

24       Perhaps more significantly, implementation of the USPO's

25  sentencing recommendation will assuredly undermine confidence in

26

27       [2] With respect to defendant's two mail fraud convictions in
    July 2006, the jury found beyond a reasonable doubt that defendant
28  committed these offenses in order "to obtain money or property."
    <u>See</u> Redacted Verdict Form, attached to the Stern Dec. as Exh A.

1  the fairness of the criminal justice process.  The USPO's
2  recommendation suggests that there is a two-tiered system of
3  justice, one for well-connected CEOs who can break the rules,
4  secretly inflate their compensation and then lie about it with
5  virtual impunity, while ordinary citizens who engage in similar
6  self-serving misdeeds through less sophisticated means such as
7  common embezzlement or theft will face far more severe penal
8  consequences.  To promote respect for the law, the public must be
9  assured that a wealthy, well-connected individual, regardless of
10 his station, array of prominent friends and associates, history of
11 private success or acts of public largesse, will be subject to the
12 same standards of criminal justice as those less fortunate when
13 held to account for serious violations of federal criminal law.  In
14 this case, the purposes of promoting respect for the law and
15 affording general deterrence can only be properly served by
16 imposing a substantial term of imprisonment.

17     With respect to the PSR's guidelines analysis, the government
18 strongly contests three crucial findings reached by the USPO:
19 (1) despite conceding that "[w]hat has been proven is defendant's
20 gain and intended gain" (PSR ¶ 52), the PSR inexplicably declined
21 to find any "intended loss" to victim KB Home, thereby failing to
22 recognize that in this case that any gain to defendant matches
23 dollar-for-dollar a corresponding loss to his employer, KB Home,
24 which was the sole source of defendant's equity compensation;[3]

25 ─────────────────────
26     [3] If, as the USPO appears to concede, defendant received a
   gain from his stock option backdating by securing below-market
27 exercise prices for his stock options, then that gain indisputably
   matches a corresponding loss to KB Home.  This is because when
   defendant had occasion to exercise his discounted backdated stock
28 options (as he did to realize over $6 million in excess profits in
   this case), defendant was obliged to pay KB Home a lower dollar

1  (2) the PSR declined to find a two-level enhancement for

2  obstruction of justice under USSG § 3C1.1, (PSR ¶¶ 66-70), despite

3  compelling evidence that defendant's and co-schemer Gary Ray's

4  ("Ray") false denials of backdating and "gaming" the system in 2006

5  were undertaken in part for the specific purpose of avoiding a

6  contemplated inquiry by the Securities and Exchange Commission

7  ("SEC") into these very same matters; and (3) the PSR declined to

8  find a two-level enhancement for aggravating role under USSG

9  § 3B1.1 (PSR §§ 57-65), notwithstanding that there can be little

10  doubt that defendant exercised final managerial authority over co-

11  schemer Ray in 2006 and was responsible for the ultimate decision

12  to conceal their prior backdating practices in KB Home's Form 10-Q

13  filing with the SEC and in disclosures to KB Home's outside

14  auditor.

15       Thus, as set forth more fully below, the government

16  respectfully submits that, contrary to the USPO, defendant should

17  receive: (1) at least a 20-level enhancement for intended loss to

18  KB Home under USSG § 2B1.1, based on intended losses of at least

19  $10.9 million relating to defendant's illicit gains from backdating

20  and defendant's efforts to preserve those gains in 2006 by covering

21  up his previous manipulation of KB Home's stock option process; (2)

22  a 2-level enhancement for aggravated role under USSG

23  § 3B1.1 in directing the activities of co-schemer Ray; and (3) a 2-

24  level enhancement for obstruction of justice under USSG § 3C1.1.

25  Along with a 7-level base offense and a 4-level enhancement for

26  violation of securities laws, both of which were applied by the PSR

27  

28  amount (based on the discounted option price) than he would have
   otherwise had to pay if defendant's options had been properly
   priced at fair market value.

1   (PSR ¶¶ 47, 55), this yields a total offense level of 35, resulting

2   in an advisory guidelines range of 168-210 months.

3       For all the foregoing reasons, and for the reasons stated

4   below, the government submits that, contrary to the USPO,

5   defendant's advisory guideline range is 168-210 months, not 8-14

6   months.  In addition, for substantially the same reasons the

7   government submits that the USPO's recommendation of a sentence of

8   five years probation, with 8 months home detention at defendant's

9   spacious Bel-Air mansion and extensive grounds (replete with pool

10  and hot tub), does not adequately address the seriousness of

11  defendant's offense conduct, nor does it promote respect for the

12  law or afford adequate deterrence to the type of criminal conduct

13  at issue, namely high-level corporate malfeasance, as required

14  under 18 U.S.C. § 3553(a)(2).  Accordingly, the government

15  respectfully submits that the Court should decline to follow the

16  USPO's sentencing recommendation, as set forth in its letter of

17  September 29, 2010.

18      While the government has reviewed the voluminous letters

19  submitted at defendant's request attesting to his character and

20  good works, and does not contest that they should be granted some

21  weight in setting the final terms of defendant's sentence under 18

22  U.S.C. § 3553, these letters neither detract from the seriousness

23  of defendant's offense conduct nor address the need to afford

24  adequate general deterrence and promote respect for the law,

25  factors that must be central to the Court's consideration in

26  imposing a fair sentence here.  See 18 U.S.C. § 3553(a)(2)(A),(B).

27  In consideration of these factors, as well as defendant's properly-

28  calculated advisory guideline range set forth above, the government

5

1  respectfully submits that a substantial custodial term must be

2  imposed in this case, falling roughly within the range of at least

3  six to seven years of imprisonment.[4]

4                                    II

5              OBJECTIONS, CORRECTIONS AND ADDITIONS TO THE PSR

6        1.  Counts of Conviction: ¶ 2: While the USPO correctly

7  reports that defendant was convicted of counts 6 and 7, namely,

8  mail fraud, it conspicuously fails to mention that, with respect to

9  both counts 6 and 7, the jury specifically found beyond a

10 reasonable doubt, as part of its special verdict, that defendant

11 committed the mail fraud "to obtain money or property."  See Exh A

12 to Stern Dec.

13       As argued below, this omission is significant in connection

14 with the USPO's loss computation because, as set forth in the

15 Indictment, the only "money or property" identified for the jury's

16 consideration in the charged mail fraud scheme is unauthorized

17 stock-based compensation awarded by KB Home to defendant in the

18 form of millions of "discounted, in-the-money stock options."

19 Indictment ¶ 22(b).

20       Accordingly, the government requests that ¶ 2 of the PSR be

21 supplemented to include the following statement: "With respect to

22 the counts of conviction 6 and 7, namely, mail fraud, the jury

23 ────────────────

24       [4] The government will file its final sentencing
   recommendation, including a full consideration and analysis of the
25 relevant Booker factors under 18 U.S.C. § 3553(a), within a
   reasonable period in advance of defendant's sentencing hearing.
26 The government is deferring presentation of its final sentencing
   recommendation in order to have an opportunity to consider the
27 defense's response to the PSR and sentencing position, and also in
   order to more fully analyze the proper weight to be accorded to
28 various Booker factors.  Nonetheless, for the reasons stated above,
   the government has concluded that a substantial term of custody
   within the above-indicated range is warranted here.

                                    6

found in its Redacted Verdict Form beyond a reasonable doubt that the mail fraud was committed "to obtain money or property."

2.  **¶ 16**: The last line of paragraph 16 reads "motive executives of the highest quality."  It appears that "motive" is a typographical error, and the government accordingly proposes that "motive" be changed to "motivate."

3.  **¶ 17:** The sentence providing that "Karatz typically received between 250,000 and 600,000 stock options annually should be clarified by inserting the following addition at the end of the sentence: "during the time period 1999 through 2005."

4.  **¶ 21:** The second sentence of paragraph 21 should be stricken because it is unclear, and the following sentence should be inserted: "In accordance with Karatz's instruction to use the date of the preceding four to six week historical low point as the grant date of KB Home's annual stock option grants, Ray obtained information regarding the date of the historical low point and designated this date as the grant date for all of KB's annual stock option awards."

5.  **¶ 22:** The following sentence should be inserted after the first sentence of ¶ 22: "In fact, between 2002-05 Ray and Karatz used a rolling two-day window through the month of October to attempt to figure out the date on which KB Home's stock price would be at its lowest price point during this period."

6.  **¶ 24:** The following sentence should be added to ¶ 24: "Karatz informed the Chairman of KB's Audit Committee that he had already discussed with KB Home's General Counsel the need to initiate such an internal investigation."

7.  **¶ 25**: The following sentence should be added to ¶ 25: "In

7

1 fact, Karatz reviewed a number of drafts of the General Counsel's

2 report into KB Home's historical option granting process before it

3 became final on June 14, 2006.  Karatz never told the General

4 Counsel that between 1999-2005 he had backdated KB Home's stock

5 option grants in order to obtain a lower exercise price for the

6 option grants, and on at least one occasion, on or about June 12,

7 2006, Karatz instructed the General Counsel to make the draft

8 report's denial of management's gaming or manipulation of the

9 option grant process even stronger.  During this same time period,

10 from late May through the middle of June 2006, Karatz also never

11 informed the Chairman of KB Home's Audit Committee that he had

12 backdated or otherwise manipulated the date of KB Home's stock

13 option grants to secure a low exercise price for these grants."

14    8.   ¶ 27:  ¶ 27 should be placed before ¶ 26, because it refers

15 to events earlier in time.  The following clause should be inserted

16 at the beginning of the first sentence of paragraph 27: "At two

17 meetings on June 14, 2006 and June 30, 2006," which should then be

18 followed by the remainder of ¶ 27.

19    9.   ¶ 26:  The following sentence should be inserted at the end

20 of ¶ 26: "Throughout these disclosure discussions that took place

21 between June 30, 2006 and July 7, 2006, Karatz never told any

22 members of KB Home's Audit Committee or its management team that he

23 had been purposely backdating the date of KB Home's option grants

24 to secure lower exercise prices from 1999-2005."

