1

2   KEKER & VAN NEST LLP
    JOHN W. KEKER, SBN 49092
3   Email: JKeker@kvn.com
    ELLIOT R. PETERS, SBN 158708
4   Email: EPeters@kvn.com
    MICHAEL D. CELIO, SBN 197998
5   Email: MCelio@kvn.com
    710 Sansome Street
6   San Francisco, CA 94111-1704
    Telephone: (415) 391-5400
7   Facsimile: (415) 397-7188

8   CALDWELL LESLIE & PROCTOR, PC
    ANDREW ESBENSHADE, SBN 202301
9   Email: esbenshade@caldwell-leslie.com
    BENJAMIN B. AU, SBN 237854
10  Email: Au@caldwell-leslie.com
    1000 Wilshire Boulevard, Suite 600
11  Los Angeles, CA 90017-2463
    Telephone: (213) 629-9040
12  Facsimile: (213) 629-9022

O'MELVENY & MYERS LLP
SRI SRINIVASAN, SBN 205145
Email: ssrinivasan@omm.com
JONATHAN HACKER
(*pro hac vice*)
Email: jhacker@omm.com
1625 Eye Street, NW
Washington, DC 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

13  Attorneys for Defendant BRUCE KARATZ

14              UNITED STATES DISTRICT COURT

15            CENTRAL DISTRICT OF CALIFORNIA

16                    WESTERN DIVISION

17

18  UNITED STATES OF AMERICA,          Case No. CR No. 09-0203-ODW

19                      Plaintiff,      **DEFENDANT BRUCE KARATZ'S
                                        RESPONSE TO THE
20       v.                            PROSECUTORS' OBJECTIONS
                                        TO THE PRESENTENCE REPORT**
21  BRUCE KARATZ,

22                      Defendant.      Sentencing Date: November 10, 2010
                                        Time:            3:00 p.m.

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................1

II.  RESPONSE TO THE PROSECUTORS' OBJECTIONS AND
     PROPOSED ADDITIONS TO THE PSR.........................................2

   A.  The Probation Office's Recommended Sentence is
       Consistent with Sentences for Similarly Situated
       Defendants ................................................................................2

   B.  The PSR Correctly Considers Only Criminal Conduct as
       "Relevant" ................................................................................4

      1.  The jury found Mr. Karatz's conduct was not
          criminal, and that finding should be respected ...........5

      2.  The prosecutors cannot prove by clear and
          convincing evidence that Mr. Karatz committed
          criminal acts prior to 2006 .........................................8

   C.  The PSR Correctly Concludes that Mr. Karatz Caused No
       Loss ........................................................................................10

      1.  Mr. Karatz's "gains" from stock options are
          irrelevant because the prosecutors have failed to
          prove any loss ...........................................................11

         a.  Mr. Karatz's alleged "excess gain" is not a
             measure of loss ................................................11

         b.  The Guidelines do not recognize the concept
             of "intended gain" ...........................................13

         c.  Mr. Karatz's SEC settlement is not evidence
             of loss ...............................................................13

         d.  Mr. Karatz had every right to retain his
             legally obtained options ...................................13

      2.  The prosecutors' own arguments to the jury belie
          their claim that "money and property" refers to
          stock options ..............................................................15

      3.  There is no evidence KB Home suffered any loss ...17

   D.  The PSR Correctly Concludes That Mr. Karatz Was Not
       a "Leader" or "Organizer".....................................................17

   E.  The PSR Correctly Concludes That the Prosecution Has
       Not Proved Mr. Karatz Obstructed Justice USSG § 3C1.1 ...18

i

**TABLE OF CONTENTS**
**(cont'd)**

Page

III.   REPONSES TO THE PROSECUTORS' LINE-BY-LINE
       OBJECTIONS ...............................................................................19

IV.    CONCLUSION...............................................................................27

# TABLE OF AUTHORITIES

<u>Page(s)</u>

## Cases

*United States v. Clark*
   316 F.3d 210 (3d Cir. 2003) ................................................................19

*United States v. Ebbers*
   458 F.3d 110 (2d Cir. 2006) ...............................................................11

*United States v. Fiore*
   381 F.3d 89 (2d Cir. 2004) ..................................................................19

*United States v. Jones*
   472 F.3d 1136 (9th Cir. 2007) .............................................................15

*United States v. Lyman*
   592 F.2d 496 (9th Cir. 1978) .................................................................9

*United States v. Olis*
   429 F.3d 540 (5th Cir. 2005) ...............................................................11

*United States v. Sabino*
   307 F.3d 446 (6th Cir. 2002) ...............................................................19

*United States v. VanMeter*
   278 F.3d 1156 (10th Cir. 2002) ...........................................................18

*Witte v. United States*
   515 U.S. 389 (1995) ............................................................................8, 9

## State Rules

Federal Rules of Civil Procedure
   Rule 32 .............................................................................................19

## Other Authorities

18 U.S.C. §3553(a)(6) ..............................................................................3

DEFENDANT BRUCE KARATZ'S RESPONSE TO PROSECUTORS' OBJECTIONS TO PSR
CASE NO. CR 09-203-OD

# I.    INTRODUCTION

The prosecutors' objections to the pre-sentence report ("PSR") regarding Bruce Karatz[1] attacks the Probation Office, calling its work "defective," "essentially incoherent," and accusing it of "defy[ing] common sense."  The prosecutors further suggest that the Probation Office is applying a different, more lenient standard to Mr. Karatz because of his wealth and prominence in the community.  Mr. Karatz disagrees with the prosecutors' assessment of the PSR and believes that the Probation Office has faithfully interpreted the jury's verdict in this case, the evidence on which it is based, and the Sentencing Guidelines.

Stripped of its rhetoric, the prosecutors' chief complaint with the PSR appears to be that it pays too much heed to the fact that the jury acquitted Mr. Karatz of 16 of the 20 counts against him.[2]  We submit that respecting the jury's verdict is a virtue, not a failure.  Mr. Karatz should be sentenced for the conduct that the jury found to be criminal.  Here, the jury found fault with Mr. Karatz's conduct in July 2006, but not with his conduct prior to that time.  The PSR is faithful to the jury's decision.  The prosecutors should not expect the Probation Office to do what the jury would not do, especially where the jury's verdict was well-grounded in the trial record—as it is in this case (*see* Section II, below).

The prosecutors also suggest that the Probation Office is favoring Mr. Karatz because of his wealth and status.  There is no evidence that the Probation Office did any such thing, nor does Mr. Karatz seek such treatment.  Clearly, every defendant's conduct should be evaluated without reference to his or her wealth.  The Probation Office has done precisely that.  The sentence it recommends for Mr.

---

[1] Mr. Karatz will submit his sentencing memorandum to the court in the normal course.  That memorandum will address Mr. Karatz's sentencing position, and the reasons supporting that position, including the relevant factors set forth in 18 U.S.C. §3553.  This memorandum responds to the prosecutors' objections to the PSR.

[2] On Friday October 15, 2010, the Court entered a judgment of acquittal on a 17th count, Count 7.

