KEKER & VAN NEST LLP
JOHN W. KEKER, SBN 49092
Email:  JKeker@kvn.com
ELLIOT R. PETERS, SBN 158708
Email:  EPeters@kvn.com
MICHAEL D. CELIO, SBN 197998
Email:  MCelio@kvn.com
710 Sansome Street
San Francisco, CA  94111-1704
Telephone:  (415) 391-5400
Facsimile:  (415) 397-7188

O'MELVENY & MYERS LLP
SRI SRINIVASAN, SBN 205145
Email:  ssrinivasan@omm.com
JONATHAN HACKER
(*pro hac vice pending*)
Email:  jhacker@omm.com
1625 Eye Street, NW
Washington, DC  20006
Telephone:  (202) 383-5300
Facsimile:  (202) 383-5414

CALDWELL LESLIE & PROCTOR, PC
ANDREW ESBENSHADE, SBN 202301
Email:  esbenshade@caldwell-leslie.com
BENJAMIN B. AU, SBN 237854
Email:  au@caldwell-leslie.com
1000 Wilshire Boulevard, Suite 600
Los Angeles, CA  90017-2463
Telephone:  (213) 629-9040
Facsimile:  (213) 629-9022

Attorneys for Defendant Bruce Karatz

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>BRUCE KARATZ,<br><br>Defendant. | Case No. CR No. 09-0203-ODW<br><br>**DEFENDANT BRUCE KARATZ'S SENTENCING MEMORANDUM**<br><br>Dept:        11<br>Judge:       Hon. Otis D. Wright II<br><br>Sentencing Date:  November 10, 2010 |

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ............................................................................. 1

II.   THE COURT SHOULD FOLLOW THE PROBATION
      OFFICE'S RECOMMENDATION ................................................... 2

      A.    The Sentencing Guidelines Support the Proposed
            Sentence ................................................................................ 2

      B.    Section 3553 Supports the Proposed Sentence ..................... 3

            1.    Mr. Karatz has already been extensively punished ................... 4

            2.    The Proposed Sentence would avoid unwarranted
                  sentencing disparities ................................................. 7

            3.    Availability of other sentences ................................... 8

            4.    Mr. Karatz's extraordinary personal character
                  supports the Proposed Sentence ............................... 10

            5.    Nature and circumstances of the offense ................ 18

      C.    Even If the Guidelines Are Calculated Differently, the
            Probation Office's Proposed Sentence Is the Right One .................... 20

III.  CONCLUSION ............................................................................. 21

505505.08

# TABLE OF AUTHORITIES

## Federal Cases

*Gall v. United States*
   128 S. Ct. 586 (2007) ..................................................................................... 2

*Gall v. United States*
   552 U.S. 38 (2007) .......................................................................................... 6

*Nelson v. United States*
   129 S. Ct. 890 (2009) ..................................................................................... 3

*United States v. Adelson*
   441 F. Supp. 2d 506 (S.D.N.Y. 2006) ......................................................... 10

*United States v. Autery*
   555 F.3d 864 (9th Cir. 2009) ....................................................................... 20

*United States v. Booker*
   543 U.S. 220 (2005) ..................................................................................... 20

*United States v. Carty*
   520 F.3d 984 (9th Cir. 2008) ....................................................................... 20

*United States v. Howe*
   543 F.3d 128 (3d Cir. 2008) ........................................................... 10, 13, 14

*United States v. Paul*
   561 F.3d 970 (9th Cir. 2009) ....................................................................... 20

*United States v. Thurston*
   544 F.3d 22 (1st Cir. 2008) ......................................................................... 10

*United States v. Tomko*
   562 F.3d 558 (3d Cir. 2009) (en banc) ....................................................... 10

*United States v. Turner*
   915 F.2d 1574, 1990 WL 150475 (6th Cir. Oct. 5, 1990) ............................ 9

## Federal Statutes

98 Stat. 1987 *et seq.* ......................................................................................... 9

18 U.S.C. § 3553 ..................................................................................... 1, 2, 3

18 U.S.C. § 3553(a) ...............................................................................passim

18 U.S.C. § 3553(a)(2)(A)-(D) ....................................................................... 4

18 U.S.C. §3553(a)(6) ............................................................................... 7, 21

28 U.S.C. § 994(j) ........................................................................................... 8

SENTENCING REFORM ACT OF 1994, 18 U.S.C. § 3551 .......................................... 9

505505.08

# I.   INTRODUCTION

The United States Probation Office has recommended to this Court that Bruce Karatz be sentenced to eight months home confinement, a fine, five years probation, and 2000 hours of community service (the "Proposed Sentence"). We believe that this sentence is the appropriate one under 18 U.S.C. § 3553, and we urge the Court to impose the Proposed Sentence.

The Proposed Sentence is within the guideline range provided by the United States Sentencing Guidelines. Mr. Karatz's Offense Level of 11 and Criminal History Category of I yield a guidelines range of 8 to 14 months. Because Offense Level 11 is within Zone B, Mr. Karatz may be sentenced to probation with a condition of home confinement under §5C1.1(c). A sentence of 8 months home confinement is therefore a "Guideline" sentence.