25    10.   **Insertion after ¶ 34**: The following new paragraph should

26 be inserted after ¶ 34: "On October 23, 2006, Karatz was

27 interviewed by counsel for the Subcommittee of the Audit Committee,

28 Irell & Manella, concerning his prior backdating practices, as part

1  of the Subcommittee's independent investigation.  While Karatz

2  admitted in this interview for the first time that he had engaged

3  in backdating of stock options post-Sox after being confronted by

4  emails clearly showing that he had done so, he claimed that he did

5  not remember whether he had engaged in backdating pre-Sox, between

6  1999-2001.  When asked why he did not tell the Audit Committee that

7  he did not remember whether he had engaged in backdating pre-Sox,

8  Karatz conceded that this is something the Audit Committee would

9  have wanted to know but indicated that failing to inform the Audit

10  Committee that he did not remember was simply an oversight.  Karatz

11  thereby falsely denied to the Subcommittee in October 2006 that he

12  had deliberately lied to KB Home's General Counsel and to the Audit

13  Committee in June and July 2006 by categorically affirming that

14  management had never engaged in any backdating or manipulation of

15  option grants."

16     11.  ¶ 40:  The government objects to the PSR's description of

17  the nature of the offense conduct at issue in this case, and

18  submits that this paragraph should be stricken.  It is misleading

19  to state that there are two layers of offense conduct, one

20  concerning stock options backdating, which "does not appear to be

21  per se illegal" (PSR ¶ 43), and a second concerning "defendant's

22  untruthfulness about backdating," which is the gravamen of the

23  "offenses of conviction."

24     Contrary to the USPO, the first layer of conduct is not about

25  backdating per se (which is nowhere alleged in the Indictment to be

26  criminal), but about defendant's participation in a scheme to

27  defraud in which he covertly backdated his own stock options in

28  violation of KB Home's own stock plans while concealing this

9

practice from KB Home's Board of Directors, auditors and

shareholders.  Similarly, the second layer of conduct in 2006 is

not about "untruthfulness about backdating" per se (PSR ¶ 40)

(which may or may not be illegal), but about concealing the

practice of backdating from KB Home's Board of Directors, outside

auditors and shareholders in required management representation

letters and in SEC filings when specific questions were raised

about this practice in 2006.  There is a common thread to

defendant's conduct between 1999 and 2006, namely, defendant's

deliberate efforts to hide his unauthorized backdating of his own

stock options from KB Home's Board of Directors, shareholders, and

auditors, in order to reap and retain the benefits of the

discounted stock options he covertly awarded himself.  This common

thread of defendant's misconduct between 1999 and 2006, which

should all be considered part of defendant's "relevant conduct," is

obscured by the PSR's misleading characterization of "two layers of

conduct," one supposedly legal and the other illegal.

   12.  ¶ 43:  For the same reasons set forth above in the

government's objection to ¶ 40, the government objects to the

analysis set forth in this paragraph and submits that it should be

stricken.  Again, the issue is not whether stock option backdating

is itself per se illegal, as this was never alleged as part of the

charges and is a purely legal question.  The issue is rather

whether (1) defendant engaged in a scheme to defraud KB Home and

its shareholders in covertly backdating his stock options between

1999-2005, in violation of KB Home's stock plans, without

disclosing this practice, or securing approval, from KB Home's

Board of Director's, auditors and shareholders; and (2) whether in

1  committing the offenses of conviction in 2006 by lying to KB Home's

2  auditors and filing a false Form 10-Q with the SEC, defendant was

3  in effect continuing this same course of conduct.

4      Contrary to the USPO, the resolution of this question has

5  nothing to do with the provisions of the guidelines relating to

6  conspiracy, USSG § 1B1.2(d), but rather is directly governed the

7  guidelines' "relevant conduct" provisions, USSG § 1B1.3(a)(2).  In

8  determining defendant's applicable guideline offense level, the

9  Court is required to take into account not just defendant's

10  offenses of conviction, but also all acts and omission of defendant

11  and his co-schemers "that were part of the same course of conduct

12  or common scheme or plan as the offense of conviction." Id.  As

13  argued more fully below in the section addressing defendant's

14  "relevant conduct," the government submits that the evidence

15  offered at trial, and the additional attached evidence offered in

16  connection with the government's instant submission, is more than

17  sufficient to enable the Court to find by clear and convincing

18  evidence that defendant's conduct between 1999-2005 in covertly

19  backdating his own stock option grants, without disclosure to KB

20  Home's Board, outside auditors and shareholders, was part of the

21  same common scheme or plan as the offenses of conviction.

22      **13.   ¶ 50:** For the reasons stated more fully below in the

23  discussion of relevant conduct and loss, the government strongly

24  objects to the USPO's assessment that "defendant's conduct does not

25  appear to have resulted in any pecuniary harm."  (PSR ¶ 50).  In

26  addition to the $6.6 million in excess profits defendant collected

27  by exercising options he discounted for himself prior to 2006,

28  defendant should be held accountable for losses to victim KB Home

in two different respects: (1) by misrepresenting KB Home's historical stock option process and categorically denying backdating in June and July 2006, defendant caused KB Home to incur some additional unnecessary expenses, i.e., actual losses, as part of the independent investigation undertaken on behalf of the Subcommittee of the Audit Committee and KB Home starting in August 2006, a portion of which was devoted to untangling the actual role of defendant and co-schemer Ray in the backdating of stock options;[5]

---

[5] The government has been provided by KB Home with an invoice summary of expenses incurred in connection with its investigation of options backdating matters starting in August 2006, which reflects a total of approximately $7 million in litigation expenses paid to an outside forensic auditing group, FTI, and an outside law firm, Irell & Manella (I&M).  A copy of this spreadsheet is attached to the Stern Dec. as Exh B.

A review of these expenses shows that there were approximately $3 million in I&M expenses billed to KB Home during the period between September 19, 2006 and December 14, 2006, right in the middle of the Special Committee Investigation into stock option backdating at KB Home.  Given that I&M devoted a significant portion of its investigative resources to figuring out what role defendant and co-schemer Ray played in pricing KB Home's annual stock option grants, including interviewing defendant October 23, 2006 for almost nine hours, it is clear that had defendant been fully forthcoming about his role in the stock option process from the outset (in June 2006), the scope of I&M's investigation would have narrowed considerably and KB Home's litigation bill would have not been as high.  While it is difficult to ascertain the exact amount of loss to KB Home caused by defendant's lack of candor about his own activities, it can be fairly inferred that defendant's unwillingness truthfully to cooperate with the backdating inquiry, given that he was directly involved in the process and the person most knowledgeable, caused KB Home to suffer some amount of otherwise unnecessary litigation/legal expenses in connection with the options inquiry.  Ninth Circuit law makes clear that a defendant may be held responsible for reasonably foreseeable investigation costs incurred by his corporate employer.  United States v. Gordon, 393 F.3d 1044, 1056-57 (9th Cir. 2004).  Here, defendant "must have known, or under the circumstances reasonably should have known, that [increased investigation costs by KB] was a potential result of [his] offenses," United States v. Pham, 545 F.3d 712, 717 (9th Cir. 2008), because he was the CEO and he had to know that the company would incur significant attorneys fees to review and discover the true facts of his backdating activities, which he had concealed for the preceding seven years.

1  and (2) in lying about his backdating in 2006 defendant also

2  clearly intended, as the jury found, to maintain the status quo

3  <u>ante</u> and ensure that he would retain the profits deriving from his

4  previously unauthorized pricing of his own stock options at a

5  discount.[6]

6      14.  ¶ 52: For reasons stated more fully below in its

7  discussion of loss, the government objects to the PSR's analysis in

8  this paragraph.  Most fundamentally, the jury made a specific

9  finding that in committing the two mail fraud offenses set forth in

10  counts 6 and 7, defendant did so for the purpose of obtaining money

11  or property.  The only "money or property" at issue in counts 6 and

12  7, as described in the Indictment's description of the scheme to

13  defraud (Indictment ¶ 22), is the unauthorized compensation

14  defendant sought to receive from KB Home through his covert

15  backdating of his own stock options.  Accordingly, it is clear that

16  the jury found that defendant committed the offenses of conviction

17  set forth in counts six and seven in part to ensure that he would

18  retain the benefits in unauthorized compensation from KB Home he

19  attained through his covert backdating of stock options.  This

20  amount reflects both an "intended loss" to KB Home, as well as an

21  actual gain[7] to defendant at the time of the completion of his

22  _____

23      [6] As the government's summary charts used at trial clearly
established, defendant sought to realize approximately $10.9
24  million in profits through the hindsight pricing of his own stock
options at a discount.  <u>See</u> PSR ¶ 23.  A copy of the closing charts
25  summarizing the gains defendant sought to realize through the
backdating of his own stock options is attached as Exh C to the
26  Stern Dec.  This figure of $10.9 million corresponds to the amount
of "intended loss" to KB Home that defendant intended to cause by
27  his offense conduct.

28      [7] Arguably the actual gain to defendant at the time of the
completion of his offenses encompasses only the backdated stock
options he actually exercised, which netted $6.6 million in profits

13

1 | offenses of conviction.  As the government's summary charts
2 | regarding defendant's contemplated profits from backdating reflect,
3 | the amount of this intended loss to KB Home is approximately $10.9
4 | million.

5 |      **15.**    **¶¶ 53-54**: The government objects to both of these
6 | paragraphs.  For reasons stated more fully below, the government
7 | believes that defendant's participation in the fraudulent scheme
8 | between 1999-2005 described in the Indictment, which involved
9 | defendant's substantive backdating of stock options and his
10 | concealment of this conduct from KB Home's Board, auditors and
11 | shareholders, should be considered "relevant conduct" for the
12 | purpose of determining defendant's total offense level under the
13 | Guidelines.  In addition, as previously noted, the government
14 | submits that defendant should be held accountable for an intended
15 | loss to KB Home of $10.9 million, or alternatively for an actual
16 | gain to himself of $6.6 million in profits from his own actually
17 | exercised stock options.