1

1   Karatz is consistent with the sentences imposed on defendants convicted of similar

2   conduct. Indeed, the *majority* of the defendants sentenced for stock-options related

3   crimes received *no prison time whatsoever*—not even the home confinement that

4   has been recommended for Mr. Karatz. For the minority that received prison time,

5   sentences have ranged from two months to two years. No defendant has *ever*

6   received anything approaching the six to seven years the prosecutors seek here,

7   much less the fourteen to seventeen years they say the Guidelines recommend.

8   Against the backdrop of these facts, the prosecutors' claim that the Probation

9   Office has undermined confidence in the criminal justice system rings hollow. *See*

10  Government's Response and Objections to the Presentence Report (cited herein as

11  "Obj.") (Docket 432) at 2:25-3:1.

12      Indeed, the Probation Office's recommended sentence is within the range set

13  forth in the United States Sentencing Guidelines, which suggest a sentence of

14  between 8 and 14 months. The Guidelines further permit sentences of that length

15  to be served in home confinement. This is true for every defendant, rich or poor.

16  The prosecutors' real quarrel is not with the Probation Office or even with Mr.

17  Karatz, but with the Guidelines themselves.

18      Rather than criticize the thorough and impartial work of the Probation

19  Office, it should be recognized that given the volume of evidence in this case, its

20  complexity, and the vigor with which conflicting sentencing positions were pressed

21  by the parties, the Probation Officer conducted a skillful investigation and drafted

22  an unusually lucid and rational report. It should not be altered.

23  **II.    RESPONSE TO THE PROSECUTORS' OBJECTIONS AND**
    **PROPOSED ADDITIONS TO THE PSR[3]**

24
    **A.    The Probation Office's Recommended Sentence is Consistent with**
25  **Sentences for Similarly Situated Defendants**

26      Although the prosecutors complain that Mr. Karatz is receiving special

27  _____

28  [3] The prosecutors have submitted paragraph-by-paragraph objections to the PSR.
    Mr. Karatz's paragraph-by-paragraph response is set forth in Section III, below.

1    treatment, nothing could be further from the truth.  Mr. Karatz will likely be the

2    last defendant to be sentenced in a long string of backdating cases.  A review of the

3    sentences received by others charged with crimes associated with stock option

4    pricing demonstrates that the sentence proposed for Mr. Karatz is consistent with

5    what similar defendants have received.  *See* Backdating Cases Charts, attached as

6    Exhibit A to the declaration of Michael D. Celio ("Celio Decl.") filed herewith.  A

7    principal function of the Guidelines is to bring uniformity to federal sentencing,

8    and 18 U.S.C. §3553(a)(6) places an emphasis on avoiding unwarranted sentencing

9    disparities.  The PSR does precisely that.

10       Eleven individuals nationwide have faced sentencing for conduct relating to

11   the pricing of employee stock options.  A majority of those sentenced (six of the

12   eleven) received no prison time (nor even home confinement) and were sentenced

13   to terms of probation ranging from one to five years.  Notably, two of the

14   individuals receiving probationary sentences were, like Mr. Karatz, the chief

15   executive officers of their respective companies (Michael Shanahan of Engineered

16   Support Systems and Ryan Brant of Take Two).  The other individuals sentenced

17   to probation were more directly involved with stock options than the two CEOs:

18   two general counsels, a chief accounting officer and a corporate controller.  None

19   of them were low-level "paper-pushers"—each was a corporate officer with direct

20   responsibility for the legal and accounting consequences of their companies.

21       Only five individuals nationwide have been sentenced to prison for options

22   pricing-related conduct.  The shortest custodial sentence was two months

23   (Stephanie Jensen of Brocade) and the longest was two years (James Treacy of

24   Monster, Inc).  No defendant has ever received a sentence approaching what the

25   prosecutors indicate they will suggest here—indeed, none has received even one-

26   third of their proposed sentence.  And unlike those defendants who have been

27   previously sentenced, Mr. Karatz was acquitted of *all* counts concerning the

28   alleged backdating of stock options.

1    The PSR's recommended sentence of 8 months of home confinement is in

2    fact slightly more restrictive than the sentences received by a majority of similarly

3    situated defendants.  The majority of defendants sentenced for stock options

4    related crimes did not suffer any period of home confinement.  The prosecutors'

5    argument that the Probation Office is affording Mr. Karatz special treatment is

6    inconsistent with these facts.

7    **B.    The PSR Correctly Considers Only Criminal Conduct as "Relevant"**

8    The prosecutors' next contention is that even though Mr. Karatz was

9    acquitted of any wrongdoing related to KB's options granting process, it is

10   nonetheless "relevant conduct" under U.S. Sentencing Guidelines § 1B1.3.  As a

11   result, the prosecutors ask that Mr. Karatz be sentenced exactly as he would have

12   been if they had prevailed on every count at trial rather than losing on seventeen of

13   twenty.

14   Under the facts of this case, the prosecutors' position is improper for at least

15   two reasons: first, it trivializes the jury's finding that Mr. Karatz's conduct

16   regarding options pricing was not criminal.  In essence, the prosecutors demand

17   that the Probation Office nullify the jury's decision, even though that decision was

18   well-grounded in the trial record, as set forth below.  Second, even if it is

19   technically permissible to consider acquitted conduct at sentencing, the prosecutors

20   must <u>prove</u> that conduct by clear and convincing evidence—the standard that the

21   prosecutors acknowledge but do not satisfy.[4]  The scant evidence the prosecutors

22   cite, in the form of self-serving memoranda of interview (prepared by government

23   agents) and selective grand jury testimony (not subject to cross-examination), was

24   directly contradicted by the evidence at trial.  Even if one were to credit the grand

25   jury testimony, the direct conflict between that testimony and the trial record

26

27   [4] *See* Obj. at 23, fn. 16 (stating that "the government submits that the Court should
     here apply the higher standard of clear and convincing evidence (rather than mere
28   preponderance) in making this sentence finding.")

1  renders it incapable of satisfying the prosecutors' burden to provide clear and

2  convincing evidence to support its position.  Indeed, the prosecutors' inability to

3  cite even a single line of trial testimony or a single trial exhibit supports the jury's

4  decision to acquit Mr. Karatz on those counts.

5      **1.    The jury found Mr. Karatz's conduct was not criminal, and that**
        **finding should be respected**

6

7      Conduct that is legal cannot fall under the ambit of §1B1.3.  Mr. Karatz was

8  acquitted of the pre-2006 "backdating" charges because the evidence at trial failed

9  to establish that his conduct was illegal.

10     At trial, the prosecution broke its case into two distinct parts:  first, the

11 alleged "backdating" of stock options that from 1999 through February 2006

12 resulted in over $6 million in allegedly illicit gain to Mr. Karatz, and second, the

13 alleged cover-up in July 2006.  This is how the case was tried and argued from

14 start to finish.  *See* Celio Decl., Ex. B at Tr. 651:12-17[5] (Prosecution's opening

15 statement, "from 1999 to 2005, he secretly padded his pay each year, without

16 revealing it to shareholders and without their knowledge.  And in 2006 when he

17 was asked about it, when he was asked about the plans that he had been using,

18 things that he had been doing from 1999 to 2005, he lied.")