Even if the Guidelines were to be calculated differently, however, the Proposed Sentence is appropriate for *this* defendant and for *these* offenses for at least three reasons. First, Mr. Karatz has already paid an enormous price for his conduct–having lost his job, having repaid every penny of benefit the government claims he received twenty times over, and having been exposed to public ridicule and scorn. A harsher sentence is simply not necessary to achieve the proper punitive purposes of sentencing. Second, the majority of defendants sentenced for crimes related to stock options "backdating" received no prison term–even though those defendants uniformly were being sentenced for the more serious substantive "backdating" crimes. It would be anomalous for Mr. Karatz, who was acquitted of every one of those counts, to be treated more harshly. Finally, and most fundamentally, Mr. Karatz is a profoundly good man who, even as he succeeded in business, focused his time and talents on helping people in need. The Probation Office's summary says it well:

> **Truly, in the collective 30 plus-year experience of the undersigned Probation Officer and Supervising Probation Officer, this office has never seen such an array of efforts to assist the community . . .**

1

> These letters [submitted on Mr. Karatz's behalf] all note the defendant's support during times of need.  Most notably, the letters describe the involvement of the defendant and reflect a participation that involved much more than mere financial donations. This is not a man who simply shared his wealth. He extensively shared his expertise and time as well.

Docket 422 at 4.  Reviewing the ledger of Mr. Karatz's deeds throughout his lifetime, the extraordinary amount of good that he has done should give him a considerable credit balance.  When the credits and debits are assessed, the sentence the Probation Office recommends results.

As this Court exercises its authority to sentence Mr. Karatz, it has the opportunity to turn the wrongs for which Mr. Karatz was convicted into something positive.  Mr. Karatz now works on a daily basis for yet another worthy community endeavor, Homeboy Industries.  Homeboy's founder, Fr. Gregory Boyle, S.J., describes Mr. Karatz's work there as "transformative." If the Court accepts the Probation Office's recommendation, Mr. Karatz's immense talent and experience will be put to work on behalf of young people who need it badly.

Taking the § 3553 factors together—the Sentencing Guidelines, the price Mr. Karatz has already paid, the sentences imposed in similar cases, and Mr. Karatz's long history of service to his community—we believe that the sentence the Probation Office recommended is the appropriate one.

## II.   THE COURT SHOULD FOLLOW THE PROBATION OFFICE'S RECOMMENDATION

### A.   The Sentencing Guidelines Support the Proposed Sentence

Because the Guidelines are "the starting point and the initial benchmark" for sentencing, the fact that a sentence falls within that range suggests that it is appropriate. *Gall v. United States*, 128 S. Ct. 586, 596 (2007).  Here, the Proposed Sentence falls within the guideline range.

As the Probation Office determined, Mr. Karatz's offenses are properly analyzed under U.S.S.G. § 2B1.1 (2010):

| Base Offense Level | 7 |
| Officer/Director | +4 |
| Total Offense Level | 11 |

Because Mr. Karatz was convicted of securities fraud (and two related counts), § 2B1.1 provides for a base offense level of 7.  Mr. Karatz was an officer of a publicly traded company and was convicted of a violation of the securities laws, so § 2B1.1(b)(17) mandates a four level enhancement.  As the Probation Office found, no other enhancements apply.  As a result, the proper Offense Level under the Guidelines is 11.  As Mr. Karatz has no prior criminal record, he is in Criminal History Category I.  The resulting Guideline range is thus between 8 and 14 months, and is within Zone B.  *See* U.S.S.G. § 5C1.1(c) (2010).  The Probation Office's recommended sentence falls within the Guidelines.[1]

**B.     Section 3553 Supports the Proposed Sentence**

Even if the Sentencing Guidelines counseled a different result, the sentence that the Probation Office has recommended is the correct one, and we respectfully request that the Court explicitly so find.  The required inquiry is "what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a)." *Nelson v. United States*, 129 S. Ct. 890, 891-92 (2009).  The overarching principle in the analysis is that the court "shall impose a sentence sufficient, but *not greater than necessary*, to comply with the purposes [of sentencing]." 18 U.S.C. § 3553(a) (emphasis added).

Here, based on the section 3553(a) factors, the Probation Office's proposed non-custodial sentence is "sufficient but not greater than necessary" to serve the

---

[1] Mr. Karatz separately responded to the government's objections to the PSR in his Response to Prosecutor's Objections to PSR (*See* Docket 437).  The government continues to assert its positions even though the Probation Office has twice considered its arguments and rejected them.  We do not repeat the arguments made in our prior pleadings here, except to say that the Probation Office has independently and thoughtfully considered the issues the government has raised

1   purposes of sentencing in Mr. Karatz's case.  Indeed, as set forth below, the public

2   interest is best served by leveraging Mr. Karatz's skill and energy in community

3   service and philanthropy to improve Los Angeles.

4         **1.     Mr. Karatz has already been extensively punished**

5         Mr. Karatz has already paid a steep price as a result of the events that brings

6   him before the Court.  He has lost his job, has had to pay or forego millions of

7   dollars, and most importantly has suffered a humiliating fall from grace.  Instead of

8   being lauded among the great and the good of Los Angeles, he stands before this

9   Court as a convicted felon.

10         Under Section 3553(a)(2), it is appropriate to make adjustments to a

11   sentence in order to achieve four general purposes of the criminal justice system:

12   (1) just punishment, to ensure that the sentence is commensurate with the

13   seriousness of the offense; (2) general deterrence, to discourage other members of

14   the public from committing the same acts; (3) specific deterrence, to discourage the

15   defendant from committing the same acts again; and (4) rehabilitation, to help the

16   defendant obtain the training or counseling he may need.  *See generally* 18 U.S.C.