18 |      **16.**    **¶¶ 59-65**: The government objects to the USPO's refusal to
19 | apply a two-level enhancement for role under USSG § 3B1.1.  As
20 | further discussed below, the USPO is incorrect because (1) the
21 | evidence corroborates co-schemer Ray's statements that defendant
22 | directed the fraudulent scheme for which defendant has been
23 | convicted as well as their concerted effort to have Hirst create a
24 | false Report; (2) defendant's pre-existing supervisor relationship
25 | with Ray does not preclude imposing a role enhancement; and (3) the

26 | ―――――――――――――――――

27 | for defendant, whereas the intended loss to KB Home covers both the
actually exercised options and the gains from backdated options

28 | defendant had not yet exercised at the time the offenses were
complete, resulting in the larger amount of $10.9 million in
contemplated profit or intended loss to KB Home.

1  rule of lenity applies to statutory construction, not where, as
2  here, the issue is whether the evidence supports applying an
3  enhancement.

4      17.  **¶¶ 69-70**: The government objects to the PSR's analysis of
5  the inapplicability of a 2-level enhancement for obstruction of
6  justice under USSG § 3C1.1.  The PSR appears to conclude that an
7  obstruction enhancement is inapplicable here because the government
8  would have to show that defendant sought to obstruct or impede the
9  investigation or prosecution of the counts of conviction, thereby
10 requiring that "the evidence would have to show that Karatz
11 attempted to cover-up the cover-up."  (PSR ¶ 69).

12     The PSR's analysis again fails because it is premised on a
13 misunderstanding of the nature of the offenses of conviction.
14 Defendant was not convicted of a generic "coverup."  Rather, he was
15 convicted, among other things, of two offenses under the Securities
16 Exchange Act of 1934 (counts 19 and 20), namely, causing false
17 statements to be filed with the SEC and lying to independent
18 accountants of a publicly-traded company.  These types of offenses,
19 _i.e._, defendant's offenses of conviction, fall within the
20 investigative jurisdiction of the SEC.  The trial evidence
21 established that, as part of defendant's relevant conduct,
22 defendant assisted co-schemer Ray in causing a false report to be
23 created, namely, the Hirst Report, with the intent of impeding and
24 obstructing a contemplated investigation of the SEC into, among
25 other things, the adequacy of KB Home's public disclosures with
26 respect to stock option backdating.  This constitutes a violation
27 of 18 U.S.C. § 1519, a statute that make it criminal to falsify a
28 document with the intent to impede a contemplated investigation of

1  a properly authorized federal agency, e.g., the SEC.  Because the

2  evidence at trial established that defendant's relevant conduct was

3  designed, among other things, to impede a contemplated SEC inquiry

4  into the adequacy of KB Home's public disclosures regarding

5  backdating, a two-level enhancement for obstruction of justice is

6  warranted in this case.[8]

7      18.  ¶ 103:  Paragraph 103 of the PSR describes defendant's

8  home at a "5 bedroom, 6 bath nicely furnished residence."  This

9  information is incomplete.  In connection with assessing the

10  propriety of the USPO's recommendation of 8 months of home

11  detention, the government requests that the following supplemental

12  description be added to paragraph 103: "The interior of defendant's

13  two-story home is 7,246 square feet, and consists of 24 rooms.

14  Defendant's house sits on a lot in the Bel-Air estates section of

15  Los Angeles that is 44,000 square feet or 1.01 acres.  The lot

16  includes a large swimming pool and adjoining hot tub."[9]

17                                III

18        **DISPUTED ISSUES REGARDING THE PSR'S GUIDELINES ANALYSIS**

19  **A.   The Scope of Defendant's Relevant Conduct**

20      One of the key sentencing issues in this case concerns the

21  scope of defendant's relevant conduct, which governs the

_____

23  [8] The PSR curiously fails to mention that co-schemer Ray
actually pled guilty to conspiring with defendant to commit

24  obstruction of justice in connection with the preparation of the
Hirst Report, in violation of 18 U.S.C. § 1519.  The Court

25  determined that Ray's plea had a sufficient factual basis, and the
evidence at trial established that defendant and Ray jointly caused

26  the false Hirst Report to be created with the intent of warding off
a contemplated SEC investigation.

27  [9] This additional information was obtained from the zillow.com
website and from an aerial photograph located on the bing map

28  website.  The aerial photograph and related information are
attached as Exh D to the Stern Dec.

appropriate calculation of the specific offense characteristic of loss under U.S.S.G. § 2B1.1(b).[10]   The government concurs with the PSR that defendant's base offense level is 7, pursuant to USSG § 2B1.1(a)(1), and that he is subject to a 4-level increase for having committed a violation of securities law while serving as an officer of a publicly-traded company, pursuant to USSG § 2B1.1(b)(17).   See PSR ¶¶ 47, 55.

With respect to the scope of defendant's relevant conduct for the purpose of calculating loss, however, the PSR appears to conclude that defendant should only be held narrowly accountable for his four specific offenses of conviction in 2006, which the jury expressly found to be criminal, while defendant's earlier participation in the charged fraudulent scheme between 1999-2005 should not be considered relevant conduct because "[t]he practice of stock option backdating does not appear to be per se illegal." (PSR ¶ 43).

The PSR's analysis misconstrues both the law of relevant conduct and the evidence controlling the application of that law to this case.   The issue here is not whether stock option backdating is per se illegal (which is in any event a purely legal, not a factual question), but whether the evidence supports the inference that defendant's conduct in backdating his own stock options between 1999-2005 and concealing it from KB Home's Board of Directors and shareholders during this time period was "part of the same [fraudulent] course of conduct or common scheme or plan as the offense[s] of conviction."   USSG § 1B1.3(a)(2).   If the Court

---

[10] All references are to the version of the Sentencing Guidelines in effect as of November 1, 2010.

17

1  concludes, based on the evidence adduced at trial and sentencing,

2  that this earlier course of conduct was part of the same fraudulent

3  course of conduct as the counts of conviction, it <u>must</u> be

4  considered part of defendant's relevant conduct and taken into

5  account in determining loss.  <u>See</u> USSG § 1B1.3(a).

6      In fraud cases, "relevant conduct" is not restricted to

7  conduct identified in specific counts of conviction, but

8  comprehends "all acts and omissions" which are "part of the same

9  course of conduct or common scheme or plan as the offense of

10  conviction."  USSG § 1B1.3(a)(2); <u>see also</u> <u>United States v. Peyton</u>,

11  353 F.3d 1080, 1089 (9th Cir. 2003) ("[w]hen determining relevant

12  conduct, the district court properly considered charged, uncharged

13  and <u>acquitted</u> conduct by the defendant") (emphasis added) overruled

14  on other grounds, <u>United States v. Contreras</u>, 593 F.3d 1135 (9th

15  Cir. 2010; <u>United States v. Munoz</u>, 233 F.3d 1117, 1126 (9th Cir.

16  2000) ("[i[n] determining relevant conduct for sentencing purposes

17  in a fraud case, a district court may consider fraudulent conduct

18  by the defendant other than that for which evidence was offered at

19  trial"); <u>United States v. Newbert</u>, 952 F.2d 281, 283 (9th Cir.

20  1991) ("[r]elying on the entire range of conduct, regardless of the

21  number of counts that are alleged or on which a conviction is

22  obtained, appears to be the most reasonable approach to writing

23  workable guidelines for these offenses [such as mail fraud]")

24  (quoting comment to USSG § 1B1.3 (backgr'd)); <u>United States v.</u>

25  <u>Scarano</u>, 975 F.2d 580, 584 (9th Cir. 1992) (in mail fraud case,

26  "cumulative loss produced by a common scheme or course of conduct

27  should be used in determining offense level, regardless of the

28  number of counts of conviction").

1    Application Note 9 to USSG § 1B1.3 serves to clarify what is

2  required in order for a defendant's related conduct to be

3  considered "relevant conduct" by virtue of being part of the same

4  common scheme or plan as the offenses of conviction:

5           Common scheme or plan: For two or more offenses to
            constitute part of a common scheme or plan, they must
6           be substantially connected to each other by at least
            one common factors, such as common victims, common
7           accomplices, common purpose or similar modus operandi.

8  USSG § 1B1.3, Application Note 9(A) (commen't). See also id.,

9  Application Note 9(B) (commen't) (identifying factors of

10  similarity, regularity and temporal proximity as basis for

11  concluding that offenses are part of the same course of conduct);

12  United States v. Hahn, 960 F.2d 903, 910 (9th Cir. 1992) ) ("the

13  essential elements of the section 1B1.3(a)(2) [relevant conduct]

14  analysis are similarity, regularity, and temporal proximity").

15    Applying these factors in determining the scope of defendant's

16  "relevant conduct," it is clear that defendant's ongoing practice

17  between 1999-2005 of backdating his own stock options to secure

18  below-market exercise prices for these options while simultaneously

19  concealing this practice from KB Home's Board of Directors and

20  shareholders was an integral part of the same ongoing fraudulent

21  scheme that defendant continued in 2006 in deliberately concealing

22  his prior backdating practices from KB Home's Audit Committee,

23  outside auditors and shareholders as part of defendant's four

24  offenses of conviction.  The 1999-2005 offense conduct is related

25  to the 2006 offenses of conviction by all four common factors:[11]

26

27       [11] As noted above, Application Note 9 to USSG § 1B1.3(a)(2)
   requires no more than one common factor in order to warrant a
28  finding that offenses constitute part of a common scheme or plan
   for the purpose of determining the scope of relevant conduct.

(1) they involve a common victim, namely, KB Home; (2) they involve a common accomplice, namely, co-schemer Ray, who assisted defendant in hiding their backdating from the Compensation Committee between 1999-2005 and then helped to coverup this backdating in 2006 by lying to KB Home's General Counsel in 2006; (3) they involve a common purpose, namely, enabling defendant to obtain and to secure unauthorized compensation from KB Home in the form of discounted stock options; and (4) they involve a similar modus operandi, namely, consistently making false statements and omissions about KB Home's stock option process to KB Home's Board, auditors and shareholders to conceal defendant's use of hindsight pricing.