19     But the prosecutors failed to prove illegal conduct in the pricing of stock

20 options.  The backdating of stock options is <u>not</u> itself illegal, and the Court so

21 instructed the jury at the beginning and end of the trial.  Although the prosecutors

22 try to minimize this essential fact, it has an important consequence: the prosecutors

23 must prove that some *additional* conduct by Mr. Karatz made the options pricing

24 illegal.  The prosecutors failed to do this under any legal standard, much less by

25 clear and convincing evidence – the standard the prosecutors concede should

26 apply.

27

28

[5] The relevant transcript pages and exhibits are attached to the Celio Declaration.

1    The prosecutors failed to adduce a single document that showed fraudulent

2  intent on the part of Mr. Karatz (or anyone else) in the process of selecting option

3  grant dates.  In the millions of pages that were produced by KB Home and other

4  entities and individuals, there was not a single page showing that Mr. Karatz

5  knowingly acted improperly in pricing stock options.  The prosecutors relied solely

6  on the testimony of Gary Ray, a witness who admitted lying numerous times to the

7  prosecutors in statements given under penalty of prosecution.  The testimony was

8  of such limited credibility that the Court stated during Mr. Ray's cross-

9  examination that "I think we have established that the man is a liar."  (Celio Decl.,

10  Ex. B at Tr. 2171:12-13).

11    By contrast, Mr. Karatz called several witnesses whose testimony

12  demonstrated that the use of hindsight in the pre-2006 period occurred without

13  fraudulent intent.  This is demonstrated by the trial testimony of two witnesses who

14  were deeply involved in the stock option-pricing process: Julia Ambrose and

15  Kimberly King.  Ambrose was KB Home's Senior Vice-President of

16  Compensation, and was involved in the grant date selection process for the entire

17  span of the alleged fraudulent scheme.  King served as KB's Deputy General

18  Counsel and was the lawyer in charge of securities law compliance.  Both Ms.

19  King and Ms. Ambrose testified that KB's process was legal, not concealed from

20  anyone, was performed transparently, and that neither ever believed it was illegal.

21    For example, Ms. King testified that she was well aware that KB Home used

22  lookbacks to price stock options, that she researched the propriety of the practice,

23  and concluded it was legal.  Celio Decl., Ex. B at Tr. 3683:17-3684:5.  Ms. King

24  understood she had a duty to inform Mr. Karatz if she believed the practice was

25  illegal but she did not because she did not believe the process to be illegal.  *Id.* at

26  Tr. 3684:7-22, 3740:9-11.  Notably, an exhibit introduced at trial demonstrated that

27  Mr. Karatz was aware that Ms. King was directly involved in the process and that

28  her involvement was relevant to Mr. Karatz.  Celio Decl., Ex. C (Trial Exhibit

DEFENDANT BRUCE KARATZ'S RESPONSE TO PROSECUTORS' OBJECTIONS TO PSR
CASE NO. CR 09-203-ODW

126).

Ms. King further testified that KB Home's process was transparent and well-known to the relevant parties at KB Home.  Among others, she discussed KB's options granting processes with KB Home's then General Counsel, Bart Pachino, and concluded that Mr. Pachino shared her view that KB Home's option-pricing process was legal.  Celio Decl., Ex. B at Tr. 3684:23-3685:14.  Ms. King also discussed KB Home's process with the Chief Accounting Officer Bill Hollinger, the Vice President of Tax, Cory Cohen, and another in-house lawyer, Tony Richelieu.  *Id.* at Tr. 3722:21-25, 3737:12-14.

For her part, Julia Ambrose similarly testified that she was aware of the option-pricing process and never believed it to be fraudulent or improper.  *Id.* at Tr. 3457:5-7, 3519:9-11.  She was never told the process was a secret and never treated the process as a secret.  *Id.* at Tr. 3456:17-22.  In fact, Ms. Ambrose spoke freely with anyone involved in the process.  *Id.* at Tr. 3506:3-9.  Ms. Ambrose worked closely with her boss Gary Ray, and he never indicated he was uncomfortable with the process or believed it was wrong.  *Id.* at Tr. 3457:8-13.

The testimony of Ms. King and Ms. Ambrose was consistent with the documents adduced at trial.  As Ms. Ambrose testified, documents discussing the options pricing process were widely circulated among the company's top management.  Indeed, she prepared a memorandum that went to every senior officer in the company explaining that after the passage of the Sarbanes-Oxley Act in 2002, KB no longer had the flexibility it had previously had to select option grant dates.  (*Id.* at Tr. 3493:25-3494:21; Celio Decl., Ex. D (Trial Exhibit 5343A)).  Nor is this memorandum the only example:  Ms. Ambrose testified that an email sent by Gary Ray to Ms. Ambrose, Ms. King, Mr. Pachino (the General Counsel at the time), Mr. Hollinger (the Chief Accounting Officer) and Cory Cohen (the Vice President of Tax) made clear that the option grant date would be chosen by looking back up to two days.  (Celio Decl., Ex. B at Tr. 3488:3-3489:6,

1    Celio Decl., Ex. E (Trial Exhibit 5326)).

2        The testimony of Ms. King and Ms. Ambrose, the documents showing open

3    discussion of the option-pricing process and the lack of any documents showing

4    criminal intent by Mr. Karatz, provided an ample basis for the jury to acquit Mr.

5    Karatz on the sixteen backdating-related counts.  Because the conduct was not

6    criminal, it is not relevant conduct and should play no role in Mr. Karatz's

7    sentence.

8        **2.    The prosecutors cannot prove by clear and convincing evidence
             that Mr. Karatz committed criminal acts prior to 2006**

9

10       The prosecutors' position on sentencing is this:  the Court should ignore the

11   jury's verdict and the evidence on which it was based; it should apply a new and

12   lower standard of proof; it should consider certain inadmissible evidence never

13   presented to the jury or subjected to cross-examination; on that basis it should

14   conclude that Mr. Karatz is actually guilty on all counts; and then it should

15   sentence Mr. Karatz for the exact conduct of which the jury acquitted him.  Just

16   weeks ago, while defending the three counts of conviction against Mr. Karatz's

17   motion for acquittal, the prosecutors argued that the jury's decision was entitled to

18   great deference.  Now, they argue, those verdicts should be disregarded.  While

19   some case law gives a sentencing court the authority to go down that route if it

20   wishes, there is no reason for this Court to do so here.

21       The prosecutors' argument fails for one simple reason:  they must prove by

22   clear and convincing evidence that the allegedly relevant conduct *was criminal*.

23   *See Witte v. United States*, 515 U.S. 389, 403 (1995) ("relevant conduct provisions

24   of the Sentencing Guidelines" enhance a sentence "if it was either accompanied by

25   or preceded by additional *criminal* activity"(emphasis added)).  The prosecutors'

26   discussion of whether Mr. Karatz's pre-2006 conduct is "relevant conduct" under

27   §1B1.3 ignores this critical requirement.  Indeed, the prosecutors quote the key

28   language but miss its import:  "For two or more *offenses* to constitute a common

1   part of a scheme or plan…" U.S. Sentencing Guidelines Manual §1B1.3

2   Application Note 9(A) (2004). The use of the word "offenses" is not an accident;

3   it refers to criminal conduct. As the Supreme Court made clear, only "additional

4   criminal activity" can be "relevant conduct" for sentencing purposes. *See Witte*,

5   515 U.S. at 403.