17   § 3553(a)(2)(A)-(D).  In Mr. Karatz's case, Proposed Sentence would satisfy all

18   four purposes of sentencing, for the following reasons:

19         The financial and professional penalties Mr. Karatz has already suffered, and

20   the significant publicity that this case and Mr. Karatz's precipitous fall from grace

21   have received, powerfully addresses the objective of general deterrence.  Mr.

22   Karatz gave up his livelihood[2] and more than $200 million of vested benefits when

23   he was forced out as CEO of KB Home.  As the Probation Office determined, Mr.

24   Karatz fully disgorged to KB Home the over $6 million he allegedly gained

25   through the pricing of the KB stock options.  He also entered into a settlement

26   ──────────────────────────────

    and resolved them correctly.

27   [2]  In addition to losing his job running a company that he had worked at for over

28   thirty years, Mr. Karatz agreed to be barred from working as an officer or director
    of a publicly traded company for 5 years as part of his settlement with the SEC.

505505.08

1  agreement with KB Home where he agreed to give up his right to over three

2  million vested stock options, which at the time he left the company had an

3  approximate value of nearly $50 million.  In addition, he relinquished nearly 1.4

4  million shares of KB Home stock with a value of over $65 million at the time of

5  his departure and released KB Home from his rights to a $62 million payment and

6  other benefits called for in his employment agreement.  Taken together, Mr. Karatz

7  relinquished the legal right to more than $200 million as a direct result of the

8  allegations against him, the vast majority of which had nothing whatsoever to do

9  with the conduct alleged in this case.  The loss of $200 million is a harsh

10  punishment, and sends a message sufficient to serve the purposes of general

11  deterrence.

12  As painful as the financial and professional consequences have been, it is the

13  fact of his indictment, trial, and conviction that provides the greatest deterrent

14  effect here.  Mr. Karatz and his family have already been punished as a

15  consequence of the investigation and public trial, in which his standing in the

16  community has been irreparably damaged.  Moreover, Mr. Karatz will forever be

17  grouped with others convicted of "white collar crimes"–but those defendants, unlike

18  Mr. Karatz, harmed their companies and the people who invested in them.  As the

19  Probation Office concluded, "This case will likely be lumped into a group of high

20  profile cases which all share a common thread of white collar malfeasance. Unlike

21  other such cases, however, there is no evidence that the company, or its

22  shareholders, suffered any actual significant financial damage as a result of the

23  defendant's actions." Docket 422 at 5.  This has nothing to do with the calculation

24  of "loss amount" under the Sentencing Guidelines, but instead goes to something

25  much more fundamental.  Unlike those defendants whose crimes hurt their

26  company or their investors, Mr. Karatz's actions throughout his long tenure as CEO

27  did nothing but help KB Home and its investors.  That the public will now

28  wrongfully believe the opposite is true is a punishment that will pain Mr. Karatz

for the rest of his life.

Finally, the Proposed Sentence calls for Mr. Karatz to be monitored with an ankle-mounted GPS receiver during his period of home confinement, the most restrictive of the available forms of monitoring. This is a restraint on Mr. Karatz's liberty. Indeed, the Supreme Court has recently recognized that even probation has considerable punitive effect and greatly restricts a convicted person's liberty. *See Gall v. United States*, 552 U.S. 38, 48-49 (2007). Thus, the public interest in having a just punishment is satisfied.

Mr. Karatz has no prior criminal record, presents no danger to the community, and has no likelihood of recidivism. It is exceedingly unlikely he will ever work for a public company again, so he is unlikely to be in a position to violate the securities laws. No further specific deterrence is required. Nor does Mr. Karatz require "educational or vocational training, medical care, or other correctional treatment" as contemplated by §3553(a)(2)(D). Under the circumstances, a sentence of imprisonment would be "greater than necessary" to comply with the purposes of sentencing, and the public interest would not be advanced by such a sentence. The public interest would be better served by, and would benefit from, a sentence of carefully supervised, intensive community service, as has been proposed.

Indeed, the recent amendments to the Guidelines specifically suggest that home detention is often appropriate for older defendants like Mr. Karatz, and that the Court can consider whether a sentence *below* the applicable Guideline range is appropriate. *See* USSG §5H1.1. The new Guidelines state: "Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration." *Id.* The Proposed Sentence here does not require a downward departure as it is already within the Guidelines range. Section 5H1.1 provides further support for the Proposed Sentence.

505505.08

## 2. The Proposed Sentence would avoid unwarranted sentencing disparities

Another factor supporting the Proposed Sentence is the fact that so few other 'backdating' defendants have received custodial sentences. Mr. Karatz is the latest and likely one of the last defendants to be sentenced in a long string of backdating cases. A principal function of the Guidelines is to bring uniformity to federal sentencing and section 3553(a) also places an emphasis on avoiding unwarranted sentencing disparities. *See* 18 U.S.C. §3553(a)(6).

As we have explained in our prior filings, a review of the sentences received by others charged with crimes associated with stock option pricing shows that the Proposed Sentence is not out of the ordinary. Eleven individuals nationwide have faced sentencing for conduct relating to the pricing of employee stock options. A *majority* of those sentenced (six of the eleven) received no prison time and were sentenced to terms of probation ranging from one to five years. *See* Declaration of Michael D. Celio ('Celio Decl.'), Ex. A.