The evidence in this case establishes that defendant backdated his options between 1999-2005 to give himself a built-in profit from his stock option grants that was independent of whether KB Home's stock price appreciated or not.  In other words, even if the price of KB Home's stock did not go up a single penny, defendant was able through his backdating practice to sell these options and realize a profit because he set the exercise price of his options significantly below the fair market value of KB Home's stock.  The evidence further established that defendant's backdating practice was not permitted under KB Home's stock plans, which gave KB Home's Compensation Committee the exclusive discretion to set the strike price for executive options.  Moreover, defendant's backdating practice was neither subject to approval nor review by KB Home's Compensation Committee, and it therefore essentially represented unauthorized compensation that defendant gave to himself.[12]

---

[12] As the attached memoranda of interviews of Compensation Committee members, attached as Exhibit E to the Stern Dec., demonstrate, not a single Compensation Committee member -- not

In lying to the Audit Committee through the Hirst Report and in concealing this practice from KB Home's outside auditors and shareholders in 2006, defendant essentially continued his fraudulent scheme to ensure that he would be able to retain the benefit of the unauthorized compensation he awarded himself between 1999-2005.[13]  Given the scope of defendant's relevant conduct, the government respectfully submits that defendant should be held accountable under the Guidelines for the losses sustained by KB Home for the unauthorized compensation defendant awarded himself throughout his fraudulent scheme, starting in 1999 and continuing through October 2006.

In finding that this is a no-loss case, the USPO relies, among other things, on the fact that defendant was acquitted of certain charged pre-2006 conduct and that as a consequence the scope of defendant's "relevant conduct" should be restricted to the "coverup" that occurred in 2006, which allegedly caused no

---

Reinhart, Nogales, Irani, Burkle, or Lanni-- was aware that defendant was backdating KB Home's stock options, and they all stated that they should have been briefed and that defendant's practice raised red flags because it involved concealed self-dealing by management.  See also Declaration of Harvinder S. Anand, filed under seal, Exhibits A-D (containing under oath testimony regarding these same matters).

[13] One significant indication that defendant's false statements in 2006 were part of the same fraudulent course of conduct as his covert backdating practices between 1999-2005 is that, once defendant's lies about his backdating were uncovered in the fall 2006, KB Home was compelled not just to restate its financial results for 2006, but rather it had to restate its financial results for entire period in which defendant engaged in his covert backdating practices, i.e., during the entire period between 1999-2005.  See Stern Dec., Exh F (copy of relevant portions of KB Home's restatement in February 2007).

"pecuniary harm" to KB Home.[14]   (PSR ¶¶ 41, 43, 50).   The USPO thereby ignores well-settled case law that in making its relevant conduct determination, the Court is entitled to consider not merely uncharged conduct, but also conduct "underlying acquitted criminal charges."   <u>United States v. Mercado</u>, 474 F.3d 654, 658 (9th Cir. 2007); <u>see also</u> <u>United States v. Watts</u>, 519 U.S. 148, 155 (1997) ("'acquittal does not prove that the defendant is innocent; it merely proves the existence of a reasonable doubt as to his guilt'") (citation omitted).   Indeed, as the Supreme Court observed in <u>Watts</u>,

> "[A]n acquittal is not a finding of any fact.   An acquittal can only be an acknowledgment that the government failed to prove an essential element of the offense beyond a reasonable doubt.   Without specific jury findings, no one can logically or realistically draw any factual finding inferences . . ."

<u>Watts</u>, 519 U.S. at 155 (quoting the dissent in <u>United States v. Putra</u>, 78 F.3d 1386, 1394 (9th Cir. 1996)).

Because this Court's relevant conduct determination is subject to a different standard of proof at sentencing,[15] and "the jury cannot be said to have "necessarily rejected" any facts when it

---

[14] Assuming <u>arguendo</u> that defendant's relevant conduct must be restricted to his 2006 offenses of conviction and related conduct, which the government does not concede, as argued below this conduct still resulted in pecuniary harm to KB Home in the form of $10.9 million in intended loss to KB Home.   This is because, as the jury expressly found, defendant's lies in 2006 were undertaken to secure the financial benefits of his unauthorized backdating from 1999-2005, including exercised and unexercised backdated options.

[15] As the Supreme Court stated in <u>Watts</u>, the establishment of facts relevant to sentencing is "governed by a lower standard of proof," and accordingly a jury's verdict of acquittal does not prevent the sentencing court from considering the conduct underlying the acquitted charge, "so long as that conduct has been proved by a preponderance of the evidence."   <u>Watts</u>, 519 U.S. at 157; <u>see also</u> <u>Mercado</u>, 474 F.3d at 656 (same); <u>United States v. Hopper</u>, 177 F.3d 824, 832-33 (9th Cir. 1999).

1  returns a general verdict of not guilty, <u>Watts</u>, 519 U.S. at 155,

2  this Court must make its own independent assessment as to whether

3  defendant's concealment of his backdating activities between 1999-

4  2005 was part of the same fraudulent scheme and/or course of

5  conduct as his offenses of conviction in 2006.  For the reasons

6  stated above, the government respectfully submits that the evidence

7  described above amply supports this Court's finding, by clear and

8  convincing evidence,[16] that defendant's covert backdating activities

9  between 1999-2005 fall within the scope of defendant's relevant

10 conduct in that they were an integral part of the same fraudulent

11 scheme as the conduct underlying defendant's four counts of

12 conviction in 2006.

13 **B.**  **Given The Extensive Scope of Defendant's Relevant Conduct,**
        **Defendant Should Be Held Accountable For $10.9 Million in**
14      **Losses to KB Home**

15      1.  <u>The Jury Convicted Defendant of Committing Mail Fraud to</u>
            <u>Obtain Money and Property in the Form of Unauthorized</u>
16          <u>Stock-Based Compensation from KB</u>

17      The USPO concluded that "pecuniary harm" has not been

18 established in this case.  (PSR ¶ 50.)  According to the USPO,

19 despite the jury's findings that defendant committed mail fraud to

20 obtain money and property, it is purportedly unclear which money or

21 property the jury found to be the object of defendant's fraud.

22

---

23      [16] Given that the relevant conduct finding proposed by the
   government is based upon the Court's consideration of some conduct
24 underlying acquitted counts and could arguably have an extremely
   disproportionate effect on defendant's sentence relative to the
25 offenses of conviction, the government submits that the Court
   should here apply the higher standard of clear and convincing
26 evidence (rather than mere preponderance) in making this sentencing
   finding.  <u>See</u> <u>United States v. Berger</u>, 587 F.3d 1038, 1048-49 (9th
27 Cir. 2009) (heightened clear and convincing standard is applicable
   to sentencing findings where sentencing factor has disproportionate
28 effect relative to offense of conviction and is based on
   "uncharged" or "acquitted" conduct).

1  (Id. ¶ 52 (referring to three possible interpretations of the

2  jury's findings).)   The USPO is incorrect.

3        The jury's guilty verdicts and findings establish that

4  defendant committed mail fraud to obtain money and property in the

5  form of unauthorized compensation from KB and its shareholders.

6  The Indictment charged defendant with engaging "in a fraudulent

7  scheme to disguise and conceal from KB and its shareholders the

8  nature and value of stock-based compensation KB was actually

9  awarding to [defendant] . . ., thereby causing KB consistently to

10 award stock-based compensation to [defendant] . . . in a manner not

11 authorized by the Committee and in violation of the terms of the

12 applicable stock incentive plans."   (Indictment ¶ 22 (emphases

13 added).)   The only money and property described as the object of

14 defendant's fraudulent scheme was the unauthorized stock-based

15 compensation he had received by backdating his own stock options.

16 (Id. ¶ 22(e) ("By fraudulently backdating his own annual stock

17 option grants, . . . [defendant] deceived KB's Board of Directors,

18 [Compensation] Committee, and shareholders as to the nature and

19 amount of compensation KB was awarding its CEO and others.").)

20       The jury convicted defendant of the scheme described in the

21 Indictment and found that defendant committed those crimes "to

22 obtain money or property."   (Stern Dec., Exh A).   The jury's

23 convictions and findings can only mean that it concluded that

24 defendant had defrauded KB and its shareholders to secure the

25 unauthorized compensation described in the Indictment.   Indeed, the

26 jury could not have found otherwise because it could only have

27 convicted defendant of the charges in the Indictment.   Defendant

28 committed mail fraud to obtain the money and property charged in

the Indictment -- excess stock-based compensation.

2.   Under Relevant Conduct Analysis, Defendant Is
     Responsible at a Minimum for Intended Losses of
     $10.9 Million

     a.   KB Actually Lost at Least $6.6 Million

As discussed above, the record establishes by clear and convincing evidence that defendant illegally obtained and exercised his backdated discount stock options to collect unauthorized compensation.  As a result of his fraudulent conduct, defendant collected ill-gotten profits of approximately $6.6 million, causing KB to suffer actual losses of at least $6.6 million.[17]  (PSR ¶ 23; Stern Dec., Exh C).

     b.   Defendant Intended to Cause $10.9 Million in Losses

The USPO correctly notes that "loss is the greater of actual loss or intended loss" (PSR ¶ 49), but inexplicably does not

_____

[17] KB incurred a total of approximately $3 million in I&M investigatory costs related to the options inquiry in the fall of 2006 and early 2007.  (Stern Decl. Ex. B).  If defendant had admitted his backdating conduct during KB Home's internal investigation, KB Home would have likely incurred some investigatory costs to fully evaluate the financial impact of defendant's backdating activities.  KB Home, however, undoubtably incurred some incremental and unnecessary investigatory costs as a result of defendant's lies and criminal misconduct, including interviewing witnesses and reviewing documents to figure out exactly what defendant did.  That is, KB Home would not have had to expend all the money it did to reconstruct the events of the preceding eight years if defendant had informed KB Home of his conduct and assisted KB Home in evaluating the financial impact of that conduct.

KB Home therefore suffered losses as result of defendant's crimes, although the exact amount is not ascertainable.  If the Court concludes that defendant is not responsible for intended losses in this case, it should use defendant's gains as an alternative measure of loss.  U.S.S.G. § 2B1.1(b)(1), cmt. n. 3(B) (explaining that the "court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined").  The USPO concluded that "[w]hat has been proven is the defendant's gain and intended gain."  (PSR ¶ 52.)