6        The prosecutors fail to offer a single citation to trial testimony or a single

7   trial exhibit; they fail to demonstrate that there was any "additional criminal

8   activity." *See* Obj. at 16-23. Rather, the prosecutors rely on selected memoranda

9   of interviews of Board members prepared by F.B.I. agents and on grand jury

10   testimony from certain Board members.[6] These interviews and grand jury

11   testimony were not presented at trial, and were thus not subject to cross-

12   examination. As a result, they are of little value in establishing the relevant

13   conduct in this case. If the prosecutors believed that the testimony was credible

14   and demonstrated Mr. Karatz's guilt, they should have had no fear of subjecting it

15   to cross-examination. But they were unwilling to have those witnesses' stories

16   tested, and that decision speaks for itself.

17        The trial record supports Mr. Karatz's position, not the prosecutors'. The

18   only member of the Compensation Committee called as a witness at trial, Charles

19   Rinehart, admitted that stock option grant dates were never concealed from him or

20   from shareholders. Celio Decl., Ex. B at Tr. 1007:2-13. He further admitted that

21   no one concealed from the Board or shareholders the fact that the grant date was

22   set after the compensation committee date. *Id*. at Tr. 1002:22-25; 1007:20-23. In

23   fact, Mr. Rinehart testified that he never thought Mr. Karatz was trying to hide

24   anything from the Board's Compensation Committee. *Id*. at Tr. 1012:15-19.

25   Former KB Home Chief Financial Officer Michael Henn cast further doubt on the

26   prosecutors' assertion of a six year fraudulent scheme to conceal. Mr. Henn

27

28

---

[6] The prosecutors also cite the indictment they drafted, but "An indictment is not evidence." *United States v. Lyman*, 592 F.2d 496, 502 (9th Cir. 1978).

1    testified that a review of the company's publicly available proxy statements,

2    reviewed and approved by the Board and distributed to shareholders, would have

3    told him that grant dates were chosen with hindsight. *Id.* at 1566:22-1567:4;

4    1567:12-16. Notably, this testimony was brought out by the prosecutors

5    themselves.

6         The prosecutors' argument that Mr. Karatz engaged in a six-year fraudulent

7    scheme of concealment is also inconsistent with the testimony of KB Home human

8    resources executive Julia Ambrose and securities compliance lawyer Kimberly

9    King, as set forth above.   The jury's verdict strongly suggests that it believed Ms.

10   Ambrose and Ms. King and not admitted liar Gary Ray. The prosecutors have not

11   carried their burden of proving the purported relevant conduct by any standard, let

12   alone by clear and convincing evidence.

13   **C.    The PSR Correctly Concludes that Mr. Karatz Caused No Loss**

14        The prosecutors' third major objection is that they believe the PSR erred

15   when it found that Mr. Karatz caused no loss under the Sentencing Guidelines.

16   PSR ¶50.   The prosecutors primary complaint is that Mr. Karatz's gain from his

17   options between 1999 and 2005 should be used as the measure of KB's loss.  But

18   the PSR correctly concludes that "gain" may only be used in the place of loss

19   where a loss amount has been proved, and no loss has been demonstrated.  The

20   prosecutors argue that the "money and property" referenced on the verdict form

21   can, in their view, only refer to the stock options Mr. Karatz received from 1999 to

22   2005. But this is directly contradicted by the record and by the arguments these

23   very same prosecutors made to the jury. The Probation Office cannot be faulted

24   for accepting the possibility that the jury took the prosecutors at their word.

25   Finally, the prosecutors object that KB Home was required to spend money to

26   investigate the options granting practices that had been employed.  The PSR

27   properly rejected this argument because there is no evidence to support it.  To the

28   contrary, it appears that KB would have been required to examine its options

practices and restate its financial results regardless of how Mr. Karatz responded to the investigation in 2006.

### 1. Mr. Karatz's "gains" from stock options are irrelevant because the prosecutors have failed to prove any loss

#### a. Mr. Karatz's alleged "excess gain" is not a measure of loss

The prosecutors' primary objection—that loss for the counts of conviction can be determined by reference to Mr. Karatz's gains between 1999-2005—is factually and legally wrong. Under the Guidelines, gain is only used as a surrogate for loss when there is a loss, but the exact amount of loss is difficult to calculate. U.S. Sentencing Guidelines Manual § 2B1.1 Application Note 3(B) (2003). The "loss" here in 2006 is not difficult to calculate – it is nonexistent.

There is no loss here because for sentencing purposes, "loss must be the result of the fraud." *United States v. Ebbers*, 458 F.3d 110, 128 (2d Cir. 2006) (*citing United States v. Olis*, 429 F.3d 540, 547 (5th Cir. 2005)). "Losses from causes other than the fraud must be excluded from the loss calculation." *Id.* The Sentencing Commission has specifically explained that "actual loss" under § 2B1.1 "requires factual causation (often called 'but for' causation) and provides a rule for legal causation (*i.e.,* guidance to courts regarding how to draw the line as to what losses should be included and excluded from the loss determination). U.S. Sentencing Guidelines Manual Appendix C, amend. 617 (Definition of Loss) (2006).

Here, there was no cognizable loss caused by or "but for" Mr. Karatz's offense conduct. Mr. Karatz stands convicted of three counts (6, 19 and 20) that relate to three statements that occurred over several days in July of 2006. On July 5, Mr. Karatz signed a "management representation letter" to KB Home's outside auditor Ernst & Young, that stated (among other things) that he wasn't aware of any deficiencies in KB Home's system of internal controls. Count 6 alleged that the letter's failure to disclose the company's options pricing practices was mail

1  fraud; count 20 alleged this same letter constituted a lie to the auditor of a public
2  company.   Two days later, on July 7, 2006, Mr. Karatz signed a quarterly report
3  filed with the Securities and Exchange Commission that did not disclose how
4  options were priced.  Count 19 alleged this was securities fraud.  Taken together,
5  these counts alleged that Mr. Karatz, in 2006, failed adequately to disclose what
6  KB had previously been doing between 1999 and 2005—not that what KB had
7  been previously doing was itself criminal.

8       The prosecutors contend that Mr. Karatz's receipt of $6.6 million between
9  1999 and 2005 should be the measure of loss in this case.  That $6.6 million
10 represents the difference between the value of the options as actually priced and
11 their value as the prosecutors contend they should have been priced.  They go so
12 far as to claim that every dollar of gain for Mr. Karatz must necessarily be a loss to
13 KB Home.  Obj. at 3:22-25.  But it is incorrect to claim that Mr. Karatz would not
14 have received that money "but for" his statements in 2006.  The pricing of his
15 options had been set well before July 2006, and Mr. Karatz had a contractual right
16 to exercise those options and thereby receive that money regardless of what he
17 subsequently said or did not say in July 2006.[7]  The 2006 conduct in no way
18 caused the alleged loss from option awards completed years earlier.

19      The prosecutors have elsewhere conceded that there is no loss in this case.
20 Only one other individual, Gary Ray, was charged in connection with the 2006
21 concealment of the manner in which the options were priced from 1999 through
22 2005.  In Ray's plea agreement, he admitted to having conspired to impede and
23 obstruct a potential SEC investigation through the presentation of false statements
24 regarding the manner in which options had been priced.  *See* Celio Decl., Ex. F

---

[7] Imagine, for example, that Mr. Karatz had simply refused to sign the two
documents in question.  No crime would have been committed (although Mr.
Karatz may have had to resign as CEO) but Mr. Karatz would still be entitled to his
options and KB Home would still have been required to honor them.  The signing
of these two documents did not cause KB Home any loss.