The other defendants that received non-custodial sentences have much in common with Mr. Karatz. Two of the individuals receiving probationary sentences were, like Mr. Karatz, the chief executive officers of their respective companies (Michael Shanahan of Engineered Support Systems and Ryan Brant of Take Two). The other defendants who received probation were directly involved with stock options process: two general counsels, a chief accounting officer and a corporate controller. None of them were low-level 'paper-pushers' — each was a corporate officer with direct responsibility for the legal and accounting consequences of their companies. Setting Mr. Karatz apart from those other defendants, however, is the fact that he was *acquitted* of *all* counts concerning the backdating of stock options.

Only five individuals nationwide have been sentenced to prison for options pricing-related conduct. The shortest custodial sentence was two months (Stephanie Jensen of Brocade) and the longest was two years (James Treacy of

DEFENDANT BRUCE KARATZ'S SENTENCING MEMORANDUM
CASE NO. CR 09-203-ODW

505505.08

Monster, Inc).  No one has ever received the type of sentence that the government claims is justified here.

Further, these sentences do not take into account the hundreds of instances in which the United States Attorneys Office and the SEC have elected not to prosecute individuals for similar conduct.  In a recent study published in August 2009, researchers at the University of Houston's Bowers College of Business concluded that "approximately 800 companies engaged in backdating, of which at least 500 are still undisclosed." Celio Decl., Ex. B at 2 (emphasis added).  Against this backdrop, a Guidelines sentence for Mr. Karatz (as recommended by the Probation Office) is appropriate.

**3.     Availability of other sentences**

Section 3553(a)(3) requires consideration of the "kinds of sentences available" for a particular offense, including alternatives to imprisonment so that the sentencing court can determine whether a sentence of incarceration is in the best interest of society.  In this case, society would be better off with Mr. Karatz continuing his charitable work under a sentence of home detention, as the Probation Office has recommended.

One purpose of the Sentencing Reform Act was to ensure that the Sentencing Guidelines "reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or otherwise serious offense, and the general appropriateness of imposing a term of imprisonment of a person convicted of a crime of violence that results in serious bodily injury." 28 U.S.C. § 994(j).  In other words, Congress sought to require courts to scrutinize whether incarceration is required in the case of non-violent first-time offenders like Mr. Karatz.  This scrutiny is necessary to "ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society." SENTENCING REFORM ACT OF 1984 § 239 (Public

8

Law No. 98-473, S§ 211-239, 98 Stat. 1987 *et seq.*).

Congress has recognized that non-custodial punishments involving community service benefit society rather than unnecessarily consume taxpayer resources on incarceration. *See* SENTENCING REFORM ACT OF 1994, 18 U.S.C. § 3551. And courts have recognized community service to be a "burdensome penalty that meets with widespread public approval, is inexpensive to administer... produces public value ... and ... can to a significant extent be scaled to the seriousness of crimes." National Institute of Justice, *Intermediate Sanctions in Sentencing Guidelines*, May 1997. Community service is particularly well-suited for those defendants, such as Mr. Karatz, who have exhibited historically a long-term commitment to service throughout their lives (detailed below) and for whom incarceration would go against the public interest. *See, e.g.*, *United States v. Turner*, 915 F.2d 1574, 1990 WL 150475, at *4 (6th Cir. Oct. 5, 1990) ("It seems ill-conceived to deprive the ... community of [defendant's] service by sentencing him to prison when other means of punishment are available.").

The Probation Office's Proposed Sentence would better serve the interests of justice and the interests of the City of Los Angeles. It would allow a person of extraordinary skill to continue to serve the people of Los Angeles. The Proposed Sentence includes a substantial, 2,000 hour community service requirement. As discussed more fully below, Mr. Karatz is currently working on a daily basis at Homeboy Industries, where his expertise and business acumen have been invaluable.

In its pre-sentence investigation, the Probation Office took special care to evaluate Mr. Karatz's contributions to the community so that it could fairly evaluate whether a sentence that involved community service would be appropriate. As the Probation Office wrote:

> In making an evaluation of the defendant's overall character, the Probation Officer has been careful to focus on the extent and substance of the benefit to the community at large resulting from the

9

505505.08

defendant's endeavors. **This benefit is viewed as profound**.

Docket 422 at 4 (emphasis added).  The Proposed Sentence has the virtue of keeping (and indeed enforcing) Mr. Karatz's presence at Homeboy.  A custodial sentence would, by removing Mr. Karatz from Homeboy, have the collateral effect of punishing the young people Mr. Karatz is helping.

### 4.    Mr. Karatz's extraordinary personal character supports the Proposed Sentence

Mr. Karatz's personal history and character strongly supports the proposed sentence. "[S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *United States v. Adelson*,  441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006); *see also United States v. Tomko*, 562 F.3d 558, 572 (3d Cir. 2009) (en banc) (affirming the grant of a downward variance under section 3553(a) based in part on letters written on the defendant's behalf indicating that he "performed pre-indictment charitable acts that involved not only money, but also his personal time").

Mr. Karatz's long history of good works supports the Guidelines sentence recommended here.  Indeed, courts routinely exercise their discretion to issue sentences *significantly below* the Guidelines advisory range where a defendant has exhibited a lifelong commitment to community service and good works.  *See, e.g.*, *United States v. Thurston*, 544 F.3d 22, 26 (1st Cir. 2008) (sentencing defendant to 3 months imprisonment, notwithstanding Guidelines range of 63 to 78 months, based on his "charitable work, community service, generosity with time, and spiritual support and assistance to others").  *Accord United States v. Howe*, 543 F.3d 128, 137-38 (3d Cir. 2008) (sentencing defendant to 2 years probation, no fine, and no forfeiture, despite Guidelines range of 18 to 24 months, based on similar factors).  Here, Mr. Karatz does not seek to be sentenced below the Guidelines range, but instead simply at the low end of that range, as the Probation Office

1   recommended.