1  consider, discuss or analyze whether defendant should be held

2  accountable for any intended loss in this case.  The USPO's

3  complete disregard for intended loss is especially perplexing given

4  that the USPO concedes that "[w]hat has been proven is the

5  defendant's gain and intended gain."  (Id. ¶ 54 (emphases added).)

6  It should be obvious that defendant's "intended gain" here

7  corresponds to, or derives from, the loss he intended to impose on

8  KB Home and its shareholders.  E.g., United States v. Berger, 587

9  F.3d 1038, 1045 (9th Cir. 2009) ("The offender's gain from

10 committing the fraud is an alternative estimate that ordinarily

11 will underestimate the loss."); United States v. Andersen, 45 F.3d

12 217, 221 (7th Cir. 1995) ("Generally the defendant's gain may

13 provide a reasonable approximation of a victim's loss, and may be

14 used when more precise means of measuring loss are unavailable.");

15 United States v. Zamora, 37 F.3d 531, 535 (9th Cir. 1994)

16 (explaining that defendant "knowingly intended to gain, and

17 correspondingly to cause loss") (Rymer, C.J., dissenting); United

18 States v. Breon, 357 Fed. Appx. 615, 617 (5th Cir. 2009)

19 (explaining relationship among loss, intended loss and gain)

20 (unreported).

21      The $6.6 million in excess compensation that defendant

22 collected (Stern Dec., Exh C) was only part of the loss defendant

23 intended to impose on KB and its shareholders.  Defendant also held

24 of hundreds of thousands of unexercised stock options in 2006,

25 including thousands of discounted options that he had illegally

26 backdated for himself.  The unrealized gains from those options --

27 totaling approximately $4.3 million (id.; PSR ¶ 23) -- also should

28 be included as intended loss because defendant is responsible for

intended losses that are "the natural and probable consequences of [his] actions." United States v. Piggie, 303 F.3d 923, 927 (8th Cir. 2002).

Indeed, if defendant's crimes had not been uncovered in the second half of 2006, he stood to collect approximately $4.3 million more in unauthorized compensation by exercising the backdated discount options he held.[18] Because KB was at risk of losing at least $10.9 million of unauthorized compensation as a result of defendant's execution of a criminal scheme to deprive KB Home and its shareholders of money and property, causing KB to file a false Form 10-Q, and lying to KB's auditors, the Sentencing Guidelines require that defendant be held accountable for an intended loss of at least $10.9 million. United States v. Choi, 101 F.3d 92, 93 (9th Cir. 1996) (explaining "the amount of loss can mean potential loss had the defendant not been apprehended") (quotations and alteration omitted) (per curiam); United States v. Lauer, 148 F.3d 766, 768 (7th Cir. 1998) ("[T]he amount of the intended loss, for purposes of sentencing, is the amount that the defendant placed at risk by misappropriating money or other property. That amount measures the gravity of his crime.") (Posner, C.J.); United States v. Lin, 410 F.3d 1187, 1192 (10th Cir. 2005) (explaining "in determining an intended loss courts focus on the amount that the scheme placed at risk, not the amount of money or property [actually] stolen") (quotation marks omitted).

Here, as discussed above, defendant executed a continuous

---

[18] Whether defendant would have actually realized the excess gains is irrelevant because intended loss "includes pecuniary harm that would have been impossible or unlikely to occur." U.S.S.G. § 2B1.1(b)(1), cmt. n. 3(A)(ii).

1  scheme from 1999 through 2006 to defraud KB and its shareholders to
2  collect excess compensation.   It is therefore fair to hold
3  defendant accountable for the $10.9 million in losses he intended
4  to extract from his victim, including the unrealized excess
5  compensation he stood to collect from his unexercised stock
6  options.[19]

7  C.   **Even if Defendant Legally Obtained His Discounted Backdated
        Stock Options Prior to 2006, His Conduct in 2006 Establishes
8       that He Illegally Retained Compensation and Assets to Which
        He Was Not Entitled**
9
        Assuming _arguendo_, as the USPO concludes, that defendant's
10  acquisition of discounted backdated stock options prior to 2006 was
11  not criminal (which the government does not concede), the question
12  remains whether he should have _retained_ excess profits from those
13  options and other unexercised discounted backdated options after he
14  learned in 2006 that discounted options were not permitted under
15  KB's stock plans and that numerous other individuals were being
16  prosecuted for the very same conduct in which he had engaged for
17  approximately seven years.   The clear answer to this question is
18  "no."   That is, even if the Court concludes that defendant's
19  conduct prior to 2006 was not an integral part of defendant's
20  criminal scheme to defraud, defendant's indisputably criminal
21  conduct in 2006 still makes him responsible for intended losses of
22  at least $10.9 million in this case.

23       1.   _Defendant Was Notified that Backdating Stock Options to
              Receive a Discount Violated KB's Stock Plans and that
24            He Faced Prosecution for Such Conduct and for Falsely
              Certifying KB's Financial Statements_
25

26       Beginning in late 2005 and continuing up to defendant's

27  _____

28       [19] As discussed above, if the Court concludes that defendant
     is not responsible for intended losses in this case, it should use
     defendant's gains as an alternative measure of loss.

1  commission of the crimes of conviction, defendant repeatedly
2  learned that backdating his own stock options to collect excess
3  compensation could constitute fraud and that he was subject to
4  prosecution for having engaged in such conduct.  Defendant received
5  notice of the potential consequences of discounting his own options
6  from newspaper articles, his General and Deputy General Counsels,
7  and his outside attorneys.  Defendant also received notice from his
8  attorneys that falsely certifying KB's financial statements also
9  would subject him to criminal prosecution.  Defendant ignored all
10 of these warnings and repeatedly lied in 2006 about having
11 backdated his own stock options to receive discounted options.  He
12 did so to conceal his conduct prior to 2006 and, as the jury
13 specifically found, to keep his excess compensation and unexercised
14 discount options.

15      One example of the notice that defendant received through
16 numerous newspaper articles is a November 2005 article in The Wall
17 Street Journal (the "WSJ"), which reported that "Federal regulators
18 . . . [were] exploring the extent to which companies improperly
19 backdated grants to provide insiders an extra pay windfall."[20]
20 (Stern Decl. Exh G).  The same article further reported that one
21 company's "chief executive and two other top officials resigned
22 after an internal investigation found they 'benefitted personally'
23 from widespread manipulation of stock-option grant dates."  (Id.)
24      Another example is a May 2006 article in the WSJ, which
25

26      [20] Defendant's assistant Connie Fox testified that defendant
   received the WSJ on a daily basis and that he read it on at least
27 some days.  (RT 3/12/10 at 1075, Stern Dec., Exh H).  Beginning in
   late 2005, Ray discussed stock option backdating articles appearing
28 in business periodicals with defendant, whom Ray described as a
   "voracious reader."  (RT 3/17/10 at 1819-22, Stern Dec., Exh I).

1  reported that "[i]n a dramatic widening of the investigations into

2  potential stock-options abuses, federal prosecutors . . . [had]

3  launched criminal probes of at least five U.S. companies." (Stern

4  Dec., Exh J).  This article also reported that "[b]ackating would

5  undermine the incentive purpose of the option grant and could

6  violate a host of securities laws."  (Id.)

7       On June 1, 2006, after he had begun KB's internal backdating

8  investigation, General Counsel Ben Hirst sent defendant an email

9  reminding him of his certification obligations under the Sarbanes-

10 Oxley Act of 2002 ("SOX"), including that defendant had to disclose

11 to KB's "auditors and audit committee any fraud, whether or not

12 material, that involves management or other employees who have a

13 significant role in the company's internal control over financial

14 reporting."  (TX 252 at 1, Stern Dec. Exh K).[21]  Hirst sent the

15 reminder to defendant "to be certain [that he took his obligations]

16 seriously in [the] highly-charged post-Enron environment."  (Id.)

17 Hirst specifically warned defendant that "a false certification is

18 a criminal offense."  (Id.)

19      Aside from these general notices and warnings, by no later

20 than June 28, 2006, Munger, Tolles & Olson ("MTO"), KB's external

21 lawyers, notified defendant in unambiguous terms that backdating to

22 receive discounted stock options was not authorized under KB's

23 stock option plans:

24       [B]ackdating often results in discounted options --
         options that have an exercise price based on a prior
25       day's closing price that is lower than the fair market
         value of the common stock on the date the options are
26       actually granted.  Each [stock] plan contains a specific
         requirement prohibiting the issuance of discounted
27       options.

28 _____

         [21] "TX" refers to trial exhibits in the above-entitled matter.

                              30

(TX 322 at 21, Stern Dec., Exh L).  Moreover, MTO further warned defendant:

- "If backdated options were issued, then KB Home's existing disclosure regarding the value of its option grants, the dates of various option grants and the basis for determination of Mr. Karatz's compensation might not be accurate."  (TX 322 at 31.)

- SOX required defendant to certify KB's 2006 Second Quarter 10-Q, that he would "need to consider any option issues in determining whether to deliver" the certification, and that "[i]ncorrect certifications can give rise to potential civil and criminal penalties for the certifying officers."  (TX 322 at 31-32.)

- "[T]he SEC, the U.S. Attorney and the IRS [were] investigating . . . backdating practices" and that the "SEC and the U.S. Attorney appear to take the position that certain backdating practices are fraudulent and violate securities and other laws." (TX 322 at 32.)

Finally, MTO also informed defendant that Section 304 of the Sarbanes-Oxley Act of 2002 provides that if a company is required to restate it financial statements "due to material noncompliance, as a result of misconduct, with any financial reporting requirements, the CEO . . . must reimburse the company for" any bonus, equity-based compensation, and profits realized by the officer from the sale of the company's securities "during the 12 month period following the first public issuance or filing with the SEC of the financial statements that had to be restated."  (TX 322 at 33.)

On July 5, 2006, Charlie Carroll, KB's Deputy General Counsel, sent two emails to Bill Hollinger, which were eventually forwarded to defendant.  In the first email, Carroll unambiguously stated that he believed that, as written, KB's Second Quarter 10-Q "would constitute a material violation of federal securities laws." (TX 340, Stern Dec., Exh M).  In the second, Carroll reminded Hollinger that defendant was "personally liable, both criminally

31

and civilly," under SOX for falsely certifying KB's Second Quarter 10-Q.  (TX 343, Stern Dec., Exh N).