(Ray Plea Agreement, Factual Statement) at ¶¶ 12-16.  These same prosecutors agreed with Ray that there was no loss associated with his offense.  The prosecutors should honor that truthful concession in the case of Mr. Karatz.

### b.    The Guidelines do not recognize the concept of "intended gain"

The prosecutors also claim that Mr. Karatz is responsible for an "intended loss" of $10.9 million because he possessed numerous unexercised stock options.  This is not an "intended loss" but rather an "intended gain."  The Sentencing Guidelines do not recognize the concept of an "intended gain."  As the PSR recognizes, there is simply no legal authority for using such a concept to calculate loss, and the prosecutors cite to none.

### c.    Mr. Karatz's SEC settlement is not evidence of loss

The prosecutors' argument that the 2008 SEC settlement is proof that Mr. Karatz understood in 2006 that he did not have a right to the $6 million the prosecutors claim is the amount of loss is unfortunate and unfair.  Obj. at 1, fn. 1.  The SEC settlement explicitly states that the settlement is entered into without Mr. Karatz conceding or admitting anything, including any form of liability.  It is troubling that these prosecutors, aware that this civil settlement with another agency of the United States government reflects *both parties'* explicit understanding that it is not an admission of anything, would then present it to this Court and argue that it is an admission of liability.  Moreover, nothing about that settlement in 2008 has the slightest bearing on Mr. Karatz's intention in 2006, or his understanding at that time that he would ever have any legal obligation to pay money to the company or to the United States government.

### d.    Mr. Karatz had every right to retain his legally obtained options

As a fallback position, the prosecutors claim that even if Mr. Karatz had a right to the options when he first received them, he was under an obligation to return them at some ill-defined point in 2006.  The prosecutors are incorrect.  As

1   an initial matter, Mr. Karatz already had those options and their value and had

2   every legal right to keep them; and the jury acquitted him of any alleged

3   misconduct associated with his having received them.  The terms of those options

4   were disclosed in KB Home's SEC filings and KB Home's Board of Directors

5   authorized those shares.  *See, e.g.,* Celio Decl., Ex. G (Trial Exhibit 5180); Celio

6   Decl., Ex. B at Tr. 1506:6-12 (Q. [Exh. 5180] shows the stock options granted, it

7   tells the shareholders how many stock options Mr. Karatz and others were granted

8   during the previous fiscal year; right?  A. Yes.  Q. And it tells them what the grant

9   date is?  A. Yes, it does.")  There is no evidence that KB would not have awarded

10  those shares but for Mr. Karatz's conduct.

11       Nor can the prosecutors explain when, exactly, Mr. Karatz was told that he

12  should return the options in question.  The prosecutors cite several news reports

13  (forwarded to Mr. Karatz) that discuss investigations into other companies that had

14  issues with their options granting processes.  But the evidence at trial made clear

15  that KB Home's practices were different than those other companies.  Indeed,

16  prosecution witness Robert McCormick testified that he believes, even today, that

17  what KB Home did when it looked back one to two days was not backdating:

18       Q: . . .Thursday I could decide whether to use Wednesday's price,
         and that's fine; right?
19
         A.  That's right.
20

21  Celio Decl., Ex. B at Tr. 2552:20-22.  Even the prosecution's own witnesses, who

22  met with the prosecutors extensively before trial, do not believe that Mr. Karatz

23  was under an obligation to return the options he received.

24       Indeed, none of the evidence the prosecution points to suggests he had any

25  obligation to return the shares in question.[8]  The prosecutors claim that retaining

26  _____

27  [8] For example, the prosecution points to language that section 304 of Sarbanes
    Oxley states that a CEO is only required to repay compensation when there is
    evidence of misconduct—but Mr. Karatz committed no misconduct in connection
28  with stock options, as the jury found.

money that a defendant no longer is entitled to can, in some circumstances, constitute fraud. *See United States v. Jones*, 472 F.3d 1136 (9th Cir. 2007). But *Jones* has nothing whatsoever to say about Mr. Karatz's case. In *Jones*, the defendant did not have any entitlement to the funds; he was always holding them on behalf of his investors. And at the moment he appropriated them for himself, the Court found he had fraudulent intent. *Id.* Here, by contrast, the jury found that receipt of the options was not criminal, and thus that Mr. Karatz had no fraudulent intent when he received the options as compensation. *Jones* certainly does not stand for the proposition that it is fraud not to return money or property where the defendant received title in the absence of any fraudulent intent. Moreover, even if *Jones* could be read so broadly, the defendant in that case, having no title to the funds, was obligated to return them once the opportunity to purchase the cars fell through. In Mr. Karatz's case, the fact of backdating in no way divested him of the right to his options, and there is nothing else to establish that ownership of those options otherwise would have reverted back to KB Home at any point.[9]

Finally, the trial record does not support the prosecutors' claim that Mr. Karatz intended to harm KB Home. *See* Obj. at 26:21-23. The trial record demonstrates that Mr. Karatz was deeply devoted to KB Home, a company that he built over more than two decades. *See* Celio Decl., Ex. B at Tr. 3940:2-14. The notion that he consciously intended to harm KB Home cannot be squared with the testimony of record.

**2.   The prosecutors' own arguments to the jury belie their claim that "money and property" refers to stock options**

The prosecutors' buttress their objections to the PSR's loss calculation by

---

[9] It is worth noting that had the "coverup" been successful, KB would arguably have been better off, as it would have caused KB to retain money it otherwise would have had to pay to the government in the form of back taxes. KB would actually have gained more than it lost from Mr. Karatz's conduct had it been successful.

DEFENDANT BRUCE KARATZ'S RESPONSE TO PROSECUTORS' OBJECTIONS TO PSR
CASE NO. CR 09-203-ODW

1    arguing that that the jury form's reference to "money and property" in connection

2    with Count 6 is obviously a reference to the options Mr. Karatz received from 1999

3    to 2005.  Obj. at 24.  But that conclusion is only obvious if you ignore the trial

4    record and the arguments that these very prosecutors made to the jury.  It is, for

5    example, equally likely that the jury accepted their argument at trial that

6    Mr. Karatz's objective in July 2006 was to keep his job and be able to issue more

7    options in October 2006.  For instance, the prosecutors argued in their Opening

8    Statement that Mr. Karatz:

9        hid the process in 2006, lied about the process all to avoid being here,
         all to keep his job, all to avoid the Securities & Exchange
10       Commission actually finding out what occurred.

11   Celio Decl., Ex. B at Tr. 705:2-5.  The jury instructions in the case permitted the

12   jury to convict on the basis that Mr. Karatz sought to keep his job, since the jurors

13   were instructed that it did not matter whether the scheme or plan was successful.

14   KB Home suffered no "loss" from any effort by Mr. Karatz to keep his job.

15       The prosecutors also presented a theory that the "property" at issue consisted

16   of options that would be granted in the future.  That is what Gary Ray stated when

17   discussing the objectives of the 2006 cover-up:

18       Mr. Karatz wanted to go ahead and have another option grant in
         2006 with the stated belief on his part we need to insure that the
19       rank and file, all the employees see that it is business as usual.