2          Mr. Karatz has led an exemplary life.  He has actively volunteered his time,

3   expertise, and energies, as well as contributing money to virtually every important

4   civic cause to have arisen in Los Angeles in the last thirty years—long before this

5   case factored into Mr. Karatz's life.  Moreover, his service has never been limited to

6   monetary donations, as is too often the case with executives of his stature.  Mr.

7   Karatz has, time and time again, rolled up his sleeves and worked actively to

8   benefit the causes he has adopted.  The numerous letters from Mr. Karatz's family,

9   friends, colleagues, employees, and community leaders describe in vivid detail Mr.

10  Karatz's integrity, his commitment and dedication to his family, his former

11  company, and his community, and his compassion for and generosity towards

12  those in need.

13                        **a.      Family**

14         Before turning to Mr. Karatz's contributions to the community, it is

15  important to place Mr. Karatz in the context of his life outside this case.  The Court

16  has observed Mr. Karatz for many months and has heard a great deal about the

17  events that bring him before the Court.  That, of course, is but one small part of

18  who Mr. Karatz is.

19         Bruce Karatz, now 65, was born in Chicago, Illinois to a hard-working,

20  middle-class family, and was raised in Minneapolis, Minnesota.[3]  Following

21  graduation from high school, Mr. Karatz headed east to attend Boston University

22  where he worked in-between classes and during summers to finance his college

23  education.  He graduated in 1967 and moved again, this time to California where

24  he matriculated at the University of Southern California School of Law.  It was

25  during those years that Mr. Karatz began to make a home for himself in Southern

26  _____

27  [3] As noted above, recent amendments to the Guidelines allow the Court to consider
    the defendant's age  in determining whether a sentence *below* the applicable
    Guideline range is appropriate. *See* USSG §5H1.1.  Here, of course, the Proposed

28  Sentence is within the Guidelines.

California, putting down roots and starting his own family.  He married Janet Dreisen Rappaport in 1968, beginning a partnership that would span thirty-two years.  When Mr. Karatz graduated from USC Law in 1970, he did so as a husband and father to his first-born, Elizabeth.  A second child, Matthew, followed the next year.  Teddy, Mr. Karatz's youngest child, was born while he was heading KB Home's France division.

Mr. Karatz is now married to Lilly Tartikoff who has two children, Lizzy (15 years old) and Calla (27 years old).  Lizzy lives with Mr. Karatz and Lilly, while Calla stays often at their home but has her own apartment.  Calla is seriously disabled due to injuries sustained in a car accident as a young girl, and requires 24-hour care, 7 days a week.  Mr. Karatz has had an active role caring for his new family with Lilly, and continues to have a close relationship with his former wife, his three adult children, his grandchildren, as well as his father Robert (90 years old) who lives in Phoenix, Arizona, and his brother Robert (61 years old) who is in Los Angeles.

### b.      Community Service

Perhaps the best measure of Mr. Karatz is the chorus of letter-writers who have come forward to speak on his behalf and to testify to his many years of good works.  Many defendants present letters of support at sentencing, but the letters on behalf of Mr. Karatz are unique.  They come from people from all walks of life, from diverse religions, races and creeds, but each describes a man who has given selflessly of his time and treasure for decades.  These letters make one thing clear:  Mr. Karatz is a deeply good man.

As noted above, the Probation Office reviewed just a fraction of these letters, and came to a conclusion worth repeating: "Truly, in the collective 30 plus-year experience of the undersigned Probation Officer and Supervising Probation Officer, this office has never seen such an array of efforts to assist the community as that reflected by the numerous letters of support that were submitted on behalf

of the defendant to the Probation Office. These letters all note the defendant's support during times of need.  Most notably, the letters describe the involvement of the defendant and reflect a participation that involved much more than mere financial donations. This is not a man who simply shared his wealth. He extensively shared his expertise and time as well." Docket 422 at 4.

Just a sampling from those letters follows:

- Mr. Karatz learned that Homeboy Industries, a non-profit organization focusing on the rehabilitation and community integration of former gang members, was in dire financial straits.  After discussing Homeboy's needs with its founder, Fr. Gregory Boyle, S.J., Mr. Karatz threw his full energy into assisting Homeboy.  He and Fr. Boyle are spearheading a fundraising drive to raise more than $5 million from foundations and individual contributors, and he has participated in an *ex officio* capacity as an advisor to Homeboy's Board. Mr. Karatz has contributed $125,000 to Homeboy and also made a signed commitment to contribute another $1 million of his own funds.  Mr. Karatz's work has already reaped tangible rewards for Homeboy's mission.  As Fr. Boyle writes, "His contribution is, frankly, like no other, and has already helped us return 100 of our laid-off employees and trainees to this place of hope and bright promise." Appendix, Tab 6.

- Mr. Karatz helped form a committee called the Alliance for a Safer LA to modernize the Los Angeles Police Department.  In that capacity, Mr. Karatz personally raised money to install computers in every LAPD precinct.  A fellow member of that committee, Ronald Rogers, writes: ". . . Mayor Riordan asked Mr. Karatz to quickly step in to fill a void in city funding.  The Los Angeles Police Department was facing serious issues affecting its ability to fight crime . . . . Mr. Karatz quickly jumped in, formed The Mayor's Alliance For A Safer L.A. with a small group of community activists and business leaders and within a short time had raised more than $16 million to address many of these issues." *Id.* at Tab 52.  That effort eventually led to the founding of the L.A. Police Foundation.