   2. <u>Defendant Repeatedly Lied in 2006 to Conceal His Backdating Activities and to Avoid Returning Unauthorized Compensation and His Unexercised Discount Options</u>

  "The Supreme Court has interpreted § 1343 [the wire fraud statute] broadly and twice held that individuals who <u>retain</u> or <u>misappropriate</u> the money or property of others, regardless of how they acquired it, fall within the purview of mail or wire fraud." <u>United States v. Sullivan</u>, 522 F.3d 967, 974 (9th Cir. 2008) (emphases added) (quoting <u>United States v. Jones</u>, 472 F.3d 1136, 1139 (9th Cir. 2007); <u>see also</u> <u>Carpenter v. United States</u>, 484 U.S. 19, 27 (1987) ("The concept of fraud includes the act of embezzlement, which is the fraudulent appropriation to one's own use of the money or goods entrusted to one's care by another.") (quotations omitted); <u>United States v. Andreen</u>, 628 F.2d 1236, 1241 (9th Cir. 1980) (defining embezzlement to "encompass[] the fraudulent appropriation of the property of another by one in lawful possession thereof"); <u>Morissette v. United States</u>, 342 U.S. 246, 271-72 (1952) ("Conversion . . . may be consummated . . . where the initial possession by the converter was entirely lawful.").

  The facts identified above establish that, by July 5, 2006, defendant had been repeatedly warned that (1) collecting excess compensation from discounted backdated stock options could be fraudulent, and indeed, was not permitted under KB's stock plans; and (2) that he could be subject to criminal prosecution for both backdating his own options and falsely certifying KB's Second Quarter Form 10-Q.  It was therefore clear to defendant that he had

1  received millions of dollars of unauthorized compensation for

2  discount stock options that he had backdated and that he stood to

3  collect additional millions of dollars for his unexercised

4  discounted stock options.  In short, defendant clearly was on

5  notice that he was not entitled to keep the unauthorized gains he

6  had collected or the unauthorized discount options he held.

7       It is also particularly telling that MTO notified defendant

8  that if he had falsely certified KB's Home's SEC filings he would

9  be required to reimburse KB Home for any bonus, equity-based

10 compensation, and profits he realized from the sale of the

11 company's securities "during the 12 month period following the

12 first public issuance or filing with the SEC of the financial

13 statements that had to be restated."  (TX 322 at 33.)  The WSJ

14 articles had also notified defendant that several companies were

15 restating their financial results based on executives' backdating

16 activities.  Defendant therefore knew that a significant portion of

17 his compensation was at risk if KB Home had to restate its

18 financial statements.

19      Knowing all of this, defendant did not come forth and tell

20 his employer that he had already engaged in backdating his own

21 stock options for several years.  Instead, defendant lied to

22 everyone:  KB's General and Deputy General Counsel, Compensation

23 and Audit Committees, external auditors, and outside investigators.

24 Defendant committed the crimes for which he was convicted to both

25 conceal his realized and unrealized excess profits and to avoid

26 having to disgorge his ill-gotten gains. Defendant also caused KB

27 to file a false Form 10-Q and has been convicted for committing

28 that crime.  This criminal conduct establishes that defendant

1   intended to retain and convert for personal use $10.9 in realized

2   and unrealized gains from his backdated discount stock options.[22]

3   "[L]oss serves as a measure of the seriousness of the offense and

4   the defendant's relative culpability."   U.S.S.G. § 2B1.1 comment

5   (Background).   To ignore the jury's findings that defendant

6   intended to obtain money and property through his crimes, as well

7   as the economic reality of defendant's self-serving criminal

8   conduct, would reward defendant and significantly understate both

9   his culpability and his proper Guidelines offense level.   The Court

10   should hold defendant accountable for intended losses of $10.9

11   million.

12   **D.**     **A Two-Level Organizer or Leader Adjustment Applies for Defendant's Role in the Offense**

13

14       In relevant part, section 3B1.1 of the Sentencing Guidelines

15   provides that if a defendant "was an organizer, leader, manager, or

16   supervisor of any criminal activity," a two-level increase in

17       [22] The government has cited <u>Sullivan</u> and the other cases

18   discussed above because they are legally relevant in assessing defendant's intent to cause KB to lose at least $10.9 million of

19   unauthorized compensation, not to prove that defendant committed the crime of embezzlement or conversion.   Defendant has been

20   convicted of four felonies based on his conduct in 2006.   Intended loss is the "pecuniary harm that was intended to result from the

21   offense."   § 2B1.1(b)(1), cmt. n. 3(A)(ii); <u>United States v. McCormac</u>, 309 F.3d 623, 628 (9th Cir. 2002) (noting that the 2001

22   amendment to the Sentencing Guidelines for fraud adopt a "broad definition" of intended loss and noting that the definition of

23   intended loss "includes the 'pecuniary harm that was intended to result from the offense,' whether or not that pecuniary harm 'would

24   have been impossible or unlikely to occur.'") (quoting USSG § 2B1.1., cmt. n. 2(A)(ii) (2001)).   The cases discussed above make

25   clear that a defendant's retention of money or property that he acquired lawfully can be criminal.   The jury specifically found

26   that defendant committed mail fraud to obtain money or property in 2006.   The facts and cases discussed above further establish

27   defendant's fraudulent intent to also retain unauthorized compensation once he learned in 2006 -- if he did not already know

28   it previously -- that he had no right to keep gains from options that he had discounted for himself or the unexercised discount options he continued to hold.

offense level is appropriate.  U.S.S.G. § 3B1.1(c).  To find that a defendant was an organizer or leader, "there must be evidence that the defendant exercised some control over others involved in the commission of the offense [or was] responsible for organizing others for the purpose of carrying out the crime."  United States v. Harper, 33 F.3d 1143, 1151 (9th Cir. 1994) (internal quotations omitted; alteration in original).

"In determining whether a defendant controlled or organized others, the district court should consider the following factors: (1) the exercise of decision making authority, (2) the nature of participation in the commission of the offense, (3) the recruitment of accomplices, (4) the claimed right to a larger share of the fruits of the crime, (5) the degree of participation in planning or organizing the offense, (6) the nature and scope of the illegal activity, and (7) the degree of control and authority exercised over others."  United States v. Narte, 197 F.3d 959, 966 (9th Cir. 1999) (internal quotations omitted).  "An enhancement may be proper where . . . a defendant organizes others in the commission of the criminal activity even though he does not retain a supervisory role over the other participants."  United States v. Varela, 993 F.2d 686, 691 (9th Cir. 1993) (explaining that "by coordinating the activities of the other participants to the extent necessary to complete [a narcotics] transaction, [defendant] organized people"). "A single incident of persons acting under a defendant's direction is sufficient evidence to support a two-level role enhancement." United States v. Maldonado, 215 F.3d 1046, 1050 (9th Cir. 2000); see also United States v. Morgan, 238 F.3d 1180, 1186-87 (9th Cir. 2001) (same).

1     To reach a reasonable conclusion about whether a role
2  adjustment should apply to defendant, it is important to keep in
3  mind the following essential facts:  defendant was the CEO of KB
4  for over 20 years; he was an omnipresent force in the company in
5  all respects and he had final authority over all decisions of
6  consequence; defendant's subordinates knew better than to make any
7  decision that would undermine defendant's position in the company,
8  lest they be fired; as discussed above, once KB began to
9  investigate its historical stock option backdating practices,
10 defendant knew that he risked losing -- as he eventually did -- his
11 positions as CEO and Chairman of the Board, generous compensation
12 package and accumulated discount stock options; defendant knew that
13 the Hirst Report had to clearly and definitively exculpate him to
14 ensure a reasonable chance of his keeping his positions and assets;
15 and defendant supervised and directed Ray in the execution and
16 administration of KB's stock option plans for the approximately 10
17 years prior to 2006.

18     With these facts providing context, the record clearly
19 supports the conclusions that defendant directed Ray to (1) execute
20 their mail fraud scheme between 1999 and 2006; and (2) create a
21 false exculpatory storyline to be included in the Hirst Report.[23]
22 The following analysis of the <u>Narte</u> factors establishes that the
23 Court should apply a role adjustment for defendant:

24     <u>Exercising decision making authority, the degree of</u>
25 <u>participation in planning or organizing the offenses and degree of</u>
26 <u>control and authority exercised over others</u>:  As a powerful CEO,

27 _____

28     [23] The USPO appears to have correctly concluded that the Hirst
    Report was false, stating that "Ray felt that Karatz assigned him
    the responsibility to come up with a false story."  (PSR ¶ 60.)

1  defendant clearly exercised unchallenged decision making authority
2  in running KB.  As discussed above, defendant understood the
3  importance of having Hirst issue a "clean" and unambiguous
4  exculpatory report.  Defendant therefore took actions calculated to
5  achieve this result, which included, <u>inter alia</u>, directing Ray to
6  lie to Hirst and come up with a price-neutral process to account
7  for the selection of grant date.

8      For example, defendant admitted to I&M, KB Home's outside
9  investigators, that during the pre-SOX period, defendant was
10 involved in the selection of grant dates and that Ray did not have
11 authority to pick dates himself.  (RT 3/30/10 at 3296-97, Stern
12 Dec, Exh O).  Defendant further admitted that he also had ultimate
13 authority to pick grant dates during the post-SOX period.  (<u>Id.</u>)
14 Defendant supervised and directed Ray for approximately 10 years
15 while they administered KB's stock option plans.

16     With respect to the Hirst Report, the evidence further
17 establishes that defendant directed Ray and coordinated the plan to
18 manipulate Hirst's internal investigation.  One example that
19 corroborates defendant's supervisory role is Ray's shifting story
20 about whether defendant and Ray used a look back to price options
21 during the pre-SOX period.  Ray initially told Hirst on May 24,
22 2006, that he and defendant had used a two- or three-day look back
23 to price options during the pre-SOX period.  (RT 3/17/10 at
24 1826-27, Stern Dec., Exh P).  After this meeting with Hirst, Ray
25 met with defendant and informed him of the information he had
26 provided to Hirst.  Defendant was upset because he wanted to get
27 Hirst on the "right path" and did not want Hirst to know that
28 defendant and Ray had employed a look back.  (<u>Id.</u> at 1828.)