20   Celio Decl., Ex. B at Tr. 1888:7-10.  A grant cycle in 2006 might have delivered

21   additional money and property to Mr. Karatz in the form of stock options, and the

22   jury may have determined that was the "property" involved in Count 6.  But that

23   property is not the "loss" the prosecution now identifies.  At trial, the prosecutors

24   stated that Mr. Karatz concealed facts in 2006 in order to keep his job and to be in

25   a position to issue and receive more options in October 2006.  They have

26   abandoned those theories now, in favor of an effort to ratchet up Mr. Karatz's

27   sentencing exposure by arguing a "loss" based on a theory the jury rejected.

28

DEFENDANT BRUCE KARATZ'S RESPONSE TO PROSECUTORS' OBJECTIONS TO PSR
CASE NO. CR 09-203-ODW

### 3.     There is no evidence KB Home suffered any loss

Finally, the prosecutors argue that KB Home suffered a loss because its investigation into its historic stock options practices might have cost less but for the offense conduct. The prosecutors' position is unsupported by any evidence whatsoever. The closest it can come is a spreadsheet – not offered at trial and not authenticated by any witness – that purports to show the total cost of Irell & Manella's investigation. The prosecutors speculate that if Mr. Karatz had spoken up about KB Home's practices sooner than he did, some of those costs might have been ignored. *See* Obj. at 12, fn.5; *id.* at 25 fn.17.

But as the PSR recognized an investigation would have been required in any event. Indeed, the prosecution concedes as much. *See* Obj. at 25 n.17. The prosecutors present no evidence whatsoever that the investigation would have cost less; they simply speculate that it *might* have. Because they bear the burden of proof, their failure is fatal to their argument.

### D.     The PSR Correctly Concludes That Mr. Karatz Was Not a "Leader" or "Organizer"

The prosecutors' fourth major objection is that that Mr. Karatz's sentence should be enhanced for his "role in the offense." But the PSR correctly concluded that no enhancement for aggravating role is warranted. Section 3B1.1 provides for a two-level increase if the defendant was an organizer, leader, manager or supervisor in any criminal activity. U.S. Sentencing Guidelines Manual § 3B1.1 (2003). For purposes of that section, a "'participant'[in criminal activity] is a person who is criminally responsible for the commission of the offense," although he "need not have been convicted." *Id.* at Application Note 1. Because Mr. Karatz was convicted only of signing two documents that failed to describe the way in which options were priced from 1999 through 2005, at most, there were only two

DEFENDANT BRUCE KARATZ'S RESPONSE TO PROSECUTORS' OBJECTIONS TO PSR
CASE NO. CR 09-203-ODW

participants in that criminal conduct: Mr. Karatz and Gary Ray.[10]  In order for this enhancement to apply, Mr. Karatz must have been the *supervisor* in the actual criminal conduct.  *See United States v. VanMeter*, 278 F.3d 1156, 1166 (10th Cir. 2002).

The only evidence introduced at trial that could be interpreted to support this view is the testimony of Mr. Ray, whom the Court found not to be credible—and with good reason, as he admitted that he has lied repeatedly.  And even if Mr. Ray had a shred of credibility, his current story depends on his interpretation of ambiguous comments, as he does not even purport to recall what Mr. Karatz actually said.  For example, in his October 8, 2006 interview with the prosecution, the FBI records him as saying "Ray felt Karatz assigned him the responsibility to come up with the process to explain to Hirst because Karatz wanted to keep at arm's length."  Ray's "feelings" about what Mr. Karatz wanted are insufficient to establish Mr. Karatz's "leadership" in the offense by any standard, much less by the requisite clear and convincing evidence.  As a result, this enhancement does not apply.

**E.     The PSR Correctly Concludes That the Prosecution Has Not Proved Mr. Karatz Obstructed Justice USSG § 3C1.1**

Finally, the prosecutors object to the PSR's finding that it would be inappropriate to enhance Mr. Karatz's sentence for obstructing or impeding the administration of justice under section 3C1.1.  The PSR is correct.  Application Note 7 to section 3C1.1 expressly forbids the concept of "double counting" and cautions that if the defendant is convicted of certain obstruction-related offenses, such as perjury and obstruction, the enhancement should not be applied unless a "significant further obstruction" occurred during the investigation, prosecution, or

---

[10] It is far from clear that Gary Ray played *any* role at all in the conduct underlying the counts of conviction.  As the head of human resources, Ray had no role in the preparation or signing of the management representation letter of the SEC form 10-Q that form the basis for the counts of conviction.

sentencing of the obstruction itself, beyond the facts comprising the count of conviction.

Here, the obstruction Mr. Karatz engaged in was the same as the conviction conduct—namely, failing to disclose fully the historical options pricing practices through misrepresentations and/or omissions—and is therefore accounted for in the base offense level. There is no "significant further obstruction." Mr. Karatz did not testify falsely in his trial. He did not provide a false statement to law enforcement. He did not destroy evidence, or urge others to do so. He has been cooperative with the Probation Office and Pretrial Services. The obstruction adjustment is not appropriate where the defendant has been convicted of an offense that already takes account of his effort to obstruct justice. *See United States v. Clark*, 316 F.3d 210, 213 (3d Cir. 2003) (rejecting increase because production of false birth certificate was part of the charged offense of making false claim to U.S. citizenship); *United States v. Sabino*, 307 F.3d 446 (6th Cir. 2002) (because the indictment listed false testimony to the grand jury as an overt act, the false statements were "part" of the conspiracy and could not support a separate obstruction increase). *Cf. United States v. Fiore*, 381 F.3d 89, 95 (2d Cir. 2004) (holding that it was permissible to enhance fraud sentence for obstruction where fraud did not include obstructive conduct).

## III.   REPONSES TO THE PROSECUTORS' LINE-BY-LINE OBJECTIONS

Under Rule 32, the parties may file objections to the PSR. Typically, such objections note any perceived errors in the PSR and any disagreements with the PSR's Guidelines analysis. In this case, however, the prosecutors have provided paragraph-by-paragraph edits to the PSR. The prosecutors' edits do not identify any errors in the PSR but instead seeks to redraft the PSR's prose to better reflect their sentencing position, discussed above. Because the prosecutors' substantive arguments are incorrect, there is no reason to alter the language of the PSR in

19

1  support of those arguments.

2      For the Probation Office's convenience (and for the Court's), set forth below

3  is a point by point refutation of the prosecutors' proposed edits to the PSR, with

4  citations to supporting evidence.[11]

5      **1.**    <u>**Counts of Conviction ¶2:**</u>

6      The prosecutors fault the Probation Office for (allegedly) not mentioning

7  that the jury checked a box on the verdict form.  But the PSR discusses the very

8  finding that the prosecution alleges was omitted.  *See* PSR ¶52.  The prosecutors'

9  complaint is not the omission of the information, but instead that the PSR

10  (properly) rejects arguments the prosecution makes based on that finding – as

11  discussed at length above.  This checked box sets up an argument the prosecutors

12  wish to make about how they believe the loss amount should be calculated under

13  U.S. Sentencing Guidelines § 2B1.1.

14      There is, however, one change that needs to be made to ¶2:  on October 15,

15  the Court granted Mr. Karatz motion for a judgment of acquittal on Count 7.  That

16  judgment of acquittal should be noted in the PSR.