- Mr. Karatz worked with civic leaders in an organization called Rebuild LA, which was a non-profit corporation formed after the civil unrest in 1992 by Mayor Tom Bradley and Governor Pete Wilson to restore the health and vitality of Los Angeles.  Danny Bakewell, Sr.,

who served on Rebuild LA with Mr. Karatz, writes, "I saw, first hand Bruce's dedication and commitment to doing everything he could to help rebuild those areas impacted by the civil unrest." *Id.* at Tab 2.

- Putting quality housing within reach for working people has always been a cause Mr. Karatz championed.  As Senator John L. Burton (Ret.) writes, "[I]n 2002 Bruce was instrumental in the passage of Senate Bill 1227, which placed on the ballot a bond measure providing financial help for the construction of housing for low-income people, university students, farm workers, the disabled and needy seniors . . . Even after he left KB Home, Bruce was instrumental in raising funds for successful campaigns for affordable housing . . . [this] was [] an indication of his belief that all people in the state should have decent, affordable housing." *Id.* at Tab 9.

- After he left KB Home, Mr. Karatz started the Keep Your Home Foundation, which works to help people avoid foreclosure on their homes.  In a letter to the Court, Lori Gay, the President and CEO of Los Angeles Housing Services, writes, "Through his sponsorship, [Center for Foreclosure Solutions] has been able to continue to assist thousands of families to remain in their homes and to obtain more affordable loan products. . . . Mr. Karatz's support has been immeasurable, and he has proven to be a man of character, integrity, and a true supporter . . . . His readiness to assist in these difficult times helps families realize and maintain their dreams of affordable homeownership and improved quality of life." *Id.* at Tab 24.

- In addition to serving the Los Angeles community as a whole, Mr. Karatz has also taken a very active leadership role in his place of worship.  Mr. Karatz served as the President of the Wilshire Boulevard Temple, one of the largest synagogues in Los Angeles, and continues to be part of the Temple's leadership, including devoting time and energy to the Temple's current capital campaign.  Rabbi Leder of the Wilshire Temple writes this about Mr. Karatz's devotion to the Temple and its membership: "For 25 years Wilshire Boulevard Temple has looked to Bruce Karatz for leadership and found it.  For a quarter of a century Bruce has helped our congregation with everything from leading the search to find a new Senior Rabbi 25 years ago, to serving as a Trustee and eventually as the President of Wilshire Boulevard Temple-an historic and time consuming volunteer position within the Los Angeles Jewish community . . . . He did so at the height of his business career when he was working 15 hour days and traveling extensively.  Over the years Bruce has given literally

14

thousands of hours of time to his synagogue and its clergy." *Id.* at Tab 39.

Mr. Karatz's service to his community extended to his vision for KB Home, which stood out among industry peers as not just a profitable company, but also as a socially-conscious one:

- Mr. Karatz made a commitment to help rebuild New Orleans after Hurricane Katrina when no other major homebuilder would do so, in an effort to be a catalyst to bring other business to the ravaged city. KB Home thus became the first, and at the time only, national homebuilder to join the effort there. Former Mayor of New Orleans Ray Nagin writes, "I saw him respond to a national tragedy that brought hope to many here in New Orleans . . . . He wanted to be a catalyst for other companies to help us survive. I met and came to know a compassionate, caring business executive . . . . I will always be grateful for the attention Bruce Karatz paid to us at our time of need. He is more than a successful CEO. He is a man who has deep concern for those less fortunate than he and he is a man who acts on that compassion." *Id.* at Tab 47.

- As Henry Cisneros, former Secretary of Housing and Urban Development, writes, "I met Bruce in Los Angeles in 1994 after the Northridge earthquake  . . . Many homes and multi-family apartment buildings were destroyed and thousands of people were suddenly left homeless . . . [Mr. Karatz] stepped up and immediately had KB Home working to provide homes for these people.  Bruce genuinely cared. I suspect few ever knew the role Bruce played in helping them to have a new roof over their heads." *Id.* at Tab 11.

Mr. Karatz's leadership also extends to community organizations, having served on the boards of many.  Those organizations include, the YMCA of Metropolitan Los Angles;  DARE America, a non-profit that works to reduce drug use among America's youth;  Children's Institute International, a non-profit that specializes in the treatment and prevention of child abuse and neglect; and the Rape Treatment Center, which provides assistance to victims of sexual abuse and violence.

What is set forth above is but a sampling of Mr. Karatz's commitment to his

community and the well-being of those less fortunate than he has been.  We have submitted with this memorandum more than fifty letters about Mr. Karatz.  These letters come from people from all walks of life; from the rich and the poor, the powerful and the powerless, from business competitors and colleagues, from mentors and subordinates.  Despite their diverse sources, they all strike a common chord:  if there was a problem, large or small, Mr. Karatz would help solve it.  Whether it was a personal crisis for an individual employee, or an entire city that needed help building schools, he would make himself available–not just with money, but with time and experience.  It is not uncommon for the wealthy to be generous–and Mr. Karatz is surely generous–but it is incredibly rare for an individual to give of himself as Mr. Karatz has.