1 Defendant told Ray that they would meet with Hirst.  (Id.)
2 Following the meeting with defendant, Ray and defendant met with
3 Hirst and told him in no uncertain terms that they did not
4 backdate.  (Id.)

5     Except for the intervening meeting between defendant and Ray,
6 this sequence of events is corroborated by Hirst.  Hirst told the
7 FBI that Ray initially told him on May 24, 2006, that defendant and
8 Ray had used a two- or three-day look back to price options during
9 the pre-SOX period, but they both "were emphatic that there was no
10 backdating" during meetings on May 30, 2006.  (Stern Dec., Exh Q).

11     Ray's testimony that he changed his story after meeting with
12 defendant is credible because Ray's second account to Hirst was
13 consistent with defendant's account to Hirst.  Ray would not have
14 had any reason to change his story unless he were following
15 defendant's lead in presenting a consistent false storyline to
16 Hirst.[24]

17     Hirst also corroborated Ray's account that defendant directed
18 the creation of a false basis for Hirst to conclude that the
19 Compensation Committee had delegated authority to defendant to
20 select option grant dates.  Ray testified that defendant was
21 unhappy with a draft of Hirst's report, that defendant wanted the
22 report to be unequivocal, that they presented Hirst with a note
23 from a 1998 Compensation Committee meeting as a pretext for a

---

25     [24] The USPO appears to suggest that defendant and Ray could
have acted independently of each other.  (PSR ¶ 61.)  It is
26 unreasonable to conclude, however, that defendant and Ray acted
independently but came up with the same storyline.  The more
27 reasonable conclusion is that they had coordinated their stories
and it is indisputable that defendant was Ray's superior and an
28 intimidating figure who, as Ray testified, directed the plan to
mislead Hirst.

1    delegation argument, and that, on June 12, 2006, defendant

2    intimidated Hirst into changing his draft report to clearly find

3    that delegation had occurred.  (RT 3/17/10 at 1846-52, Stern Dec.,

4    Exh R; see also TX 266, TX 267, Stern Dec., Exhs S&T).

5         In an interview with the FBI, Hirst corroborated Ray's

6    account of the June 12, 2006, meeting, stating that after reviewing

7    Hirst's Report "Karatz's voice became very loud and aggressive and

8    his behavior became demanding and bullying.  Karatz told **HIRST** that

9    the report needed to be stronger, 'there is no backdating.'"

10   (Stern Dec., Exh U at 9 (emphasis in original).)

11        Indeed, a review of Hirst's draft reports before and after

12   the June 12, 2006, meeting also corroborate Ray's testimony.  The

13   draft report prior to the June 12th meeting did not include a

14   reference to the note from the 1998 Compensation Committee meeting

15   that defendant presented to Hirst, but the draft after defendant

16   intimidated Hirst did include the note.  (Compare TX 266 at 4-5 to

17   TX 267 at 4-5.)  Furthermore, in the later draft, Hirst also

18   included a much stronger conclusion that delegation had occurred,

19   stating the Compensation Committee's "intent" was "clear."  (TX 267

20   at 4.)

21        The incidents described above reflecting defendant's

22   involvement in directly shaping the contents of the Hirst Report

23   establish that defendant directed co-schemer Ray and made the final

24   decisions on the plan to mislead Hirst that they jointly

25   implemented.  A "single incident of persons acting under a

26   defendant's direction is sufficient evidence to support a two-level

27   role enhancement."  Maldonado, 215 F.3d at 1050.

28        To conclude that defendant did not direct and oversee Ray to

1  cause Hirst to issue a fraudulent report that exculpated defendant
2  would be to ignore reality.  Defendant ran KB Home as if he owned
3  the company and he did so by exercising pressure on his
4  subordinates.[25]  Defendant had the most to lose by Hirst's
5  backdating investigation.  Defendant therefore was not some idle or
6  disinterested observer who simply permitted Ray to unilaterally
7  execute the plan to mislead Hirst.  Rather, as Ray testified, and
8  as Hirst also told the FBI, defendant was intimately involved and
9  took the lead position in ensuring that Hirst reached the
10 exculpatory conclusions that defendant wanted him to reach.

11      <u>Participation in the offenses and nature and scope of the</u>
12 <u>illegal activities</u>:  As discussed above, the jury's verdicts
13 establish defendant's participation in and culpability for the
14 offenses of conviction.  Ray's guilty plea and admissions at trial
15 also establish Ray's and defendant's joint participation in the
16 offenses, which, as discussed above, are corroborated by Hirst.

17      The record further establishes that defendant was more
18 culpable than Ray in that Ray resigned his position at KB Home
19 rather than continue to lie to the KB Home's outside investigators.
20 In contrast, defendant told the investigators more lies in his
21 October 2006 interview and tried to salvage his position as CEO and
22 all the compensation and assets he knew were at risk.

23      <u>The recruitment of accomplices</u>:  Throughout his interviews
24 with the FBI, Ray consistently stated that defendant essentially

25 _____

26      [25] Indeed, as KB Home's former Deputy General Counsel
   described defendant in a contemporaneous email to Hirst with
27 reference to defendant's behavior at the critical June 12th
   meeting, "I have observed the same about Bruce -- now there's a guy
28 who really does eat his young when he comes under pressure.  It
   seems to me that he just hates to deal with any difficult truth."
   (TX 757 at 2, Stern Dec., Exh. X).

1  directed him to lie to Hirst and to have Hirst create a false

2  exculpatory report.  Ray told the jury the same thing and defendant

3  was convicted of four crimes, including causing KB Home to file a

4  false Form 10-Q and lying to KB's auditors.  At a minimum, it

5  appears that the jury credited Ray's testimony for defendant's

6  conduct in 2006.  The verdicts and record support the conclusion

7  that defendant recruited and directed Ray to assist him in lying to

8  Hirst and causing him to issue a false report.

9       <u>Share of fruits of the crimes</u>:  Defendant received the lion's

10 share of KB's stock options and realized far more gains from his

11 discount backdated options than anyone else, including Ray.  (Stern

12 Dec., Exh V).  Indeed, as discussed above, one of defendant's

13 primary motives to commit the crimes for which he has been

14 convicted was to avoid having to disgorge the ill-gotten gains he

15 had collected and returning his unexercised discount options.

16 Defendant was keenly aware that he stood to lose everything and he

17 took steps to try to prevent that eventuality from occurring.

18      This record establishes that a two-level enhancement for

19 defendant's role as an organizer and leader in the criminal scheme

20 is appropriate.  Defendant's role in this case was more extensive

21 than other fraud cases in which the adjustment has been applied.

22 <u>E.g.</u>, <u>United States v. Garro</u>, 517 F.3d 1163, 1170 (9th Cir. 2008)

23 (upholding enhancement where co-schemer "prepared material for

24 [defendant] and interacted with investors under [defendant's]

25 direction" and other evidence showed that defendant used co-schemer

26 to execute scheme); <u>United States v. Jennings</u>, 599 F.3d 1241,

27 1253-54 (11th Cir. 2010) (upholding aggravating role adjustment in

28 part because the defendant was the "owner of [two companies and] he

41

1  influenced the other coconspirators"); <u>United States v. Cunningham</u>,

2  593 F.3d 726, 731 (8th Cir. 2010) (upholding aggravating role

3  adjustment where CEO defendant was "equally culpable" as

4  subordinate employee because "without [the defendant] none of [the

5  fraud] could have happened"); <u>United States v. Radtke</u>, 415 F.3d

6  826, 845 (8th Cir. 2005) (upholding aggravating role adjustment in

7  part because, as the CEO and owner of a company, the defendant

8  "received a disproportionate share of the profits" from the

9  fraudulent scheme).[26]

10
11  **E.     Defendant Should Receive A Two-Level Enhancement For Obstruction of Justice Under USSG § 3C1.1**

12      As noted above, the USPO also declines to apply a two-level

13  enhancement for obstruction of justice under USSG § 3C1.1 because,

14  according to the PSR, defendant's obstructive conduct is somehow

15  covered by the "counts of conviction and is being viewed within the

16  framework of USSG § 2B1.1." PSR ¶ 70. According to the PSR, there

17  is no additional evidence that defendant engaged in further

18  obstructive conduct other than the counts of conviction. <u>Id.</u>

19      The PSR's analysis is fundamentally misguided. The evidence

20

21      [26] The USPO suggests that Karatz's "pre-existing" supervisory
    relationship with Ray "makes the task of disentangling the
22  perceived direction from a boss to an employee from the aggravating
    criminal direction from one criminal participant to another very
23  problematic." (PSR ¶ 62.) Not so. The issue is whether defendant
    was an "organizer, leader, manager, or supervisor <u>in any criminal</u>
24  <u>activity</u>." U.S.S.G. § 3B1.1(c) (emphasis added). Defendant's
    supervisory position could not shield him from a role enhancement
25  for directing criminal activity. The cases cited above make clear
    that a CEO can be held responsible for an aggravating role
26  adjustment.

27      The USPO also incorrectly relies on the "rule of lenity" to
    not apply a role adjustment. (PSR ¶ 65.) The rule of lenity is
28  applied when a statute is ambiguous, not to decide whether evidence
    supports a sentencing enhancement.