17      **2.**    <u>**¶16:**</u>

18      The prosecutors claim that the word "motive" in paragraph 16 should be

19  replaced with the word "motivate."  The meaning of the sentence is unambiguous,

20  and we leave word choice to the Probation Office's discretion.

21      **3.**    <u>**¶17:**</u>

22      Paragraph 17 currently states that Mr. Karatz "received between 250,000

23  and 600,000 stock options annually."  The prosecution objects that ¶17 should be

24  limited to state that he received such options "during the period 1999 to 2005."

25  This limitation is not entirely accurate, as Mr. Karatz received options within the

26  

---

[11] In their paragraph-by-paragraph objections, the prosecutors cite to no evidence
in support of their proposed changes.  The Probation Office would be justified in
rejecting them on that basis alone.

DEFENDANT BRUCE KARATZ'S RESPONSE TO PROSECUTORS' OBJECTIONS TO PSR
CASE NO. CR 09-203-ODW

1  stated range in fiscal year 1998, and also received a smaller, though still substantial

2  number of options during prior years as well.  The prosecutors are seeking to limit

3  paragraph 17 to buttress their arguments about the scope of relevant conduct.  As

4  the Probation Office considered and rejected those arguments, there is no reason to

5  alter ¶17.

6      **4.**    **¶21:**

7      Paragraph 21 states that "From approximately 1999 to 2001, Karatz had Ray

8  identify the date on which KB's closing price was at its historical low point for the

9  proceeding four to six weeks.  After receiving this information, Ray designated this

10  date for all of KB's annual stock option awards."

11      The prosecutors object that the sentence is somehow unclear, and seek to

12  substitute their own version of the sentence that it prefers.  The PSR's version is

13  both clear and more faithful to the testimony at trial.  The PSR's uses of the phrase

14  "after receiving this information" reflects the evidence at trial that Gary Ray

15  corresponded with other members of the human resources department to obtain the

16  required information[12]—an important fact because it demonstrates the open, above-

17  board manner in which the process proceeded.   The jury's rejection of all charges

18  from this period is consistent with this view of the evidence.

19      **5.**    **¶22:**

20      As with the prior paragraph, the prosecutors seek to add language

21  conforming with their view of the evidence rather than the evidence at trial.  The

22  prosecutors' proposed language states that "Ray and Karatz used a rolling two day

23  window…" but this is potentially misleading as it suggests a more active role in

24  the process than Mr. Karatz actually played.  Although Mr. Karatz was required to

25  sign off on the date, Ray typically selected the date and Karatz approved it.  *See,*

26   

---

27  [12]*See, e.g.,* Celio Decl., Ex. B at Tr. 1631:16-1632:1.  Even Gary Ray, the

28  prosecution's star witness, conceded on direct examination that as many as 3 other

employees in his HR department were involved in the process.

DEFENDANT BRUCE KARATZ'S RESPONSE TO PROSECUTORS' OBJECTIONS TO PSR
CASE NO. CR 09-203-ODW

1  *e.g.,* Celio Decl., Ex. H (Trial Exhibit 122 - Email from Ray to Julia Ambrose:

2  "Based on the bounce that new home starts data has given the sector, I'm going to

3  talk to Bruce today about using Friday, 10/22, as the strike price date."). The

4  PSR's language conforms more closely with the evidence at trial.

5        **6.**    **¶24:**

6        Paragraph 24 of the PSR discusses the fact that the chairman of the Audit

7  Committee contacted Mr. Karatz in May of 2006 regarding the stock option issues

8  that were appearing in the press.  The prosecutors seek to add a sentence stating:

9  "Karatz informed the Chairman of KB's Audit Committee that he had already

10 discussed with KB's general counsel the need to initiate such an internal

11 investigation."  The prosecutors provide no citation for this claim and with good

12 reason – it mischaracterizes the testimony at trial.  The relevant testimony is as

13 follows:

14      Q: Did you contact Bruce Karatz?

15      A. Yes, I did.

16      Q. And do you recall whether you made a request that the company
           look into this?

17

18      A. I did.  And Bruce told me that the company was already
           conducting an internal investigation.

19      Q. And did he identify who was doing that?

20      A. I don't recall if he did on that call or not, no.

21 Celio Decl., Ex. B at Tr. 2725:18-25. There is no mention of any claim that Mr.

22 Karatz "had already discussed with KB's general counsel the need to initiate such

23 an internal investigation."  The PSR's statement is correct and need not be altered.

24       **7.**    **¶25:**

25       The prosecutors do not object to anything in ¶25, but ask that the PSR

26 include a long statement about what it contends Mr. Karatz allegedly did not tell

27 KB Home's general counsel Ben Hirst.  The problems with the prosecutors'

28 proposed addition are legion.

1   First, there is no citation to evidence supporting any of these claims.  This is

2   for good reason: there is no such evidence.  Ben Hirst did not testify at trial.

3   Having elected not to call Hirst, the prosecutors cannot seek to enhance Mr.

4   Karatz's sentence based on what Hirst allegedly might have said.

5   Second, the notion that Mr. Hirst was unaware of KB Home's options

6   practices is demonstrably false.  The most obvious proof of Mr. Hirst's knowledge

7   comes in the form of emails between Mr. Hirst and his paramour, Kimberly King.

8   Ms. King was for many years as Deputy General Counsel at KB Home, in charge

9   of securities law compliance.  *See, e.g.,* Celio Decl., Ex. I (Trial Exhibit 5977 -

10  Hirst email to King reciting that process by which options were priced).  Numerous

11  exhibits admitted at trial demonstrate that Ms. King was fully familiar with KB

12  Home's practice of picking option grant prices using a lower market price from a

13  prior day, and she so testified.  The prosecutors are aware that Ms. King and Mr.

14  Hirst discussed KB Home's past practices in the confines of their intimate

15  relationship – indeed, they filed a motion to exclude that evidence, which the Court

16  granted.  In the sentencing context, however, they may not ignore these facts.

17  That truth is this:  In 2006, when Mr. Hirst was preparing the so-called Hirst

18  report, Ms. King confirmed in writing that she had told Mr. Hirst on at least four

19  separate occasions about the company's stock option practices.  Mr. Karatz also

20  told Mr. Hirst truthfully that the company looked back a few days in picking grant

21  dates.  This fact is memorialized in plain English in the FBI 302 documenting the

22  FBI's interview with Mr. Hirst.  Mr. Hirst knew this, but he concluded, as Ms.

23  King had, that after 2002 and the passage of the Sarbanes-Oxley Act, there was no

24  "backdating" if the Form 4s were filed on time because picking an option price a

25  day or two in the past was permissible.

26  The prosecutors' proposed additions should be rejected.

27  **8.   ¶26:**

28  The prosecutors object to paragraph 26 because it does not state that Mr.

23

1    Karatz remained silent at certain meetings.  That statement is made explicitly in

2    paragraph 27 and it need not be repeated.