### c.       Business Leadership at KB Home

Mr. Karatz's devotion to service has helped an incredible number of people.  It is possible that he helped even more people by providing them good jobs at KB Home, which enjoyed its best years under his stewardship.  Mr. Karatz joined Kaufman & Broad, KB Home's predecessor, two years after graduating from law school in 1972, as an associate general counsel.  He soon realized, however, that he wanted to work in KB Home's core business and help build the houses that would become people's homes.  He transitioned out of his legal capacity and into Kaufman & Broad's land acquisition and entitlement division.  Mr. Karatz was quickly recognized for his work ethic and business instincts, and was promoted to head the company's French division where he fostered its growth into one of France's largest homebuilders.  After that successful stint, Mr. Karatz returned to Los Angeles in 1981 and was named KB Home's Chief Executive Officer in 1985, and the Chairman of its Board in 1993.

Mr. Karatz accomplished a tremendous amount on behalf of KB Home's shareholders and employees.  Eli Broad, KB Home's founder and former Chairman, recalls that "in the many years that we worked together, I was involved in thousands

of decisions Bruce made.  His judgments were based on what was right for the company, not for himself." Tab 7.  Indeed, as a product of those keen judgments, the company's growth skyrocketed according to every industry metric while Mr. Karatz was at its helm:

- Mr. Karatz led KB Home through a remarkable period of growth, doubling shareholder value many times over, consistently out-performing the homebuilding sector, and providing thousands of jobs.

- The number of KB employees grew fourteen-fold, jumping from five hundred in 1986 to over seven thousand in 2006.

- KB Home's revenue increased twenty-fold from $491 million in 1986 to $11 billion in 2006.

- The number of homes KB Home built increased nine-fold, jumping from 4,327 homes in 1986 to 39,013 homes in 2006.

- KB Home's stock price skyrocketed from $6.06 on November 10, 1986 to $45.40 on June 30, 2006, not accounting for stock splits.

Mr. Karatz's contributions to KB Home, however, were more than just economic.  As described in letters from his former colleagues and employees, Mr. Karatz cared deeply about the development and well-being of the employees of KB Home, taking the time to mentor others and lead by the example of his business integrity.  He also fostered an environment of transparency at the Company.

- As Dominic Cecere, KB Home's Chief Financial Officer from 2002 to 2008 writes, "Mr. Karatz told me directly, more than once, that we hide nothing from our Board.  I always felt comfortable that I was allowed to fully express my opinion in these meetings and was never reprimanded for providing my thoughts on any subject being discussed in these meetings." Tab 10.

- As described in the letter from Dr. J. Zink, *id.* at Tab 63, Mr. Karatz initiated Round Table meetings to address and treat mental health and personal issues facing KB Home executives.  Dr. Zink writes, "[o]ver the years, and at his own expense, Bruce asked me to speak on the

17

subjects of children and marriage to a number of groups including the executives and Board of Directors of KB Home.  He did this not to improve the 'bottom line' but to help the people for whom he cared."

- Jana Waring Greer, a former member of Kaufman & Broad's management, recalls that "[Bruce's] commitment to diversity, equality and the advancement of women during his tenure as CEO of KB Home was exemplary . . . [He] always had an open-door policy . . . he knew all of his business colleagues and employees by their first names, knew their spouses, and cared to inquire about their children[.]" *Id.* at Tab 28.

- Derrick Hall, a former executive at KB Home, echoes this view of Mr. Karatz's relationship with his co-workers: "He treated his leadership team like family and served as a mentor for so many of us.  We respected him for being a man of decency, honesty, and integrity.  KB Home came first, and he gave his heart and soul to the company."  Moreover, Mr. Hall echoed the sentiments of others regarding Mr. Karatz's concern for KB Home's customers.  According to Mr. Hall, "[Mr. Karatz] cared immensely for the communities where he built homes, as well as the buyers who lived in them . . . who were for the most part first-time buyers.  He wanted that experience to be stress-free and hassle-free and one of pride." *Id.* at Tab 29.

In a testament to Mr. Karatz's strong leadership, KB Home received numerous accolades from the business world during his tenure.  Among them, in 2004, the Company received the American Business Award for Best Overall Company.  Fortune Magazine recognized KB Home as "One of America's Most Admired Companies" in 2006.

As the Court considers the appropriate sentence for Mr. Karatz, we respectfully submit that it is against this record that Mr. Karatz's offense should be weighed.

### 5.    Nature and circumstances of the offense

The Court must, of course, consider the conduct of which Mr. Karatz was convicted against his decades of service and good character.  Giving credence to the jury's *entire* verdict supports the Proposed Sentence.  The jury acquitted Mr. Karatz of all counts pertaining to the 'backdating' itself.  In acquitting Mr. Karatz of

18

505505.08

1   these sixteen counts, the jury rejected the government's core theory that Mr. Karatz

2   had improperly profited from the illegal awarding of stock options.[4]   Rather, the

3   verdict signified the jury believed that Mr. Karatz did not, as the government

4   alleged, seek to enrich himself over a period of years.

5          The three counts of conviction arise from a failure to disclose adequately all

6   facts about the Company's historical option-granting practices when issues arose in

7   June and early July 2006.  While perhaps not laudable, it is conduct far removed

8   from what the government accused him of committing.  Most importantly, this

9   conduct caused no loss to anyone and did not enrich Mr. Karatz.  Indeed, Mr.

10  Karatz offered to repay any amount associated with irregularities in the option-

11  granting process during the summer of 2006–and ultimately did repay it and more.