42

at trial and sentencing shows that defendant engaged in two distinct categories of misconduct: namely, (1) a scheme to defraud to obtain money or property from KB Home from 1999 through 2006, achieved by various means, including misleading KB Home's Board and the investing public through false SEC filings and by lying to auditors; and (2) a conspiracy to obstruct justice with co-schemer Ray in 2006, by causing to be created a false document within the records of KB Home, namely, the Hirst Report, with the intent to impede and obstruct a contemplated SEC investigation.  Category one of defendant's misconduct was expressly charged in the Indictment, forms the bases of defendant four counts of conviction, and is properly taken into account within the framework of USSG § 2B1.1. Category two of defendant's misconduct was not charged in the Indictment, is <u>not</u> covered by defendant's offenses of conviction (which involve mail fraud and Title 15 offenses) and is (contrary to the PSR) <u>not</u> addressed under USSG § 2B1.1.[27]

However, the trial evidence showed that this obstructive conduct formed an integral part of defendant's relevant conduct in 2006, and therefore it must be taken into account in deciding whether to apply USSG § 3C1.1.  Defendant's obstructive misconduct in 2006, in particular, in causing the false Hirst report to be created to ward off a contemplated SEC investigation, constitutes, as the PSR appears to concede, part and parcel of "the same course of conduct" as the offenses of conviction.  Because it is part of

---

[27] In fact, the offense of obstruction of justice involves a different category of purposes and victims, and is covered under an entirely different guideline provision, namely, USSG § 2J1.2 (pertaining to offenses involving the administration of justice).

43

the "same course of conduct" as the offenses of conviction,[28] it must necessarily be viewed as "relevant conduct," see USSG § 1B1.3(a)(2), and accordingly it must be considered in determining guideline "adjustments in Chapter Three," which specifically includes the adjustment for obstruction under USSG § 3C1.1.  USSG § 1B1.3.

In declining to apply the obstruction enhancement, the USPO ignores that co-schemer Ray in fact pled guilty to conspiring with defendant to commit obstruction of justice, in violation of 18 U.S.C. § 1519, and that Ray's guilty plea was well-supported by a detailed factual basis that was accepted by this Court.[29] Application of the obstruction enhancement to defendant's relevant conduct is further supported by Ray's trial testimony, as well as by evidence that defendant was generally warned that the SEC was looking into the matters he was concealing during the very same time period that defendant orchestrated the preparation and dissemination of the false Hirst report with co-schemer Ray.[30]

The USPO also incorrectly suggests that an obstruction enhancement is not warranted here because the government has to show that defendant obstructed the criminal investigation or

---

[28] Defendant's obstructive conduct is also relevant conduct under the provisions of USSG § 1B1.3(a)(1)(A)&(B) in that it relates to acts and omissions caused by defendant and by co-schemer Ray.

[29] For the Court's convenience, a copy of co-schemer Ray's plea agreement and Information is attached to the Stern Dec. as Exh. W.

[30] See the report of MTO, TX 322, attached to the Stern Dec. as Exh. L, which defendant received in late June 2006 and which warned of the pendency of DOJ and SEC investigations into stock option backdating.

1 prosecution of the counts of conviction, *i.e.*, that defendant

2 "attempted to coverup the coverup." PSR ¶ 69. The USPO's analysis

3 is wrong. It is well-settled in the Ninth Circuit that the

4 government does not have to show that defendant sought to obstruct

5 the criminal investigation of the offenses of conviction for the

6 obstruction enhancement to apply. Rather, it is sufficient if the

7 government can establish that defendant intended to obstruct a

8 civil or administrative investigation into the same matters that

9 pertained to his offenses of conviction. See, *e.g.*, United States

10 v. Luca, 183 F.3d 1018, 1022 (9th Cir. 1999) (affirming imposition

11 of § 3C1.1 enhancement where defendant intentionally submitted

12 false prospectuses to Arizona securities division because

13 enhancement applies if defendant provides false information with

14 "intent to obstruct or attempt to obstruct discovery of his or her

15 scheme"). Here defendant caused a false report to be created with

16 the intent to impede a contemplated SEC investigation into the very

17 matters of which he sustained convictions in counts 19 and 20,

18 namely, KB Home's executives' non-compliance with their financial

19 reporting obligations (both to auditors and the investing public)

20 under federal securities law. Because the evidence at trial and

21 sentencing shows that defendant violated 18 U.S.C. § 1519 in

22 concert with co-schemer Ray, a two-level enhancement for

23 obstruction of justice is amply warranted here. See also

24 Application Note 4(i) to USSG § 3C1.1 (specifically identifying as

25 an example of "obstructive conduct" under § 3C1.1 "other conduct

26 prohibited by the obstruction of justice provisions under Title 18,

27 United States Code").

28

45

**F.    A Substantial Term of Imprisonment Is Required To Address The Seriousness of the Offense And Provide General Deterrence**

For the reasons previously stated above, the government respectfully submits that the USPO's recommendation of five years probation, with 8 months home detention in defendant's 24-room Bel-Air mansion and adjoining grounds, is grossly insufficient "to comply with the purposes set forth in paragraph (2)" of 18 U.S.C. § 3553(a).  In particular, the USPO's recommendation will neither serve to "reflect the seriousness of the offense," nor "promote respect for the law," nor "provide just punishment for the offense;" nor will the proposed sentence, as is required, "afford adequate deterrence to criminal conduct."  18 U.S.C. § 3553(a)(2).

Defendant's offenses of conviction include lying to the investing public, and to a public-company's outside auditors, about the fact that he was inflating his own executive compensation for the preceding six years through his concealed practice of stock option backdating.  In connection with the commission of these offenses, in particular with respect to count 19, defendant falsely certified in KB Home's Quarterly Form 10-Q that he had disclosed to KB Home's outside auditors and Audit Committee all significant deficiencies and material weaknesses in the company's internal controls, when in fact defendant knew he had hidden the specifics of the stock option granting process from KB's outside auditor and Audit Committee for approximately seven years.  (PSR ¶¶ 32-33).  When a high-level corporate executive deliberately makes false certifications in a company's filings with the SEC, particularly when these false certifications relate to the terms of the executive's own compensation, such an offense is serious because it

46

1  serves to undermine the integrity of, and confidence in, the

2  disclosures necessary for the proper operation of our financial

3  markets.  It was at least in part for this reason that financial

4  reporting misconduct by high-level corporate executives was

5  specifically criminalized in light of earlier financial scandals

6  between 2001-02 with the passage of the SOX.  See, e.g., 18 U.S.C.

7  § 1350 (enacting criminal penalties for willfully false

8  certifications of a public company's financial statements filed

9  with the SEC, including maximum penalties of 20 years imprisonment

10  and a $5,000,000 fine.

11      In connection with the preparation of the House Conference

12  Report relating to the passage of SOX, House Representative John

13  Sununu of New Hampshire had the following remarks included in the

14  House Conference Report, which are instructive with respect to

15  Congress's legislative intent as to the importance of ensuring

16  corporate executives' compliance with their financial reporting

17  obligations:

18
19          No one in the corporate world should ever believe that
            their position puts them above the law or outside the
20          bounds of ethical responsibility.  Those who do should
            be held accountable, those who break the law should go
21          to jail.  Today, the House will vote for the third
            time this year to hold corporate America to the
22          highest of standards.  Our action today will inform
            executives that their actions will be scrutinized,
23          with threat of real penalties for violations of their
            legal responsibilities to shareholders and the public.

24  House Conference Report, 148 Cong. Rec. E1451-03 (2002).

25      Apart from significantly understating the seriousness of

26  defendant's offense conduct, it appears that imposition of the

27  USPO's recommended sentence will have, if anything, a negative

28  deterrent effect on similarly situated corporate wrongdoers, who

47

1  may readily conclude that the benefits of corporate malfeasance far

2  outweigh any serious penal consequences attending to non-compliance

3  with their reporting and fiduciary obligations under applicable

4  securities laws.  Finally, the government is also concerned that

5  imposition of the USPO's recommendation may have the unintended

6  consequence of undermining respect for the law, in that it suggest

7  to public that there is in reality a two-tiered criminal justice

8  system, one for the affluent, powerful and well-connected, and a

9  second for ordinary citizens.

10      In any event, the government does not contest that defendant's

11 good works are properly to be considered by the Court, and that

12 they may indeed serve as a significant mitigating consideration in

13 conjunction with other relevant, and aggravating, section 3553(a)

14 factors.  However, it is important to keep in mind that defendant

15 comes before the Court for sentencing principally because of the

16 nature of his conduct, which is the focus of the criminal process,

17 not by virtue of the Court's ability to render a full or

18 transparent assessment of his moral or civic character.  With that

19 focus in mind, the government believes that the nature of

20 defendant's criminal misconduct here is serious, and the degree of

21 his culpability for that misconduct is comparatively high.

22 Accordingly, the government respectfully submits, as argued above,

23 that a substantial term of imprisonment is mandated in this case.

24 / /

25 / /

26 / /

27

28

48

## IV

## <u>CONCLUSION</u>

For all the foregoing reasons, the government respectfully submits that the Court should not follow the USPO's sentencing recommendation of September 29, 2010, and should sentence defendant to a substantial term of imprisonment as set forth above.

DATED: October 14, 2010            Respectfully submitted,

ANDRÉ BIROTTE JR.
United States Attorney

ROBERT E. DUGDALE
Assistant U.S. Attorney
Chief, Criminal Division

_____/s/_____
PAUL G. STERN
HARVINDER S. ANAND
Assistant U.S. Attorneys
Major Frauds Section

Attorneys for Plaintiff
United States of America

49

<u>CERTIFICATE OF SERVICE</u>

I, **YENI GOMEZ**, declare:

That I am a citizen of the United States and resident or employed in Los Angeles County, California; that my business address is the Office of United States Attorney, United States Courthouse, 312 North Spring Street, Los Angeles, California 90012; that I am over the age of eighteen years, and am not a party to the above-entitled action;

That I am employed by the United States Attorney for the Central District of California who is a member of the Bar of the United States District Court for the Central District of California, at whose direction I served a copy of: **GOVERNMENT'S RESPONSE AND OBJECTIONS TO THE PRESENTENCE REPORT**

**service was:**

[X] Placed in a closed envelope, for collection and interoffice delivery addressed as follows:

[ ] Placed in a sealed envelope for collection and mailing via United States Mail, addressed as follows:

[ ] By hand delivery addressed as follows:

[ ] By facsimile as follows:

[ ] By email as follows:

[ ] By federal express as follows:

**Adam Sweeny**

**U.S. Probation**

**11827 Ventura Blvd., Suite 100**

**Studio City, CA 91604-2618**

This Certificate is executed on October 14, 2010 at Los Angeles, California. I certify under penalty of perjury that the foregoing is true and correct.

_____
YENI GOMEZ