3        **9.**    **¶27:**

4        The prosecutors object to paragraph 27 because it feels that it should be

5    placed before paragraph 26.  We leave the placement of the paragraphs to the

6    discretion of the Probation Office.

7        **10.    Insertion after ¶34:**

8        The prosecutors ask that an entire paragraph be added to reflect their view of

9    an interview of Mr. Karatz in October 2006 by Irell & Manella.  At the interview

10   Mr. Karatz told the investigators that KB used hindsight in connection with its

11   options process.  The prosecutors nonetheless seek to have the interview deemed

12   "relevant conduct" so that they can claim that that Mr. Karatz's conduct covered a

13   period "of nearly five months," Obj. at 2:16, rather than the three days that were

14   actually involved.   But it is difficult to understand how Mr. Karatz's

15   *acknowledgement* of backdating could be part of a scheme to *conceal* backdating.

16       Even if the prosecutors could overcome that logical hurdle, their proposed

17   language should still be rejected because it misstates the record.[13]  The testimony

18   of Daniel Lefler, the attorney who conducted the interview, was among the most

19   controversial in the case.  The prosecutors' recitation of what was said between

20   Mr. Karatz and Mr. Lefler is incomplete and misleading.  For example, the

21   prosecutors state that Mr. Karatz told Lefler that "failing to inform the Audit

22   Committee that he did not remember [the events of 1999 to 2001] was simply an

23   oversight."  Obj. at 9.  But Lefler's memo summarizing the interview reflects

24   something different: it states that when Mr. Karatz read the Hirst Report months

25   earlier "it simply did not register that backdating or hindsight was involved."  *Id.*

26   _____

[13] The prosecutors' proposed language should also be rejected because it is so
27   muddled that it is almost impossible to understand—even for lawyers who tried the
28   case.

1   The prosecutors seek to insert language into the PSR giving the impression that

2   Mr. Karatz not only lied in June of 2006, but lied about lying in October.  But

3   Lefler's memorandum demonstrates that Mr. Karatz said the opposite.[14]  The PSR

4   should not be altered.

5       **11.    ¶40:**

6       The prosecutors object to paragraph 40, and ask that it be stricken, because

7   they contend the PSR incorrectly describes the alleged scheme as having two

8   distinct parts:  (1) the allegation that Mr. Karatz illegally backdated stock options

9   between 1999-2005 and personally profited therefrom; and (2) the allegation that

10  Mr. Karatz engaged in a cover-up in 2006.  But the prosecutors' own submissions

11  to the Probation Office leading up to the PSR made exactly this distinction

12  multiple times.[15]  The PSR cannot be faulted for using the same language that the

13  prosecutors used.  It should not be modified.

14      **12.    ¶43:**

15      The prosecutors object to ¶43 of the PSR because it rejects their claim that

16  the "relevant conduct" in this case includes the conduct underlying the counts on

17  which Mr. Karatz was acquitted.  The prosecutors claim that even though the jury

18  acquitted Mr. Karatz of these counts, the conduct must still be considered – and on

19  that basis Mr. Karatz's sentence should be enhanced 18 levels.  The prosecutors are

20  wrong, as discussed in Section II(B) above.  Paragraph 43 should not be altered.

21

22

---

23  [14] Lefler's testimony was controversial and complex, and any discussion of it
    confuses matters more than it clarifies.  If the Probation Office nonetheless feels

24  that a discussion of the October interview is needed in the PSR, we would request
    the opportunity to submit proposed language.

25  [15] *See* Prosecutors' May 21, 2010 submission to Probation Office at p. 3, where
    the prosecutors twice described the charges this way (charges arose from a scheme

26  that involved "(1) covertly backdating KB Home's executive stock option awards
    between 1999-2005 to enhance their value; and (2) concealing his own backdating

27  practices . . . in the spring and summer of 2006 when serious questions arose
    regarding the integrity of defendant Karatz's prior stock option granting

28  practices.")

1    **13.    ¶50:**

2    The prosecutors object to ¶50 of the PSR because it rejects the massive,

3    multi-million dollar loss amount they seek to impose in this case.  The prosecutors

4    incorporate their substantive arguments by reference; we have responded to those

5    arguments at length in Sections II(B) and II(C) above.  For the reasons discussed in

6    those sections, Paragraph 50 should not be altered.

7    **14.    ¶52:**

8    The prosecutors object to the PSR's findings regarding the scope of the

9    relevant conduct under the Sentencing Guidelines, claiming that the verdict form's

10   reference to "money and property" compels a finding that the loss amount in this

11   case runs into millions of dollars.  As set forth above, however, the prosecutors'

12   argument founders on their own claims to the jury, in which they identified Mr.

13   Karatz's job and potentially future option grants as other forms of money and

14   property he sought to protect.  As set forth in more detail in Section II(C)(1) above,

15   ¶52 should not be altered.

16   **15.    ¶¶53-54:**

17   The prosecutors object to the PSR's findings regarding the scope of the

18   relevant conduct under the Sentencing Guidelines.  For the reasons set forth in

19   Section II(B) above, the prosecutors are incorrect.  Paragraphs 53-54 should not be

20   altered.

21   **16.    ¶¶59-65:**

22   The prosecutors object to these paragraphs because they conclude that no

23   enhancement is appropriate for Mr. Karatz's role in the offense.  For the reasons

24   set forth in Section II(D) above, the prosecutors are incorrect.  Paragraphs 59-65

25   should not be altered.

26   **17.    ¶¶69-70:**

27   The prosecutors object to these paragraphs because they conclude that no

28   enhancement is appropriate for obstructing justice.  For the reasons set forth in

1  Section II(E) above, the prosecutors are incorrect.  Paragraphs 69-72 should not be

2  altered.

3      **18.  ¶103:**

4      Finally, the prosecutors object to ¶103, which describes Mr. Karatz's

5  residence.  The prosecutors do not take issue with the accuracy of the PSR, but

6  seek to include the square footage of the house, the size of the lot it sits on, and

7  some of the amenities that it includes.  The prosecutors' proposed additions appear

8  to be offered in an attempt to embarrass the Probation Office by highlighting the

9  fact that Mr. Karatz has a nice home.  But that fact has no bearing on sentencing,

10  where wealth should be irrelevant.  There is no reason to include the requested

11  information.

12          **IV.   CONCLUSION**

13      The jury acquitted Mr. Karatz of the majority of the charges against him,

14  rejecting the prosecutors' claim that he engaged in a multi-year fraud.  The

15  prosecutors now complain that the Probation Office has declined to undo the jury's

16  findings.  But the Probation Office's findings are well supported in the trial record

17  and in the law – indeed, they are much better supported than the positions the

18  prosecutors now urge.  The Probation Office's careful and accurate report should

19  stand.  The prosecutor's numerous objections should all be denied.

20      Mr. Karatz does not seek special treatment from the Probation Office nor

21  form the Court, nor has he been afforded any.  The sentence that the Probation

22  Office has recommended is within the properly calculated Guidelines range, and is

23  consistent with the sentences imposed upon other corporate executives convicted

24  of similar crimes.

25  Dated:  October 27, 2010          KEKER & VAN NEST LLP

26                  By: */s/ John W. Keker*
                       JOHN W. KEKER
27                     Attorneys for Defendant
                       BRUCE KARATZ
28

27