12  If the jury's verdict is to be taken seriously, which it must, it is important to

13  recognize that the jury convicted Mr. Karatz of not telling the truth about conduct

14  that it concluded was not criminal and from which he did not profit.[5]

15         Finally, it bears noting that no witness testified that they were harmed by

16  Mr. Karatz's actions.  While the parties disagree about the legal significance of this

17  fact, for sentencing purposes it supports the Proposed Sentence.  The Court is well

18  familiar with the many cases in which corporate malfeasance ruins investors.  This

19  is *not* such a case; to the contrary, Bruce Karatz enriched his shareholders

20  immensely.

21         In short, the jury acquitted Mr. Karatz's of engineering a multi-year scheme

22  to enrich himself.  It convicted him only of being untruthful when he was

23  questioned about this legal conduct.  It is this crime, the crime of which he was

24

---

25  [4] One juror, quoted in the Los Angeles Times after the verdict stated that he "hoped
26  that the judge would give Karatz probation and a big fine, but not jail time."  *See*
    Celio Decl., Ex. C.

27  [5] One of the jurors was quoted in the Los Angeles Times stating that Karatz was
    responsible for the cover-up but not for the underlying conduct: "There was no
28  evidence that he planned it, but he certainly covered it up. . . If he had just said, 'I
    did it, I didn't realize it was wrong'. . .there never would have been a trial."  *Id.*

19

505505.08

convicted, for which he must be sentenced.

**C.    Even If the Guidelines Are Calculated Differently, the Probation Office's Proposed Sentence Is the Right One**

The PSR in this case correctly calculates the Guidelines range.  If, however, the Court disagrees with the Probation Office's calculation, the Guidelines range would significantly overstate the seriousness of the offense.  As a result, we respectfully request that the Court exercise its broad discretion to enter a below-Guidelines sentence of probation and home detention pursuant to section 3553(a).  And in any event, we respectfully request that this Court explicitly hold that the sentence recommended by the Probation Office is the one that the Court would impose regardless of how the Guidelines are calculated.

The Sentencing Guidelines are only "one factor among the § 3553(a) factors that are to be taken into account in arriving at an appropriate sentence." *United States v. Carty,* 520 F.3d 984, 991 (9th Cir. 2008) (citing *Kimbrough v. United States,* 552 U.S. 85, 128 S.Ct. 558, 570, 169 L.Ed.2d 481 (2007)).  In weighing the section 3553(a) factors, "the Guidelines factor [may not] be given more or less weight than any other.[6]  So while the Guidelines are the starting point and initial benchmark and must be kept in mind throughout the [sentencing] process, the Guidelines range constitutes only a touch-stone in the district court's sentencing considerations." *United States v. Paul,* 561 F.3d 970, 974 n.3 (9th Cir. 2009) (quotation marks omitted, alterations in original).

Even if the Guidelines were calculated as the government contends they should be, the Court nonetheless has the authority to impose the sentence that the Probation Office has recommended.  As explained above, each non-Guidelines

---

[6] Since the Supreme Court held that the Guidelines are no longer mandatory; *see United States v. Booker,* 543 U.S. 220, 244-46 (2005); courts factor them into the overall analysis under section 3553(a) rather than rely on them.  *See United States v. Autery,* 555 F.3d 864, 872 (9th Cir. 2009) (noting that courts are tasked with making individualized assessments under section 3553(a) with the Guidelines as but one factor).

20

factor under Section 3553(a) points squarely in the direction of the Proposed

Sentence and thus weighs strongly in favor of a variance that would achieve such a

sentence.  Of particular significance, the government claims that the Guidelines

sentence is between 168 and 210 months–even though no defendant has *ever*

received a sentence of over two years for options-related conduct.  *See* 18 U.S.C. §

3553(a)(6).  Moreover, accepting the government's proposed sentence would

preclude Mr. Karatz from carrying on the good works that have been (and continue

to be) so crucial to the community.  A sentence of the sort the government

proposes simply would not serve any valid sentencing function.  In contrast, for the

reasons explained, the Proposed Sentence would be "sufficient, but not greater than

necessary," to promote sound sentencing policy.  18 U.S.C. § 3553(a).

For those reasons, even if the Court were to conclude that the Proposed

Sentence falls outside the applicable Guidelines range, we respectfully request that

the Court exercise its discretion to vary from the Guidelines and impose a non-

Guidelines sentence.  This would be consistent with the Sentencing Commission's

own guidance as well as notions of fairness and proportionality to the convicted

crime.

### III.   CONCLUSION

We respectfully request that the Court sentence Mr. Karatz as the Probation

Office recommends.  The proposed sentence is "sufficient, but not greater than

necessary" under section 3553(a).  Every factor under section 3553(a) counsels

against a significant term of imprisonment, and the public interest is best served

with Mr. Karatz in a capacity to continue to do important work on behalf of Los

Angeles.  We respectfully further request that the Court consider sentencing Mr.

Karatz to perform the community service component of his sentence at Homeboy

Industries, where he is currently serving to mentor, counsel, and raise funds for

over twelve thousand clients, including former gang members and recently-

released felons as they attempt to work and lead productive lives as law-abiding

1   citizens.  By serving his sentence in service to the Los Angeles community and

2   those whose lives have been impacted by the criminal justice system, we

3   respectfully submit that the goals of sentencing will be achieved.

4

5   Dated:  November 5, 2010                    KEKER & VAN NEST LLP

6

7                                      By: */s/ John W. Keker*

8                                          JOHN W. KEKER
                                           Attorneys for Defendant
9                                          BRUCE KARATZ

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

505505.08